E-filing

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name  HOLDER                    KEITH
           (Last)                  (First)              (Initial)

3
   Prison Number  E87291

4
   Institutional Address  P.O. BOX 689 – FW233

5
                          SOLEDAD, CA 93960

6  ==================================================================

7              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

8  KEITH HOLDER                          )
   (Enter the full name of plaintiff in this action.)  )

9                                        )          CV 08        672
                    vs.                  )
10 Case No.                              )
                                         )          Case No.
11 BEN CURRY, WARDEN                     )          (To be provided by the Clerk of the Court)
                                         )                              CW
12                                       )          **PETITION FOR A WRIT**
                                         )          **OF HABEAS CORPUS**
13                                       )                              (PR)
                                         )
14 (Enter the full name of respondent(s) or jailor in this action)  )

15 ==================================================================

16              **Read Comments Carefully Before Filling In**

17 **When and Where to File**

18        You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as the

22 loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located.  If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution in

28 which you are confined.  Habeas L.R. 2254-3(b).

1   Who to Name as Respondent

2          You must name the person in whose actual custody you are.  This usually means the Warden or

3   jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced.  These are not proper respondents.

5          If you are not presently in custody pursuant to the state judgment against which you seek relief

6   but may be subject to such custody in the future (e.g. detainers), you must name the person in whose

7   custody you are now and the Attorney General of the state in which the judgment you seek to attack

8   was entered.

9   A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

10         1.   What sentence are you challenging in this petition

11                (a)     Name and location of court that imposed sentence (for example, Alameda

12                        County Superior Court, Oakland):

13

14                Superior Court of Los Angeles          Los Angeles, California

15                        (Court)                                (Location)

16                (b) Case number, if known    SA003399

17                (c) Date and terms of sentence    Seven Years To Life

18                (d) Are you now in custody serving this time?  (Custody meaning being in jail,

19                on parole or probation, etc.)              Yes  X          No

20                Where?

21                Name of institution:    Correctional Training Facility

22                Address:    P.O. Box 689, Soledad, CA 93960

23         2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   Penal Code Section 209.

27

28

3. Did you have any of the following?

      Arraignment:                  Yes __X__      No _____

      Preliminary Hearing:       Yes __X__      No _____

      Motion to Suppress:        Yes _____      No _____

4. How did you plead?

      Guilty_____    Not Guilty __X__   Nolo Contendere _____

      Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

      Jury __X__      Judge alone _____    Judge alone on transcript_____

6. Did you testify at your trial?           Yes _____      No _____

7. Did you have an attorney at the following proceedings:

    (a)      Arraignment             Yes __X__      No _____

    (b)      Preliminary hearing      Yes __X__      No _____

    (c)      Time of plea            Yes _____      No _____

    (d)      Trial                    Yes __X__      No _____

    (e)      Sentencing              Yes __X__      No _____

    (f)      Appeal                 Yes __X__      No _____

    (g)      Other post-conviction proceeding    Yes __X__      No _____

8. Did you appeal your conviction?        Yes __X__      No _____

    (a)      If you did, to what court(s) did you appeal?

              Court of Appeal            Yes _____      No __X__

              Year: _____        Result: _____

              Supreme Court of California     Yes _____      No __X__

              Any other court            Yes _____      No __X__

    (b)      If you appealed, were the grounds the same as those you are raising in this

1    Petition?                                          Yes _____    No __X___

2    Was there an opinion?                              Yes _____    No __X___

3    (c)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                       Yes _____    No _____

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, application or motions with

9    respect to this conviction in any court, state of federal?    Yes _____    No __X___

10    [Note; if you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding.  Attach extra paper if you need more space.

18    I.    Name of Court:  Superior Court of Los Angeles _____

19    II.    Type of Proceeding:  Habeas corpus _____

20    Grounds raised (Be brief but specific):

21    a. Same as enclosed. _____

22    b._____

23    c._____

24    d._____

25    Result: _____ Date of Result:_____

26    II.    Name of Court:  Calif. Court of Appeals _____

27    Type of Proceeding:  Habeas Corpus. _____

28    Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS                    - 4 -

1    a. Same as enclosed.

2    b.

3    c.

4    d.

5    Result: _____ Date of Result:_____

6    III.    Name of Court: Supreme Court of California.

7    Type of Proceeding:  Petitioner for Review.

8    Grounds raised (Be brief but specific):

9    a. Denial of liberty interests under state and federal due process statutes.

10    b. Some evidence standard.

11    c.

12    d.

13    Result: _____ Date of Result:_____

14    IV.    Name of Court: N/A

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a.

18    b.

19    c.

20    d.

21    Result: _____ Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____      No  X

24    Name and location of court: _____

25    B.  GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27    support each claim.  For example, what right or privilege were you denied?  What happened?  Who

28    made the error?  Avoid legal arguments with numerous case citations.  Attached extra paper if you

1   need more space.  Answer the same questions for each claim.

2       [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One:  See attached. _____

6       _____

7       Supporting Facts:  See attached. _____

8       _____

9       _____

10      _____

11      Claim Two:  See attached. _____

12      _____

13      Supporting Facts:  See attached. _____

14      _____

15      _____

16      _____

17      Claim Three: _____

18      _____

19      Supporting Facts: _____

20      _____

21      _____

22      _____

23      If any of these grounds were not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25      _____

26      _____

27      _____

28      _____

1       List, by name and citation only, any cases that you think are close factually to yours so that

2   they are an example of the error you believe occurred in your case.  Do not discuss the holding or

3   reasoning of these cases:

4   _____

5   _____

6   _____

7   Do you have an attorney for this petition?          Yes _____      No  X

8   If you do, give the name and address of your attorney:

9   _____

10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled

11   in this proceeding.  I verify under the penalty of perjury that the foregoing is true and correct.

12

13   Executed on  *May 18 2008*

14                  Date          Signature of Petitioner

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION

Petitioner respectfully petitions this court for a writ of habeas corpus or grant Petitioner an evidentiary hearing to determine if the Supreme Court and/or the Board of Parole Hearings (hereinafter Board) violated Petitioner's right to due process and violated Petitioner's federally protected liberty interest.

The transcript, attached as Exhibit A and other relevant documents hereto will attest to the fact that it is unequivocally clear that the court and the Board did not "consider all relevant, reliable information too the panel/[court]" as directed by the Cal. Code Regulations, Title 15, Division 2, Article 5, § 2280 to § 2292.

Several times, the court cited Cal. Code Regs., tit. 15, § 2402 in its decision, which does not apply to Petitioner's crime. Section 2402 applies to parole consideration criteria and guidelines for murder committed on or after November 8, 1978, and specified attempted first degree murder committed on or after January 1, 1987. Petitioner was NOT convicted of murder, nor attempted murder. Petitioner was convicted of kidnap for ransom which falls under Cal. Code Regs., tit. 15, § 2282(c), under the Matrix of II which is "Victim Assaulted. Victim was sexually assaulted or otherwise seriously injured or assaulted and D planning. The crime involved intricate prior planning, which carries a suggested sentence of 13, 14, 16 years. Petitioner has been incarcerated for 16 years without assessing any post-conviction credits for time served prior to the hearing. (See section 2290.)

The court found that there was no evidence to support the Boar's finding that the commitment offense demonstrated an exceptionally callous disregard for human suffering. The Board also considered the Petitioner's post-conviction gains, including his participation in several anger management and other self-help, two completed vocations, a multitude of job offerings, as well as his commendable ability to remain free of any serious discipline problems throughout his incarceration. Basically, the Board denied Petitioner parole suitability for the very reason he appeared before the Board, disregarding the guidelines and criteria for determining Petitioner's parole suitability.

Petitioner contends these decisions of the Board and the Superior Court in violation of the due process clause as provided for in the statutes enacted by the legislators in Penal Code § 3041(a) that states, "the Board shall establish criteria for the setting of parole release dates...." The Board

1    established criteria for the setting of parole release dates, but refused to abide by them. Not only did

2    they throw the book at Petitioner, they literally threw the book away and appropriated to itself

3    absolute power over parole matters.

4        At an evidentiary hearing, Petitioner hopes to be able to ascertain where the imaginary line has

5    been drawn that Petitioner must cross in order for the crime to no longer be a "callous disregard for

6    human suffering" or "carried out in a pretty calculated manner." These were the primary reasons the

7    Board used to deny Petitioner parole suitability. (See Exhibit A, p. 72: 8-20.)

8        Petitioner contends this denial of parole suitability and the denial of Petitioner's writ of habeas

9    corpus was arbitrary and capricious, in violation of due process and denying Petitioner of his liberty

10   interest guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

11       By verification, it is alleged that:

12                                      I

13       On October 26, 2006, Petitioner appeared before the Board of Parole hearings. Petitioner was

14   denied parole for one (1) year which Petitioner contends was in violation of his constitutional right of

15   die process of law and not in compliance with the statutes enacted by the legislators to set parole

16   release dates for life term prisoners.

17                                      II

18       Petitioner contends, he is currently illegally confined at the Correctional Training Facility, a

19   prison attached to the State of California, Department of Corrections and Rehabilitation, in the

20   custody of Ben Curry, Warden, pursuant to a judgment of the Superior Court in and for the COUnty

21   of Los Angeles, California, Case Number SA003399.

22                                      III

23       The facts simply stated are, Petitioner was received by the California Department of

24   Corrections on March 1, 1991, for Kidnap for Ransom, Penal Code Section 209(a). Petitioner was

25   sentenced to a term if seven (7) years to life, with a Minimum Eligible Parole Date (MEPD) of

26   05/13/07. (See Exhibit A, p. 1:10-15.)

27                                      IV

28       Petitioner has been incarcerated for sixteen (16) years. The maximum "suggested base term"

1   for kidnap is seventeen (17) years.  (See Cal. Code Regs., tit. 15, § 2282(c).)

2                                              V

3          Petitioner contends, the Board of Parole Hearings:

4          1.  Did not consider his suitability for parole in a manner required by Penal Code § 3041,

5   3042, and the Cal. Code Regs., tit. 15, § 2280 to § 2292.

6          2.  The Board totally ignored the time already served by Petitioner, which would more than

7   satisfy the time suggested for the crime Petitioner committed.  (See the "Matrix for Kidnap for

8   Robbery or Ransom," Cal. Code Regs., tit. 15, § 2282(c).)

9          3.  After the court found "that there was no evidence to support the Board's finding that the

10  commitment offense demonstrated an exceptionally callous disregard for human suffering"…and

11  "was not more violent than an ordinary kidnapping ransom."  (See Exhibit D, p. 2,) the Matrix for the

12  suggested base term should have been considered.

13         4.  The Board's finding that Petitioner's parole release would pose an unreasonable risk of

14  danger to society is not supported by "some evidence," thus the Board's denial of parole suitability

15  and the courts' denial of Petitioner's writ of habeas corpus is in violation of a federally protected

16  liberty interest and Petitioner's rights as expressed in the due process clause of the United States

17  Constitution.

18                                             IV

19         Because the Board and the state courts failed to exercise their discretion appropriately,

20  Petitioner has no plain, speedy or adequate remedy in the ordinary course of the law, but to this court.

21  The issues raised in this petition are of constitutional dimensions, questioning the legality of

22  Petitioner's confinement.  Venue is proper as Petitioner is presently incarcerated in this court's

23  jurisdiction.

24         WHEREFORE, Petitioner prays this Honorable Court:

25         (A)  Issue a writ of habeas corpus or order to show cause why the writ should not be granted

26  and to inquire into the legality of Petitioner's denial of parole suitability;

27         (B)  Conduct an evidentiary hearing to determine if the crime cannot be used as being

28  "especially callous or cruel," what evidence was presented at the hearing that gave cause to deny

1    Petitioner parole suitability;

2         (C)  Order any further relief as deemed appropriate and just.

3

4    Dated _May____, 2008                    Respectfully submitted,

5

6

7                                            Keith Holder, Petitioner

8                                            In pro per

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## 1

PETITIONER WAS DENIED DUE PROCESS OF LAW WHERE
THE TRIAL COURT ERRED IN DENYING PETITIONER'S WRIT
OF HABEAS CORPUS WHEN SUCH DENIAL VIOLATED
CLEARLY ESTABLISHED FEDERAL AND STATE LAW AND
CONSTITUTED AN UNREASONABLE DETERMINATION OF
THE FACTS IN LIGHT OF THE EVIDENCE.

"[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but...in conducting such a review the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (In re Rosenkrantz (2002) 29 Cal.4th 616, 658.)

The Superior Court acknowledged that, "Although the kidnapping was certainly a very serious offense, it was not more aggravated or more violent than the ordinary kidnapping for ransom. Therefore, it did not demonstrate an exceptionally callous disregard for human suffering. See In re Scott (2004) 119 Cal.App.4th 871, 891."

The general standard for a parole unsuitability decision is that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board or the Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2281(a).)

"Circumstances tending to show unsuitability" are, (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner. The factors being considered include: "(a) multiple victims were attacked, injured or killed in the same or separate incidents. (b) The offense was carried out in a dispassionate and calculated manner, such as an execution style murder. (c) The victim was abused, defiled, or mutilated during or after the offense. (d) The offense was carried out in a manner

1  which demonstrates an exceptionally callous disregard for human suffering. (e) The motive for the

2  crime is inexplicable or very trivial in relationship to the offense. (2) Previous record of violence. (3)

3  Unstable social history. (4) Sadistic sexual offense. (5) Psychological factors. (6) Institutional

4  behavior." In this case, the record does not contain even a modicum of evidence that, due to the

5  especially "heinous" of Petitioner's commitment offense he currently poses an unreasonable risk to

6  society if released.

7       Keeping utmost at mind, Petitioner was not convicted of murder, it is therefore, his contention

8  that if the record and therefore the court recited as factors sufficient to deny parole [Cal. Code Regs.,

9  tit. 15, § 2283], they were required under controlling legal precedent and guiding regulations to

10  establish a nexus between the facts used and the conclusion reached from those facts. For example,

11  both the Board and the reviewing court(s) concluded that Petitioner's crime was carried out in a

12  "dispassionate and calculated manner." Relying on such a circumstance required the Board to point

13  out which of the factors of unsuitability it concluded was sufficient to demonstrate that Petitioner was

14  a present and continuing danger to society. Petitioner asks, as this court should, whether (Id. at

15  (c)(1)(A) and (B) the factor was (A) multiple victims were attacked, injured or killed in the case or in

16  separate incidents, or (B) the offense was an execution style murder; or was an execution style

17  murder; or was it that the case involved (C) the victim was abused, defiled or mutilated during or after

18  the offense?

19       Clearly, as this is not a second or first degree murder, there can be no nexus, or evidence of

20  any nexus between the factors cited by the Board and a reasonable threat to public safety based upon

21  factors, where the factors cited are relevant only to murder offenses under the regulations. As no

22  such legal basis exists under Cal. Code Regs., tit. 15, § 2283 or § 2283(b)(1)(A)-(C), [the controlling

23  regulations for suitability determinations for the crime of kidnapping] to deny parole upon the

24  determination cited. Indeed, the Board is doing noting more than rendering a conclusory assertion

25  that the crime fact(s) warrant a finding of continuing danger. Petitioner's liberty interest is in parole

26  and is entitled to more evidentiary protection(s) than the Board's conclusory assertions. California

27  courts have criticized the lack of a nexus between facts found and conclusion reached in many types

28  of cases. See Walker v. Summer 917 F.2d 382 (9th Cir. 1990); Santa Anna Market Inc. v. Alcohol

1  Bev. Control Bd. 76 Cal.App.4th 570, 574-576 (1999); Yu v. Alcohol Bev. Etc. Appeals Bd. 3

2  Cal.App.4th 286, 297 (1992).

3      Assuming, without conceding, that Petitioner was a danger to the community at the time of his

4  incarceration, "the passage of time itself diminishes the validity of an assumption that [a prisoner's]

5  the dangerousness continues unabated." In re Hofferber 28 Cal.3d 161 177 (1980).  With out

6  exception, courts have concluded that the erosion of the predictive value of violence based on long

7  ago past actions has been recognized in numerous parole cases.  Particularly when there is no history

8  of violence and good long term institutional behavior.  In re Lee 143 Cal.App.4th 1400 (2006); In re

9  Scott 133 Cal.App.4th 573, 595 (2005); In re Elkins 144 Cal.App.4th 475.  As one court explained,

10  while a crime may have been 'especially heinous' and exceed the minimum elements

11  of...[kidnapping...as in the instant case]...and therefore compels a finding of such and perhaps a

12  credit to the findings (In re Dannenberg II), too does not mean that the fact that there is a modicum of

13  evidence that the commitment offense was 'especially heinous' will eternally provide adequate

14  support that a decision that a prisoner is unsuitable for parole."

15      In the wake of the California Supreme Court's decision in In re Dannenberg 34 Cal.4th at pp.

16  1079, 1080, courts of appeal have elaborated on the critical distinctions between the finding that a

17  offense was especially heinous and the nexus that links that finding to the conclusion that a prisoner is

18  a 'current danger to public safety,' here, there is simply no evidence...and therefore, no nexus as

19  required by state law 'standard of review.'

20      For the court to state, "the offense was carried out in a dispassionate and calculated manner"

21  Petitioner contends that the court should have included the rest of the regulation it cited to deny parole

22  [Cal. Code Regs., tit. 15, § 2281(c)(1)(A) and (B), or that apply to Petitioner.  That regulation states:

23  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents," and "(B) the

24  offense was carried out in a dispassionate and calculated manner, such as in an execution style

25  murder," neither of which occurred in the crime Petitioner was convicted of, making the court's

26  finding of 'some evidence' to support the determination that Petitioner presented an unreasonable risk

27  of danger to society if released void.

28      The Northern District Court of Appeals in Thomas v. Brown 2005 WL378555 (N.D. Cal.)

1   analyzed the commitment offense in the context with all other competing factors favoring parole

2   suitability and determined that <u>Thomas'</u> crime does not provide 'some evidence' to support the

3   Governor's (or Board's) decision that he is currently unsuitable for parole.  The salient factor about

4   this case was how the court determined that the <u>Sass</u> and <u>Biggs</u> decisions "are not polar opposites and

5   cannot be harmonized."

6       Other District Court cases have appeared to have followed or applied the <u>Thomas v. Brown</u>,

7   <u>supra</u>, analysis in granting relief are <u>Willis v. Kane</u>, 2007, WL123060 (N.D. Cal. 04-26-2007);

8   <u>Blankenship v. Curry</u>, 3007 WL1113798 (N.D> Cal. 2007; <u>Brown v. Kane</u> 2007, WL1288448 (N.D.

9   Cal. May 2, 2007); <u>Prittle v. Cal. Bd. of Prison Terms</u>, 2007 WL11140817 (E.D. Cal.); <u>McCullough v.</u>

10  <u>Kane</u> 2007 WL1593227 (N.D. Cal. 06-01-07); <u>Flower v. Butler</u> 2007, WL17525684 (E.D> Cal. 06-

11  13-07.)

12      Petitioner also asks this Court to consider the recent state appellate case which has interpreted

13  the some evidence' standard and the <u>Dannenberg</u> decision.  In <u>In re Lee</u> 143 Cal.App.4th, 1400, 1408,

14  the court stated:

15          "The test is not whether some evidence supports the reason the Governor
           cites for denying parole, but whether some evidence indicates a parolee's

16          release unreasonably endangers the public safety...
           "[A] governor, in reviewing a suitability determination, must remain

17          focused not on circumstances that may be aggravating in the abstract, but
           rather, on the facts indicating that release currently poses 'an unreasonable

18          risk of danger to society.'" (See also <u>In re Elkins</u>, <u>supra</u>, 144 Cal.App.4th
           at p. 499.)

19

20      In <u>Elkins</u>, the court concluded that the nature of the commitment offense did not support the

21  Governor's conclusion that Elkins continued to pose an unreasonable risk of danger to society if

22  released.  "While relying upon Petitioner's crime as an indicator of his dangerousness may be

23  reasonable for some period of time, in this case, continued reliance on such unchanging circumstances

24  – after nearly two decades of incarceration and half a dozen parole suitability hearings – violates due

25  process because Petitioner's commitment offense has become such an unreliable predictor of his

26  present and future dangerousness that it does not satisfy the 'some evidence' standards.  After nearly

27  twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on

28  the circumstances of his or her is nil."  (<u>Elkins</u>, <u>supra</u>, 144 Cal.App.4th at p. 500.)

1    In the instant case, the court and the Board acknowledged the post-conviction gains of

2    Petitioner, "including his participation in several anger management and other self-help programs; his

3    two completed vocations; his multitude of job offers in the United States and Trinidad; as well as his

4    commendable ability to remain free of any serious discipline throughout his incarceration." Nothing

5    in the court order nor the Board's denial of parole suitability establishes any evidence that Petitioner

6    would now pose an unreasonable threat to public safety. It may be "irrelevant that a court might

7    determine that evidence in the record tending to establish suitability for parole far outweighs evidence

8    that demonstrates unsuitability for parole." There has to be some evidence presented at the hearing

9    that the Petitioner's release on parole would pose an unreasonable risk of danger to public safety. The

10    nature of Petitioner's commitment offense does not constitute the modicum of evidence required to

11    support the Board's finding of unsuitability once the Petitioner has surpassed the Matrix for Base

12    Terms established for the crime he committed.

13    The regulations that govern that Board's parole suitability decisions explicitly instruct that an

14    unsuitability decision is a conclusion that "the prisoner will pose an unreasonable risk of danger to

15    society if released from prison." (Cal. Code Regs., tit. 15, § 2281(a).) The Board's decision in this

16    case was that Petitioner posed an unreasonable risk of danger to society due to the facts that "multiple

17.    victims were involved in the same incident. It was carried out in a manner which demonstrated a

18    callous disregard for human suffering, particularly related to the maid, Ms. Estelilla." It is this

19    decision that must be reviewed under the some evidence standard after the Court found that "there is

20    no evidence to support the Board's finding that the commitment offense demonstrated an

21    exceptionally callous disregard for human suffering." And the court went on to say, "Therefore, it did

22    not demonstrate callous disregard for human suffering." Quoting In re Scott (2004) 119 Cal.App.4th

23    871, 891.

24    THE BOARD OD PAROLE HEARINGS VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AND
25    DEPRIVED HIM OF A FEDERALLY PROTECTED LIBERTY
    INTEREST.
26

27    The Board's assertion that Petitioner is a danger to society is without evidentiary

28    support. There is absolutely no evidence that points to anything showing Petitioner would now pose a

1   danger to society if released from prison.

2        Recently the United States Court of Appeals for the Ninth Circuit discussed and reiterated just

3   such principals as is relevant and evident in the instant case.  In the case of <u>Hayward v. Marshall</u> 572

4   F.3d _____, 2008  WL 43716, 2008 US.App Lexis 40.  In that case several distinctively relevant

5   factors were discussed which rest at the heart of the due process violation.  Petitioner contends is

6   applicable to the instant case.  For example, Hayward has been disciplinary free since 1989 and not

7   only received a single <u>minor</u> rule infraction in 1997.  Petitioner has been free of even minor

8   infractions his entire incarceration.

9        Hayward was convicted of second-degree murder in 1980 and had/has served 28 years in

10  prison.  Petitioner was convicted in 1990 for kidnapping for robbery or ransom and received seven

11  years to life.

12       Hayward had completed several trade and acquired computer and typing skills in prison.

13  Petitioner similarly has completed vocational training and other significant post-conviction gains,

14  including several anger management and various self-help programs.

15       Hayward initially denied involvement in the crime for which he was imprisoned.  It was not

16  until 1993 that Hayward took responsibility for his crime.  Petitioner has taken responsibility for the

17  crime since trial.

18       Hayward's psychological report portrays an inmate who is remorseful as well as responsible.

19  Petitioner's psychological evaluation by Dr. Marek presents the same.  Indeed, Dr. Marek opines:

20       "Holder took full responsibility for his role in the kidnapping.  He
         exhibited remorse and has – and has good insight into the harm that was
21       caused.  His remorse for his crime appears genuine and appropriate."

22       Unlike Hayward, Petitioner had no pre-offense criminality or gang related activities.

23  Petitioner has never been involved in drugs or alcohol in any but social ways.

24       Hayward was statutorily able to parole in 1995 as second-degree murder has a statutory

25  minimum of 15 years.  Petitioner, having received 7 years to life, was statutorily eligible for parole in

26  1997.  Petitioner has now served 11 years beyond his statutory minimum and at the time of the

27  challenged hearing was only a few short months shy of serving the statutorily suggested maximum

28  under the matrices of seventeen years.

1    Heretofore, Petitioner has outlined the factors relative to parole suitability and unsuitability

2 under Cal. Code Regs., tit. 15, § 2402 and 2281.  Even though these factors are helpful in analyzing

3 whether a prisoner should be granted parole, California courts have made clear that the findings that

4 are necessary to deem a prisoner unsuitable for parole.  Irons v. Carey 505 F.3d at 851, 2007 WL

5 2927359, at *3, are not that a particular factor or factors indicating unsuitability exists, but that a

6 prisoner's release will unreasonably endanger public safety.  In re Dannenberg 156 Cal.App.4th 1387,

7 2007 WL 3408290, at *9 (Cal.App 2007) modified 2007 Cal.App Lexis 1985, 2007 WL 4227229

8 (Cal.App De. 3, 2007); In re Lee 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Cal.Ct.App 2006);

9 In re Scott 133, Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Cal.Ct.App 2005).  For this court's

10 purposes then, [T]he test is not whether some evidence supports the Governor's (or Board's) reasons

11 for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers

12 public safety.  Some evidence of a particular factor does not necessarily equate to some evidence the

13 parolee's release unreasonably endangers public safety. Lee, supra.

14    The Hayward court had previously reiterated in Irons, supra, that "in some cases indefinite

15 detention based solely on an inmate's commitment offense, regardless of the extent of his

16 rehabilitation will at some point violate due process."  Surely, Petitioner's case [not involving even

17 the attempt to murder] is what the Irons court envisioned in the "in some cases" analysis.

18    In every case, as the Hayward court noted:

19     "In which we have held that a parole board's decision to deem a prisoner
20     unsuitable for parole solely on the basis of his commitment offense
      comports with due process, the decision as made before the inmate had
21     served the minimum number of years required by his sentence…Therefore,
      we conclude [*30] that "[a] we hold in those cases and all we hold
22     today…is that, given the particular circumstances of the offense in these
      cases, due process was not violated when these prisoners were deemed
23     unsuitable for parole prior to the expiration of their minimum terms."

24    Hayward, and Petitioner, by contrast had served more than the minimum [15 year term in

25 Hayward and 7 year term in the instant case] term of imprisonment.

26    Not only has Petitioner's due process liberty interest been violated in he denial of parole it has

27 been violated in utter lack of some evidence sufficient to provide the nexus between the facts and the

28 conclusion reached.  For instance, the Board found Petitioner was a current danger to public safety

1    because his crime was carried out in a manner which demonstrated an exceptionally callous disregard

2    for human suffering.

3       While the trial court did not grant the petition for writ of habeas corpus then before it, that

4    court did find that there was no evidence to support the finding.  This finding expressly validated

5    Petitioner's claim that the evidence did not possesses an indicia of reliability to the conclusion the

6    'facts' was purported to substantiate and, therefore, failed to provide 'some evidence' under the Hill

7    standard of review.  Under any 'differential' standard, this finding was sufficient to grant Petitioner's

8    petition as an unreasonable determination of the facts in light of the evidence in this court.

9       In Biggs v. Terhune (9th Cir. 2003) F.3d, the court first held that, "because the California

10    parole scheme [Penal Code § 3041(b)] vests in every inmate a constitutional protracted liberty

11    interest" "protected by the procedural safeguard of the due process clause," "the evidence underlying

12    [every California Parole] Board []parole denial] decision must have an indicia of reliability[,]" and

13    then the Court established parole decision standards for the Board to follow when weighing evidence,

14    holding that:

15        "[while] the [California] parole board's sole supporting reliance on the
         gravity of [a first degree murder] offense [involving the killing of a

16        witness] and conduct prior to imprisonment to justify denial of parole can
         initially be justified as fulfilling the requirements set forth by state law,

17        [o]ver time, however, should [a petitioner] continue to demonstrate
         exemplary behavior and evidence of rehabilitation, denying him parole

18        simply because of the nature of [his] offense and prior conduct would raise
         serious questions involving his liberty interest in parole."

19

20       In the case of James Masoner, (01/23/04) Case No. Cv 03-1261-ER, the United States District

21    Court, Central District of California stated:

22        "[3] California Penal Code § 3041(b) does impose an affirmative
         obligation upon the Board of Prison Terms (BPT), creating a cognizable

23        Due Process right in the expectation of parole."

24        "[4] Although the gravity of the commitment offense and other pre-
         conviction factors alone may be sufficient to justify the denial of a parole

25        date at a prisoner's initial hearing, subsequent BPT decisions to deny
         parole date must be supported by some post-conviction evidence that the

26        release of an inmate is against the interest of public safety."

27       The same evidence standard provides protection against more than just fabricated charges or

28    bureaucratic mistakes.  The some evidence standard also protects against arbitrary decisions.  See

1   Superintendent v. Hill, 472 U.S. at 454-455, 457. Petitioner has been before the Board five (5) times.

2   (One initial hearing and four subsequent hearings.) (See Exhibit B.) The commitment offense has

3   been repeatedly relied upon to deny parole. The Board's reliance on the circumstances of the kidnap

4   to find Petitioner unsuitable for the fifth time and at least 17 years into his 7 years to life sentence that

5   carried a maximum suggested base term of 17 years. See Cal. Code Regs., tit. 15, § 2282(c)), thus

6   'the Board's decision was arbitrary and did not comport with the some evidence standard.

7           THE BOARD OF PAROLE HEARINGS DENIED PETITIONER
            DUE PROCESS OF LAW BECAUSE PAROLE DENIAL WAS
8           BASES SOLELY UPON THE CRIME AND PRE-
            INCARCERATION FACTORS WHICH ARE IMMUTABLE.
9

10          Under Cal. Code Regulations, Title 15 Division 2, the statutory scheme of the Board, the basic

11  method that is supposed to be used to determine if an inmate is unsuitable for parole remains, "a life

12  prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner

13  will [now] pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs.,

14  tit. 15, § 2281(a).) Thus, the burden of proof falls squarely on the Board to prove, or present evidence

15  that Petitioner's release would pose an unreasonable risk of danger or threat to public safety and/opr

16  society. Just saying doesn't make it so.

17          Petitioner contends, the Board presented no evidence what so ever their invocation of the

18  exception to the rule, Penal Code § 3041(b), and without such proof/evidence, the Board should have

19  considered the Matrix for Base Terms for Kidnap for Robbery or Ransom. (See Cal. Code Regs., tit.

20  15, § 2282(c).) If they did not present such evidence having an "indicia of reliability" that Petitioner's

21  release would pose an unreasonable risk of danger to society, they violated his due process and a

22  protected liberty interest in being released on parole.

23          In Rosenkrantz, supra, 29 Cal.4th at p. 682, the court found that "the nature of the prisoner's

24  offense, alone, can constitute a sufficient basis for denying parole." However, Chief Justice George

25  noted in the next paragraph, "In some circumstances, a denial of parole based upon the nature of the

26  offense alone might raise to the level if a due process violation – for example where no circumstances

27  of the offense reasonably could be considered more aggravated or violent than the minimum necessary

28  to sustain a conviction for the offense....'The Board's authority to make an exception [to the

1  requirement of setting a parole date] based solely on the gravity of a life term inmate's current or post

2  offense should nit operate so as to swallow the rule that parole is 'normally' to be granted.... [A] life

3  term offense or any other offense underlying an indeterminate sentence must be particularly egregious

4  to justify the denial of a parole date.'"  (Rosenkrantz, supra, 29 Cal.4th at p. 683.)

5          It was also observed in Scott II, supra, 133 Cal.App.4th, that while the "assumption that

6  prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is

7  correct, but the proposition must be properly understood.  The commitment offense is one of only two

8  factors indicative of unsuitability [which] a prisoner cannot change...Reliance on such an immutable

9  factor 'without regard to or consideration of subsequent circumstances' may be unfair, and runs

10  contrary to the rehabilitative goals espoused by the prison system and could result in a due process

11  violation."

12          The commitment offense can negate suitability only if the circumstances of the crime reliably

13  established by evidence in the record rationally indicated that the offender will present an

14  unreasonable public safety risk if released from prison.  The predictive value of the commitment

15  offense may be very questionable after a long period of time.  [Petitioner has been incarcerated for

16  more than sixteen (16) years.]  Thus, denial of release based solely on the basis of the gravity of the

17  commitment offense warrants especially close scrutiny."  (Scott II, supra, 133 Cal.App.4th at pp. 594-

18  595.)  The court elaborated in this concept in Elkins, when they stated, it violates due process to deny

19  parole "where no circumstance of the offense could reasonably be considered more aggravated or

20  violent than the minimum necessary to sustain a conviction for the offense."  (Elkins, supra, 144

21  Cal.App.4th at p. 497.)  The "overarching" factor determining whether parole should be granted or

22  denied is whether the criminal poses "an unreasonable risk of danger to society."  (Scott II, supra, 133

23  Cal.App.4th p. 591; Lee, supra, 143 Cal.App.4th at p. 1400; Cal. Code Regs., tit. 15, § 2281(a).)

24          THE BOARD VIOLATED PETITIONER'S DUE PROCESS OF LAW
        WHEN THEY DENIED HIM PAROLE SUITABILITY WITHOUT ANY
25      EVIDENCE SUPPORTING THE STATEMENT THAT PETITIONER'S
        RELEASE WOULD POSE AN UNREASONABLE RISK OF DANGER
26      TO SOCIETY.

27          The Board's assertion that Petitioner "would pose an unreasonable risk of danger to society or

28  a threat to public safety if released from prison at this time," (see Exhibit A, p. 72: 8-13) is not

1   supported by any evidence having an indicia of reliability.

2       In the Mental Health Evaluation for the Board of Parole Hearings, dated August 2006 (Exhibit

3   B) under XIV, Assessment of Dangerousness, Doctor W.E. Marek, Ph.D. stated:

4       "His violence potential is obviously lower than the average inmate, based
on his good recent institutional adjustment.  If released to the community,

5       his violence potential is estimated to be no higher than the average citizen
in the community.  It appears his involvement in the instant offense was

6       essentially an aberration for him.  There are no obvious or significant
violence precursors for him."

7

8       Penal Code § 5068 requires the Department of Corrections and Rehabilitation (CDCR) to

9   conduct and submit to the Board a psychological evaluation on persons appearing for parole

10  consideration.  The Board asks the CDCR experts to specifically address the question of the prisoner's

11  'dangerousness.'  The format agreed upon between the Board and CDCR experts to rate the prisoner's

12  'dangerousness' in terms of 'violence potential.'  The CDCR's Departmental Operations Manual

13  (DOM) #62090.13, directs the conclusion to be reported by the experts as either "below average,"

14  "average" or "greater than average" violence potential.  Once Petitioner has obtained a "blow

15  average" violence potential rating in a psychological evaluation, he has obtained the most favorable

16  rating for release he can obtain.  The Board panel members are not qualified professionals and for

17  them to make contrary determinations of his violence potential or dangerousness reported by qualified

18  professionals, trained and hired by the CDCR to make such determinations and assessments, they are

19  violating Petitioner's due process of law.

20      In short, the burden is not on the Petitioner to prove that he is suitable for parole, instead, the

21  parole authorities are only relieved of their obligations to set a release date if there is a legitimate

22  concern that Petitioner would pose a threat of future violence if released.  Such a decision must be

23  based on Petitioner's violence potential and threat now, not what it was many, many years ago.

24      The legislature did not go to such lengths in providing such language as; "One year prior to the

25  inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the

26  board of Prison Terms [now the Board of Parole Hearings] shall again meet with the inmate and shall

27  normally set a parole release date as provided in Section 3041.5," only to have the Board ignore the

28  laws that give them the authority to function as part of the executive branch.  Therefore, the panel

1   member's decision that Petitioner would pose an unreasonable risk of danger to society if released

2   from prison is without foundation and not based on facts or evidence that were presented at the

3   hearing, making their decision arbitrary, capricious and possibly predetermined.

4       Petitioner contends the Board has violated the foundational precept of due process in order to

5   execute an illegal, underground policy of denying parole suitability to most indeterminately sentenced

6   prisoners, and extracting additional punishment from Petitioner beyond the sentencing laws that were

7   in effect at the time of the crime.

8       In California, under existing laws, Petitioner should not forever be banned from parole because

9   of the nature of his offense, an offense that carries a maximum suggested base term of seventeen

10  years.  (See Cal. Code Regs., tit. 15, § 2283(c).)

11                THE BOARD'S DECISION DENYING PETITIONER PAROLE IS
                  ARBITRARY AND NOT SUPPORTED BY THE EVIDENCE
12                PRESENTED AT THE HEARING.

13      The Ninth Circuit Court has held that the California parole scheme creates a cognizable liberty

14  interest in release on parole because Penal Code § 3041 uses mandatory language that is similar to the

15  Nebraska and Montana statutes addressed in Greenholtz and Allen respectively.  (McQuillion v.

16  Duncan 306 F.3d at 901-902.)  As the Ninth Circuit explained, "Section 3041 of the California Penal

17  Code creates in every inmate a cognizable liberty interest in parole which is protected by the

18  procedural safeguards of the due process clause," and interest arises "upon the incarceration of the

19  inmate."  (Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).)

20      In Biggs at 916, the court also held that the Board's continued use of the crime as a basis for

21  denial of parole violates federal due process, and that the BPT's usage of prior history and unchanging

22  factors as a basis for denial violates federal due process.

23      In In re Ramirez (2001) Cal.App.4th 569, [114 Cal.Rptr.2d 396-397] the court concluded in its

24  instruction to the Board, "[T]he Board must weigh the inmates criminal conduct not against ordinary

25  social norms, but against other instances of the same crime or crimes."  The court also acknowledged

26  that the "gravity of the commitment offense or offenses alone may be a sufficient basis for denying a

27  parole application."  (Id. at p. 369), but went on to strongly advise:

28              "Therefore, a life term offense or any offense underlying an indeterminate

1      sentence must be particularly egregious to justify the denial of a parole
2      date."

3          The question of the Board's obligation to parole offenders is becoming increasingly
4  defined/settled as more and more courts are finding denials of parole to have been rendered in such
5  way as to violate the affected prisoner's rights.  The Board's decision is governed by a deferential
6  "some evidence" standard designed to ensure minimum procedural due process protections.
7  (Rosenkrantz, supra, 29 Cal.4th at p. 658; Scott I, supra, 29 Cal.4th at 99. 885-887.)  Because this
8  requirement gives rise to a liberty interest protected by due process of law, and because due process of
9  law requires that a decision considering such actors be supported by some evidence in the record, the
10  Board's decision is subject to judicial review (an evidentiary hearing) to ensure compliance with this
11  constitutional mandate.  "[T]he 'some evidence' standard is extremely deferential and reasonable
12  cannot be compared to the standard of review involved in...considering whether substantial evidence
13  supports the finding."  (Rosenkrantz, supra, 29 Cal.4th at p. 665.)  Nevertheless, it requires "some
14  indicia of reliability"  (Scott II, supra, 133 Cal.App.4th p. 591, quoting Biggs v. Terhune (9th Cir.
15  2003) 33 F.3d, 910, 915) and "may be understood as meaning that suitability determinations must
16  have some rational basis in fact."  (Scott II at p. 590, Fn. 6.)

17          In this case, the record is replete with documentation of not only Petitioner's self-help
18  programming during his incarceration, (see Exhibit C), but the psychological evaluation for the
19  hearing (Exhibit B) concluded that Petitioner poses a low degree of threat to the public if released.

20          The Board's conclusion that Petitioner's incarceration and efforts of rehabilitation indicates
21  that Petitioner still poses a threat to public safety of released on parole is just not supported by the
22  evidence.

23          As made clear by In re Morrall (2002) 125 Cal.Rptr.2d 391, 407, 102, Cal.App.4th 280; In re
24  Rosenkrantz  and In re Ramirez, the evidence must tend to support a finding that Petitioner poses a
25  real threat to public safety if released.

26          Cal. Code Regulations, Division 2, Article 5 was established to meet the mandates of Panel
27  Code § 3041(a) which states: "The board shall establish criteria for the setting of parole release dates
28  and in consider the number of the crime for which the Petitioner was sentenced and other factors in

1    mitigation or aggravation of the crime." Neither the Penal Code nor the California Code of

2    Regulations states the Board may deny a prisoner parole suitability o the first, second or third parole

3    suitability hearing because the prisoner has not served enough time. Cal. Code Regs., tit. 15, §

4    2281(a) states in part: "Regardless of the length of the time served, a life prisoner shall be found

5    unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable

6    risk of danger to society if released from prison." By the same token, if at an inmate's first parole

7    consideration hearing, the Board cannot prove or present evidence that an inmate's release will pose

8    an unreasonable risk of danger to society, the Board is obligated to set his/her release date, as long as

9    the inmate has served his or her Minimum Eligible Parole Date (MEPD). Petitioner's MEPD was

10   May 13, 1997.

11        Without presenting any evidence that Petitioner would pose an unreasonable risk of danger to

12   society, the Board's denial of parole suitability was arbitrary and not supported by the record.

13                                       **CONCLUSION**

14        This Court has jurisdiction over the issues raised in this appeal, because the "target" issue is

15   not the state court's judgment or the sentence derived there from, but is rather the Boar's

16   administrative decision "regarding the execution of his sentence." (Rosas V. Noelson 728 F.3d, 1229,

17   1232 (9th Cir. 2005).)

18        Petitioner's contends the California Supreme Court had held the Penal Code § 3041 parole

19   statute creates a protected "liberty interest" in parole and that "due process" allies at parole hearings.

20   (See In re Rosenkrantz (2002) 29 Cal.4th, 616, 655-658.) Federal courts have also come to the same

21   conclusion. (See McQuillion v. Duncan 306 F.3d 895, (9th Cir. 2002); Jancseck v, Oregon Bd. of

22   Parole 833 F.2d, 1389 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal & Correctional

23   Complex 442, U.S. 1, 99 S.Ct. 2100, 60 L.Ed 2d, 668 (1979); Biggs V. Terhine 334F.3d 910 (9th ir.

24   2003).) This is so because Penal Code § 3041 mandatory language, "the panel or board **shall**

25   normally seta parole date **unless** it determines further incarceration is necessary in the interest of

26   public safety." Also see Board of Pardons v. Allen 482 U.S.369, 107 S.Ct. 24125, 96 L.Ed.2d 303

27   (1987) [Petitioner has] "a presumption that parole release will be granted, unless the statutory defined

28   determinations are met.")

1        In the most recent ruling of <u>Rosenkrantz v. John Marshall</u>, ___F.Supp.2d___, 2006 WL

2   2327085 (C.D. Cal.) (August 1, 2006), the court stated, "In the circumstances of this case, the BPT's

3   continued reliance upon the unchanging facts of Petitioner's crime to deny parole in 2004 violated due

4   process.  First continued reliance upon unchanging facts pf Petitioner's crime amount to an arbitrary

5   denial of Petitioner's liberty interest.  Petitioner has been denied parole on six occasions prior to the

6   determination he now challenges.  Continued reliance upon the unchanging characterization of

7   Petitioner's offense amount to converting Petitioner's sentence of seventeen years to life to a term of

8   life without the possibility of parole."

9        In <u>Brian Sass v. California Board of Prison Terms</u> 2006 DJDAR 11931 No. 05-16455, D.C.

10  No. CV-01-00835-MCE (9th Cir. August 31, 2006) the Honorable Circuit Judge Reinhardt stated in

11  his dissension, "When we asses whether state parole board's suitability determination us supported by

12  'some evidence' in a habeas case, our analysis is framed by state law.  The statute and regulations in a

13  particular state dictates what factors the parole board in that state may consider in deciding whether an

14  inmate is suitable for parole.  In other words, the state rules and regulations dictates the nature of the

15  findings that are required before a determination can be made that an inmate is unsuitable for parole.

16  Only evidence that would tend to support such finding constitutes "some evidence."  Thus, although

17  federal law establishes the 'some evidence' standards, state law tells us of what that evidence may

18  consist, and to what it might pertain.  Here, as I have explained, the California statute and regulations

19  provide that an offense must be committed in an exceptionally pr particularly egregious manner for an

20  inmate's offense to justify a determination that he is unsuitable for parole.  Also, the inmate must

21  constitute a present danger to society at the time of the suitability hearing.  Accordingly, as a habeas

22  court, we must look to whether there is 'some evidence' that Sass committed his offense of

23  imprisonment in a manner that distinguishes it from the vast majority of second-degree murders, that

24  shows that Sass's offense was more 'heinous, atrocious, or cruel' than most other such offenses.  We

25  must also look to see that there is some evidence that as of the date of Sass's parole denial he was a

26  present danger to society."

27        The California Penal Code, Section 3041(a0 requires that a parole date "shall normally" be set.

28  For the Board to normally deny parole suitability because of the conviction offense, without any post-

1  conviction evidence that Petitioner's release will now pose an unreasonable risk of danger, or threat to

2  society is a violation of due process.

3       Logic would dictate that, if the Penal Code states, "One year prior to the inmate's minimum

4  eligible parole release date a panel consisting of at least two commissioners of the Board of Prison

5  Terms [now the Board of Parole Hearings] shall meet with the inmate and "shall normally" set a parole

6  release date as provided in Section 3041.5," yet the record reflects that the Board <u>normally denies</u>

7  parole release dates to more than 90% of appearing inmates.  This fact alone should be cause to

8  examine the Board's mission and direct to be in compliance wit the statute that states, "the Board shall

9  establish criteria for the setting of parole release dates."

10      If the Board is allowed to use the nature of the off and post-conviction factors to deny

11 Petitioner parole suitability at his consideration hearing one year prior to his MEPD and every

12 subsequent parole consideration hearing thereafter, the rules and regulations, the Penal Code, and all

13 the rulings, from all the courts, state and federal, are null and void.  If the Board is allowed to make

14 decisions contrary to the state and federal constitution, Petitioner has no rights whatsoever and the

15 Board has unfettered and absolute power to interject their political views and any other underground

16 policies they choose to deny parole suitability to any and all inmates appearing before them.

17      The Board presented no reliable evidence to support their finding that Petitioner would pose an

18 unreasonable risk of danger to society and is unsuitable for parole release.  As in most hearings, more

19 then 90%, the Board uses the commitment offense as their reason to deny parole suitability.

20 California Code of Regulations, Title 15, Division 2, are the rules and regulations the Board has

21 established to meet the mandates of Penal Code § 3041, yet their disregard of parole consideration

22 criteria and guidelines has permitted the Board to repeatedly refuse to comply with the mandates of

23 the statutes and the rules and regulations is a violation of the Due Process Clause that guarantees

24 prisoners the right t a fair and impartial hearing.

25      For the reasons stated herein, Petitioner prays that this Honorable Court grant this petition for

26 writ of habeas corpus and provide the guidance needed to ensure Petitioner's Constitutional Rights are

27 protected.

28

1   Dated: _May 18___, 2008

Respectfully Submitted,

Keith Holder, Petitioner
In pro per

# EXHIBITS IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS



EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )        CDC Number E-87291
Hearing of:               )
                          )
KEITH HOLDER              )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 26, 2006

2:50 P.M.

PANEL PRESENT:

Ms. Bilenda Harris-Ritter, Presiding Commissioner
Mr. Robert Harmon, Deputy Commissioner

OTHERS PRESENT:

Mr. Keith Holder, Inmate
Mr. William Pitman, Attorney for Inmate
Mr. Patrick Sequeira, Deputy District Attorney
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum


**Janet Warnock, Northern California Court Reporters**

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 15 |
| Post-Commitment Factors | 20 |
| Parole Plans | 40 |
| Closing Statements | 58 |
| Recess | 71 |
| Decision | 72 |
| Adjournment | 76 |
| Transcriber Certification | 77 |

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER HARMON:**  And you're on record.

3          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

4    Good afternoon, Mr. Holder.

5          **INMATE HOLDER:**  Good afternoon.

6          **PRESIDING COMMISSIONER HARRIS-RITTER:**  This is a

7    Subsequent Parole Consideration Hearing for Keith Holder,

8    CDC number E-87291.  Today's date is October 26th, 2006

9    and the time is 2:50 p.m.  We are located at CTF Soledad.

10   The inmate was received on March 1st, 1991 from Los

11   Angeles County.  The life term began on March 1st, 1991,

12   and the minimum eligible parole date is May 13th, 1997.

13   The controlling offense for which the inmate has been

14   committed is Kidnap for Ransom, Los Angeles County Case

15   SA003399, Count Two Penal Code Section 209(a).  Mr.

16   Holder, this hearing is being tape recorded, and for the

17   purpose of voice identification, we're going to go around

18   the room and each of us will say our name, spell our last

19   name, and when it gets to be you turn, if you could please

20   also give us your CDC number after you spell your last

21   name, we would really appreciate that, okay?

22         **INMATE HOLDER:**  Yes.

23         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

24   I'm Bilenda Harris-Ritter, H-A-R-R-I-S hyphen R-I-T-T-E-R,

25   Commissioner, Board of Parole Hearings.

26         **DEPUTY COMMISSIONER HARMON:**  And Robert Harmon, H-

27   A-R-M-O-N, Deputy Commissioner.

2

1          **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Patrick

2     Sequeira, S-E-Q-U-E-I-R-A, Deputy District Attorney,

3     County of Los Angeles.

4          **ATTORNEY PITMAN:**  William Pitman, P-I-T-M-A-N,

5     attorney for Keith Holder.

6          **INMATE HOLDER:**  Keith Holder, H-O-L-D-E-R, my last

7     name.  E-87291 is my CDC number.

8          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you

9     very much.  We also have two correctional peace officers

10    in the room for security purposes.  Now, Mr. Holder, I'm

11    looking at your file.  I note that on October 7th, 2005

12    you signed your BPT 1073 Form, which indicates you have no

13    disabilities related to the ADA.  Do you recall that?

14         **INMATE HOLDER:**  Yes, ma'am.

15         **PRESIDING COMMISSIONER HARRIS-RITTER:**  And is that

16    still correct?

17         **INMATE HOLDER:**  Yes.

18         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

19    we just have a few little things we have to deal with

20    related to the ADA.  There's a paragraph taped to the

21    desktop in front of you.  If you could just read that out

22    loud into the record, that will get us started.

23         **INMATE HOLDER:**  "The American with

24              Disability Act, ADA, is a law to help people

25              with disability.  Disability are problems

26              that make it hard for some people to see,

27              hear, breathe, talk, walk, learn, think,

3

1            walk, work, or take care of themselves than

2            it is for others.  Nobody can be kept out of

3            public place or activities because of a

4            disability.  If you have a disability, you

5            have the right to ask for help to get ready

6            for your BPT hearing, get to the hearing,

7            talk, read forms and papers, and understand

8            the hearing process.  BPT will look at what

9            you ask for to make sure that you have a

10           disability that is covered by the ADA, and

11           that you have asked for the right kind of

12           help.  If you do not get help or if you

13           don't think you get -- got the kind of help

14           you need, ask for a BPT 1070 -- 1074

15           Grievance Form.  You can also get help to

16           fill it out."

17           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Great.

18  Thank you very much.  Now let me ask you a few questions

19  that we ask everyone.  Do you have any problem walking up

20  or down stairs, or for distances of a hundred yards or

21  more?

22           **INMATE HOLDER:**  No.

23           **PRESIDING COMMISSIONER HARRIS-RITTER:**  And do you

24  need glasses or a magnifying device to see or read

25  documents.

26           **INMATE HOLDER:**  Sometimes.  It depends on how

27  small the writing is.

4

1          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, and

2    how are you doing today?

3          INMATE HOLDER:  I did okay.

4          PRESIDING COMMISSIONER HARRIS-RITTER:  You did

5    great with that.  Okay.  Do you have any hearing

6    impairments?

7          INMATE HOLDER:  No.

8          PRESIDING COMMISSIONER HARRIS-RITTER:  All right,

9    have you ever been included in the Triple CMS program?

10         INMATE HOLDER:  No.

11         PRESIDING COMMISSIONER HARRIS-RITTER:  Have you

12   ever been included in the Enhanced Outpatient Program?

13         INMATE HOLDER:  No.

14         PRESIDING COMMISSIONER HARRIS-RITTER:  And have

15   you ever taken any psychotropic medication in prison or

16   on the streets?

17         INMATE HOLDER:  No.

18         PRESIDING COMMISSIONER HARRIS-RITTER:  And do you

19   have any disability that you believe would prevent you

20   from participating in today's hearing?

21         INMATE HOLDER:  No.

22         PRESIDING COMMISSIONER HARRIS-RITTER:  And

23   Counselor, are there any ADA issues you believe need

24   further discussion?

25         ATTORNEY PITMAN:  No.

26         PRESIDING COMMISSIONER HARRIS-RITTER:  All right.

27   Then let's go forward.  We will reach a decision today,

5

1    Mr. Holder, and we'll inform you whether or not we find

2    you suitable for parole.  We'll tell you the reasons for

3    our decision.  If you are found suitable for parole, the

4    length of your confinement will be explained to you.

5    Before we recess the hearing to deliberate on our

6    decision, the District Attorney's Representative, your

7    attorney, and you will be given an opportunity to make a

8    final statement regarding your suitability.  We will then

9    recess, clear the room, and Commissioner Harmon and I will

10    deliberate.  Once we have completed our deliberations, we

11    will resume the hearing and announce our decision.  The

12    California Code of Regulations states that regardless of

13    time served, a life inmate shall be found unsuitable for,

14    and denied parole if, in the judgment of the Panel, the

15    inmate would pose an unreasonable risk or danger to

16    society if released from prison.  You have certain rights

17    related to this hearing and that includes a timely notice

18    of the hearing, the right to review your Central File, and

19    the right to prevent -- present relevant documents.

20    Counselor, have your client's rights been met?

21            **ATTORNEY PITMAN:**  Yes.

22            **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

23    Mr. Holder, you also have the right to an impartial Panel.

24    Do you have any objection to the Panel?

25            **INMATE HOLDER:**  No.

26            **PRESIDING COMMISSIONER HARRIS-RITTER:**  And Mr.

27    Pitman, do you have any objection to the Panel?

6

1          **ATTORNEY PITMAN:**  No.

2          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

3     Mr. Holder, you will receive a copy of our written

4     tentative decision today.  That decision becomes final in

5     120 days.  A copy of the decision and a copy of the

6     transcript will be sent to you.  In 2004, the regulations

7     related to appeals of our decisions changed.  So, if you

8     have any questions regarding an appeal, you should ask

9     your attorney or visit the prison law library, okay?

10          **INMATE HOLDER:**  Yes.

11          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

12    you are not required to admit or discuss your commitment

13    offense; however the Panel does accept as true the

14    findings of the court.  Do you understand?

15          **INMATE HOLDER:**  Yes.

16          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

17    Commissioner Harmon, is there any confidential material in

18    the file and will it be used at this hearing?

19          **DEPUTY COMMISSIONER HARMON:**  Yes, there is

20    confidential information, and no, it won't be utilized in

21    today's hearing.

22          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and

23    Mr. Pitman, I passed the Hearing Checklist marked Exhibit

24    1 over there.  I think it's on the other side of your

25    file.

26          **ATTORNEY PITMAN:**  Okay.

27          **PRESIDING COMMISSIONER HARRIS-RITTER:**  If you

7

1    could just look at that and see if you have the same

2    documents and then hand it to Mr. Sequeira from the DA's

3    office so he can do the same, I would really appreciate

4    that.

5         **ATTORNEY PITMAN:**  I actually -- I don't have the

6    crime partner's last hearing transcript.  I don't know if

7    that's in there or not.  Not that I need it, but --

8         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, I

9    don't believe that I have anything.

10        **DEPUTY COMMISSIONER HARMON:**  It's in the --

11        **ATTORNEY PITMAN:**  It is checked, so.

12        **DEPUTY COMMISSIONER HARMON:**  It's in the

13   confidential file.

14        **ATTORNEY PITMAN:**  Oh, okay.  It's not in the

15   materials that I --

16        **DEPUTY COMMISSIONER HARMON:**  No.

17        **ATTORNEY PITMAN:**  --received.  Okay.  Other than

18   that, I have everything.

19        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  What

20   I have is a page that says see crime partner information

21   in the confidential section of the C-File.

22        **ATTORNEY PITMAN:**  Okay.

23        **PRESIDING COMMISSIONER HARRIS-RITTER:**  So.

24        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  (Inaudible) as

25   well, and I have the other documents here.

26        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

27   Then I will take that in now as Exhibit 1.  And are there

8

1    any additional documents to be submitted?

2        **ATTORNEY PITMAN:**  I submitted updated letters.

3        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Right, I

4    have the letters and I have the portfolio of documents

5    related to accomplishments post-conviction.

6        **ATTORNEY PITMAN:**  Okay and I also have a copy of

7    the letters for Mr. Sequeira as well, so.

8        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, thank

9    you.

10       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Thank you.

11       **ATTORNEY PITMAN:**  Okay.  And that's it.

12       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

13   thank --

14       **ATTORNEY PITMAN:**  And the documents we gave you in

15   the book just showing Mr. Holder's completion of some

16   self-help since the last hearing, and also laudatory

17   chronos over the time he's been in prison, and just a

18   record of his vocational accomplishments, et cetera.

19       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, thank

20   you.  And I note they are original documents.  We will

21   return them to you after deliberations.

22       **ATTORNEY PITMAN:**  Thank you.

23       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Certainly.

24   And are there any preliminary objections?

25       **ATTORNEY PITMAN:**  No.

26       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right.

27   Will Mr. Holder be speaking with the Panel?

9

1          **ATTORNEY PITMAN:**  Yes.

2          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, Mr.

3   Holder, if you could raise your right hand, I'll swear you

4   in.  Do you solemnly swear or affirm that the testimony

5   you give at this hearing, will be the truth, the whole

6   truth, and nothing but the truth?

7          **INMATE HOLDER:**  Yes.

8          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  To

9   get started then, I'm going to turn to the probation

10  officer's report, pages two to three.  I'm going to read

11  into the record the facts related to the crime itself.

12          "On May 17th, 1990, Kiomi Takazato (phonetic)

13          spent the day with her friend Keith Holder

14          whom she has known for two years and who has

15          many lady friends in the Japanese community.

16          She left her baby in her home with her live-

17          in housekeeper and babysitter, Mariquette

18          Estelilla (phonetic).  When she returned

19          home with Keith Holder at 12 or 12:30 a.m.,

20          she found the housekeeper, Estelilla bound

21          and gagged.  She was handcuffed to a pole in

22          the living room.  Estelilla told her that a

23          man came into her room about 11 p.m.,

24          grabbed her by the hand and led her into the

25          living room where he handcuffed, gagged her,

26          and blindfolded her.  He told her not to

27          call the police or he would kill everyone in

10

1 the house.  He then took the baby.  Holder

2 found a ransom note, which read, I want

3 $400,000, 24 hours.  I will call.  No cops

4 or you never see baby.  They decided not to

5 call the police.  Later in the morning,

6 Holder told Kiomi that he had received a

7 call from a man who said the baby was at the

8 Compton Police Department and was all right;

9 however, because the kidnapper threatened to

10 return and kill everyone, they decided to

11 tell the police that the baby had been taken

12 by a friend, and that everything was okay.

13 After they got the baby, they would then

14 tell the police the truth.  When they

15 arrived at the Compton Police Department,

16 the police separated them, and after

17 questioning both of them, arrested Holder.

18 At 11:35 p.m. on May 17th, 1990, witness

19 Ronald Coleman called the police regarding a

20 kidnapping.  He told the police that the

21 kidnapping was over a mafia-type drug deal

22 and that the baby was from wealthy Chinese

23 parents.  He indicated that the kidnapper

24 was Steve Rose.  With the help of the

25 witness, the police stopped Steve Rose at

26 11:45 p.m. while he was driving a blue BMW

27 and the victim's baby was found in the

11

1        vehicle."

2    Mr. Holder, what caused you to be involved in this crime?

3        **INMATE HOLDER:**  First, I would like to say thank

4    you for giving me the opportunity to explain.  And it was

5    a terrible thing that I've done.  And I'm not going to

6    minimize my part in this crime.  I'm totally responsible

7    for everything that happened with this crime.  And what

8    caused me to be part -- take part in this crime was that

9    at the time, you know, I was in love with Kiomi and at the

10    time I was running a small sightseeing tour business.  And

11    I knew at the time that I didn't, you know, I didn't have

12    the financial ability to afford the kind of lifestyle that

13    she was used to.  And the idea was my idea, and it was all

14    about just trying to scare Mr. Takazato into thinking that

15    the baby was going to be harmed and the baby was not going

16    to be returned, and we was just actually trying to

17    embezzle money from him, so I can invest the money into my

18    business and try to afford a lifestyle that I know she was

19    used to.  So, I'm not going shift blame to anyone.  I'm

20    fully responsible for what I've done, and I'm very sorry

21    for what I've done.  I think the record will reflect from

22    the very first Board Hearing, I've always been

23    straightforward and honest about my part in this crime.

24    And I know I've done some things wrong.  And of course if

25    I can make it right, I can change it, I would.  I did that

26    crime.  It was something that I know that I should not

27    have done, and I was wrong for doing what I've done.

12

1        PRESIDING COMMISSIONER HARRIS-RITTER:  What

2    happened to your relationship with her after this -- all

3    the truth came out about it?

4        INMATE HOLDER:  Well, Kiomi and I still stayed

5    friends.  We communicated for a short time while I was in

6    prison until fell ill to cancer, and then she passed away

7    in two years after I was in prison, she passed away.  But,

8    in the process of while I was in prison and communicating

9    with her, you know I made amends to her the best way I

10   can.  You know, I wrote letters. She wrote letters.  We

11   communicate with each other and I apologized to her, and I

12   also apologized to Mr. Hayashita (phonetic)) by a letter

13   that I sent to her, and you know, I'm not saying that I

14   don't know if he ever got it or not, but I did my best to

15   try to make amends.  And I think my time in prison, I have

16   learned a lot.  And I really reflected back on the things

17   that I have done, and I got involved in this case.  And I

18   know that it was something that I should have never ever

19   thought of doing, or even been involved with doing, you

20   know.  But, we stayed in communication with each other

21   until she passed away.

22        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

23        ATTORNEY PITMAN:  May I just add something?

24        PRESIDING COMMISSIONER HARRIS-RITTER:  Certainly.

25        ATTORNEY PITMAN:  There is a letter that Kiomi had

26   written to the Board several years ago.  And we have a

27   copy of that.  Let's see here.

13

1    PRESIDING COMMISSIONER HARRIS-RITTER:  I don't

2  have it.

3    ATTORNEY PITMAN:  This is -- and then

4  unfortunately, she went back to Japan and was stricken

5  with ovarian cancer at a young age and passed away.  But

6  this was prior to that.  And we also have the envelope

7  that's on the page beneath.

8    PRESIDING COMMISSIONER HARRIS-RITTER:  All right,

9  and will you need to refer to this during the hearing?

10    ATTORNEY PITMAN:  I just want to make sure that

11  the Board is aware of that.

12    PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, well

13  I meant this.  Can we keep this now or do I need to get it

14  back from you during our deliberations so we can review it

15  during deliberations?

16    ATTORNEY PITMAN:  No, you can look at it during

17  deliberations, yeah.

18    PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

19    DEPUTY DISTRICT ATTORNEY SEQUEIRA:  I don't know

20  that I've ever seen that letter.  I don't have a copy of

21  that.

22    PRESIDING COMMISSIONER HARRIS-RITTER:  All right.

23    ATTORNEY PITMAN:  I knew it was submitted.  It may

24  be in one of the files, but it was submitted at one Board

25  Hearing.

26    PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  Oh,

27  I see that there's a letter, and do you know approximately

14

1    what year this was?  Because I can't read the postmark.

2          INMATE HOLDER:  I think that was in '91.

3          PRESIDING COMMISSIONER HARRIS-RITTER:  All right.

4          INMATE HOLDER:  '91, I believe.

5          PRESIDING COMMISSIONER HARRIS-RITTER:  Let me --

6          INMATE HOLDER:  If I'm not mistaken, there's a

7    copy of that letter in my C-File.

8          PRESIDING COMMISSIONER HARRIS-RITTER:  There would

9    be.  It just wasn't in our packets because it's so old.

10   So, let me pass this back.  We'll let the Deputy District

11   Attorney have an opportunity--

12         ATTORNEY PITMAN:  Okay.

13         PRESIDING COMMISSIONER HARRIS-RITTER:  -- to take

14   a look at it, and then if you could just leave it here

15   when we deliberate --

16         ATTORNEY PITMAN:  Sure.

17         PRESIDING COMMISSIONER HARRIS-RITTER:  -- then

18   we'll have a chance to review it at that time.

19         ATTORNEY PITMAN:  Okay.

20         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay,

21   anything further Mr. Pitman, on this subject?

22         ATTORNEY PITMAN:  No, I just wanted to bring --

23         PRESIDING COMMISSIONER HARRIS-RITTER:  No, I

24   appreciate that.  Mr. Holder, it appears to me this was a

25   pretty complicated scheme.  Would you agree?

26         INMATE HOLDER:  Yes.

27         PRESIDING COMMISSIONER HARRIS-RITTER:  How long

15

1    did it take you to plan it?

2         INMATE HOLDER:  I can't say exactly how long it

3    took.  It was, like over maybe two or three weeks.

4         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

5         INMATE HOLDER:  Thinking about (inaudible).

6         PRESIDING COMMISSIONER HARRIS-RITTER:  And I

7    believe the only prior criminal record you had here was

8    related to a grand theft property case in Glendale in

9    1984?

10        INMATE HOLDER:  Yes.

11        PRESIDING COMMISSIONER HARRIS-RITTER:  And that

12   was forgery of a name on a credit card?

13        INMATE HOLDER:  Yes.

14        PRESIDING COMMISSIONER HARRIS-RITTER:  And you

15   received two-year summary probation for that.  Is that

16   right?

17        INMATE HOLDER:  Yes.

18        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

19        ATTORNEY PITMAN:  And I can I just add that was a

20   misdemeanor.  It was --

21        PRESIDING COMMISSIONER HARRIS-RITTER:  Right, it

22   says --

23        ATTORNEY PITMAN:  It was filed as a misdemeanor.

24        PRESIDING COMMISSIONER HARRIS-RITTER:  It says

25   misdemeanor.  All right, so this complicated scheme is a

26   pretty big jump from that misdemeanor, would you agree?

27        INMATE HOLDER:  Yes.

16

1        **PRESIDING COMMISSIONER HARRIS-RITTER:** Didn't you

2    have concerns about taking such a big step?

3        **INMATE HOLDER:** Truthfully, I didn't really think

4   about it on that (inaudible). You know I think it was

5   just my involvement with her and how I felt about her. I

6   was just trying to secure our life together, you know, and

7   I really didn't think about the difference between, you

8   know, the credit card in Glendale, and this, to be honest

9   with you.

10       **PRESIDING COMMISSIONER HARRIS-RITTER:** What about

11   the difference between right and wrong?

12       **INMATE HOLDER:** Oh, yes. That's definitely. I

13   know the difference. I have always admitted to that; that

14   I've done something wrong.

15       **PRESIDING COMMISSIONER HARRIS-RITTER:** All right.

16   Let's talk a little bit then about your social background.

17   You came to the United States from Trinidad, is that

18   right?

19       **INMATE HOLDER:** Yes.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:** And you

21   came here illegally.

22       **INMATE HOLDER:** No.

23       **PRESIDING COMMISSIONER HARRIS-RITTER:** No?

24       **INMATE HOLDER:** No.

25       **PRESIDING COMMISSIONER HARRIS-RITTER:** Why is

26   there an INS hold?

27       **INMATE HOLDER:** Because if you're not a -- I'm not

17

1    a resident -- I'm a resident of the United States.    I'm

2    not an illegal resident of the United States.    So, all

3    residents of the United States, if you're not a citizen,

4    you have to -- you have an immigration hold after

5    (inaudible).

6              PRESIDING COMMISSIONER HARRIS-RITTER:    Okay.

7              ATTORNEY PITMAN:    He was a permanent legal

8    resident.    He came here as a child when -- were you ten

9    or --

10              INMATE HOLDER:    Ten years old.

11              ATTORNEY PITMAN:    Approximately ten years old with

12    his family.

13              PRESIDING COMMISSIONER HARRIS-RITTER:    To Rhode

14    Island?

15              INMATE HOLDER:    Yes.

16              ATTORNEY PITMAN:    And then the INS; if someone's

17    been convicted of a felony offense, they typically will

18    place a hold on that person so when the person is released

19    from prison, they make a determination of whether the

20    person is subject to deportation and whether they're going

21    to --

22              PRESIDING COMMISSIONER HARRIS-RITTER:    Okay.

23              ATTORNEY PITMAN:    -- take kind of action with

24    respect to the person, so.

25              PRESIDING COMMISSIONER HARRIS-RITTER:    So with

26    you, as opposed to someone who's here illegally, there is

27    a potential for your going back, but it's not a hundred

18

1    percent.  Is that accurate?

2        INMATE HOLDER:  No, I'm going to be deported.  I

3    have heard some checks on the new immigration laws and

4    this is a serious felony.

5        PRESIDING COMMISSIONER HARRIS-RITTER:  You're

6    going back?

7        INMATE HOLDER:  I'm going to be deported back to

8    Trinidad.

9        ATTORNEY PITMAN:  I would just say that in 1996,

10   Congress passed new immigration laws.

11       PRESIDING COMMISSIONER HARRIS-RITTER:  Right.

12       ATTORNEY PITMAN:  It (inaudible) to people who

13   have been convicted of crimes and it would appear you

14   know, that he will be deported.  There is a slim

15   possibility that you know, he would not be, but it looks

16   like he will be deported.

17       PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

18       ATTORNEY PITMAN:  It's a deportable offense it

19   falls under what they call automatic exclusion, so.

20       PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, thank

21   you.  What got you from Rhode Island to California?

22       INMATE HOLDER:  Well, one thing was the weather,

23   and I used to do a lot of music shows and fashion shows

24   and things of that sort and I felt California was a place

25   that I could really blossom in doing my entertainment

26   business here.  And that was one of the strong reasons

27   that brought me from Rhode Island to California.  Rhode

19

1  Island is a very small place.  There's not a lot of

2  entertainment there and California has a bigger, you

3  know --

4          PRESIDING COMMISSIONER HARRIS-RITTER:  More

5  opportunities?

6          INMATE HOLDER:  More opportunities for you know,

7  for the stuff that I was --

8          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, now

9  you graduated from high school in Providence.  Is that

10  correct?

11         INMATE HOLDER:  Yes.

12         PRESIDING COMMISSIONER HARRIS-RITTER:  And what

13  was your life like growing up in your home with your

14  parents?  Do you have any -- you have brothers and

15  sisters, I know because we have letters.  How many of you

16  in your family?

17         INMATE HOLDER:  Four boys and one girl.  And I

18  have a sister in Trinidad.

19         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

20  Anybody else in your family have trouble with the law?

21         INMATE HOLDER:  No.

22         PRESIDING COMMISSIONER HARRIS-RITTER:  All right.

23  What about any alcohol or drug abuse in your family;

24  anything like that?

25         INMATE HOLDER:  Absolutely not.  I'm saying,

26  that's one thing that I would like to speak to the Board

27  about me because I've never been involved with any illegal

20

1   drugs or alcohol.

2            **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  All

3   right, at this time, I'm going to turn the hearing over to

4   Commissioner Harmon, and he's going to go over with you

5   post-conviction factors, then after that, he will return

6   the chair to me and we'll talk about parole plans, okay?

7            **DEPUTY COMMISSIONER HARMON:**  Okay, good afternoon

8   again there, Mr. Holder.

9            **INMATE HOLDER:**  How you doing, Mr. Harmon?

10           **DEPUTY COMMISSIONER HARMON:**  Good.  I want you to

11  listen carefully because we're going to make sure the

12  record is correct.  And we'll clear it up if it's not.  It

13  shows here your last hearing was August 6, of 1997, excuse

14  me, I mean June 27th of '05.  And that was a one-year

15  denial.  That represented subsequent number -- subsequent

16  hearing number three.  You were received at CTF August

17  6th, 1997 from Folsom State Prison.  You custody level

18  today is a Medium A.  Your classification score revised is

19  19.  Does that sound right?

20           **INMATE HOLDER:**  Yes, Mr. Harmon.

21           **ATTORNEY PITMAN:**  You know, if I may, I think the

22  last hearing was actually February of '05, not June.  I

23  may be wrong, but I'm pretty sure it was February 3rd of

24  '05.

25           **DEPUTY COMMISSIONER HARMON:**  Do you have a

26  transcript?

27           **ATTORNEY PITMAN:**  We have a transcript here.

21

1          **DEPUTY COMMISSIONER HARMON:**  Well, then if it's on

2     the transcript, I guess the C-File is -- the 112 is --

3     2/3/05?

4          **ATTORNEY PITMAN:**  Yeah.

5          **DEPUTY COMMISSIONER HARMON:**  Okay, we'll go with

6     that.

7          **ATTORNEY PITMAN:**  Okay.  That's when it was.  I

8     was here, so.

9          **DEPUTY COMMISSIONER HARMON:**  Okay.  Mr. Holder,

10    that sounds right?  Okay, we're going to focus on the

11    period of time since your last hearing.  I'm going to use

12    your counselor's report as reference.  Listen carefully.

13    If there's information I leave out, I'll give you an

14    opportunity to respond, okay?

15         **INMATE HOLDER:**  (Inaudible).

16         **DEPUTY COMMISSIONER HARMON:**  It does show that

17    from May 3rd of '04 to October 15th of '05, it said that

18    you remained at CTF in the general population during the

19    entire period of time, Medium A custody.  There's no

20    vocational training, no work during this period.  It says

21    that you were on the Support Services waiting list.  It

22    says that you were participating in the 12 Step Program,

23    and that was based on various chronos in '04 and '05.

24    There was no psychiatric treatment, you remained

25    disciplinary free.  It says you participated in the Cage

26    Your Rage Program, an anger management group program

27    verified by a chrono dated February 11th of '05.  It shows

22

1   that you completed Dr. Thomas Gordon's Family

2   Effectiveness Training, Harmony in the Home self-help

3   anger management program.  That also being verified on a

4   128B dated April 14th of '05.  Then the counselor picks it

5   up from October 16th of '05 to September 1st, of '06.

6   During this period of time you remained in CTF in the

7   general population, Medium A custody.  There's no

8   vocational training, no academics during this period.

9   There's no work noted.  It says that you are attending the

10  12 step based on various chronos in October and December

11  '05.  There's no psychiatric treatment and you continue to

12  remain disciplinary-free.  That is completed by Counselor

13  Brown and that's common spelling for the transcriber.

14  Does that pretty much bring us up to date?

15          INMATE HOLDER: Yes, Mr. Harmon.

16          DEPUTY COMMISSIONER HARMON:  What is your current

17  assignment?

18          INMATE HOLDER:  I don't have an assignment but I

19  note that I'm not assigned officially, but I volunteer.

20          DEPUTY COMMISSIONER HARMON:  When is the last time

21  you held a job?

22          INMATE HOLDER:  Since I left -- when I left.  2004

23  when I left North Facility.

24          DEPUTY COMMISSIONER HARMON:  2004?  Okay, that's

25  what -- okay, that would be pretty (inaudible).

26          ATTORNEY PITMAN:  And if I might just say, just so

27  it's clear, he's on a waiting list for work, but

23

1    apparently the institution doesn't have jobs.  So, he's

2    willing and able and available and -- but, unfortunately

3    they don't have any job for him at this point.

4            **DEPUTY COMMISSIONER HARMON:**  Okay.

5            **ATTORNEY PITMAN:**  He does volunteer though.

6            **DEPUTY COMMISSIONER HARMON:**  Okay.  You've held

7    some jobs since being in the institution.  Some of those

8    jobs include Porter, Adult Basic Education, Culinary.

9    You've been in the Vocational Program of Janitorial.

10   You've maintained good work reports when you are working.

11   Now, you have a lot of certificates for different phases

12   of your Janitorial Program as well as the stuff that you

13   did on your own.  I was going to say -- now you were

14   transferred at some point during that program, right?  Did

15   you complete the program?

16          **INMATE HOLDER:**  Yeah, I completed the program.

17         **DEPUTY COMMISSIONER HARMON:**  Okay, did you -- what

18   year did you finally complete that?

19         **INMATE HOLDER:**  It was in 90 -- '97, when I left

20   the same year I got transferred.  It was the same year I

21   completed that program.

22         **DEPUTY COMMISSIONER HARMON:**  Okay, what happened

23   to the Mill and Cabinet in '94.  I didn't see a completion

24   certificate there.

25         **INMATE HOLDER:**  I know we spoke about that last

26   time if I'm not mistaken.

27         **DEPUTY COMMISSIONER HARMON:**  Help me out.

24

1    **INMATE HOLDER:**  I spoke about that last time.
2    When I left Delano, I think my supervisor was Martinez,
3    and he was supposed to send because that was a sudden
4    move.  And he was supposed to send my completion chrono to
5    that Cabinet Making, and I never received it.

6    **DEPUTY COMMISSIONER HARMON:**  Okay, so that's still
7    not resolved then?

8    **INMATE HOLDER:**  I haven't received the chrono, but
9    I know I've completed that trade --

10   **DEPUTY COMMISSIONER HARMON:**  Okay.

11   **INMATE HOLDER:**  -- while I was there.

12   **DEPUTY COMMISSIONER HARMON:**  Okay, I don't have
13   it, so I looked in there to try to find out what the final
14   comments were, but I'm sure you've acquired some skills in
15   there from the other ones that I read.  Let's see, I guess
16   you received your high school diploma in Trinidad in '79?

17   **INMATE HOLDER:**  In Providence, Rhode Island.

18   **DEPUTY COMMISSIONER HARMON:**  Was it in Providence,
19   Rhode Island?  I didn't find a copy of your diploma in
20   there.  Is it?

21   **INMATE HOLDER:**  It's in my -- it should be in my
22   C-File, but I have a --

23   **DEPUTY COMMISSIONER HARMON:**  I didn't --

24   **INMATE HOLDER:**  (Inaudible).

25   **DEPUTY COMMISSIONER HARMON:**  I didn't see it in
26   there either.

27   **INMATE HOLDER:**  I have a copy (inaudible).

25

1        **ATTORNEY PITMAN:**  In there?

2        **INMATE HOLDER:**  Yeah, the letter.

3        **DEPUTY COMMISSIONER HARMON:**  Well, I can see

4  you've got hundreds of documents so it could have gotten

5  misplaced in there somewhere.  Did you see it when you did

6  a C-File review?

7        **INMATE HOLDER:**  I wasn't looking for it, Mr.

8  Harmon.

9        **DEPUTY COMMISSIONER HARMON:**  You should, you know,

10  you should always make sure your stuff is in there because

11  a lot of stuff gets lost and misplaced.

12        **INMATE HOLDER:**  Well, I have a letter from the

13  School Department of (inaudible).

14        **DEPUTY COMMISSIONER HARMON:**  Oh, it's not a

15  diploma, it's a letter?

16        **INMATE HOLDER:**  Yeah.  (Inaudible).

17        **DEPUTY COMMISSIONER HARMON:**  Never seen one quite

18  like this, but according to the records of the Providence

19  School Department that Keith Desmond Holder graduated from

20  Central High School in '79.  Did they give you anything

21  other than this when you graduated?

22        **INMATE HOLDER:**  I had a diploma, but you know,

23  moving and stuff, you know, when I came to California, you

24  know, my family couldn't find it.  I never thought that I

25  would need it.

26        **DEPUTY COMMISSIONER HARMON:**  Okay, because there's

27  a couple of issues here.  I mean, I'm assuming, this is

26

1    dated May 7th of '93.  Did you want to see that?  Is that

2    important?

3              **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  No, it's okay.

4              **DEPUTY COMMISSIONER HARMON:**  Okay.  Let me return

5    this to you counselor, thank you.  The reason I bring that

6    up is I need you to help me out here.  Although you claim

7    to have a high school diploma, I noted that the TABE test

8    in 1995 -- I'm going to review some of that with you.  You

9    took this particular TABE test January 13th of 1995.  And

10   it showed in the area of vocabulary and comprehension, a

11   2.8 grade equivalent.

12             **INMATE HOLDER:**  Uh-huh.

13             **DEPUTY COMMISSIONER HARMON:**  And then in math, it

14   showed a total scoring of 3.8.  In the area of language,

15   mechanics, expression, it showed a scoring of 2.0 and

16   total battery of 2.8, January 13th of 1995.  And that was

17   pretty consistent with the other TABE work that you had

18   done.  Now, I went to an old doctor's report just to see

19   if there was anything there, and I found a report from

20   February 28th, 1995 from Joseph Willis, PhD, Staff

21   Psychologist.  That's the common spelling, W-I-L-L-I-S.

22   This particular report was written by the doctor one month

23   after you took your TABE test, and this is what the doctor

24   said under recommendations in part,

25             "If he is not paroled, or in the interim

26             before he is paroled, it would be highly

27             desirable for him to improve his education.

27

```
 1              A letter written by the subject was in the
 2              medical file, and appears to have been
 3              written by a third grader."
 4      Now, that's what the doctor wrote, so that was February
 5      28th of 1995.  And then you took a TABE test June 5th,
 6      1995, just about three months after the doctor wrote that
 7      letter.  And the results of that particular test are as
 8      follows, after the ones I just read, so we stay on the
 9      same page here.  As you know we have lots here so bear
10      with me a minute.  Three months after the doctor wrote
11      that report, you took your TABE test and every category,
12      you scored 12.9.  That's as high as you can go.  Can you
13      explain to me how you're testing into a 12.9 all the way
14      up and down in a three-month period?
15              INMATE HOLDER:  Yes, I can.  That test that I did,
16      that I scored 12.9 was done in an oral test where I was in
17      the phonics class at Delano.  And because of my dyslexia,
18      I was not able to keep up with the time limit, so it was
19      done where I had enough time to do it without any time,
20      and that's why I was able to score a lot higher.  And I
21      have a chrono showing that I've completed -- I've
22      graduated from the Phonics Class in the file that you have
23      in front of you in my black folder.  That's the reason why
24      I was able to score a little bit higher, Mr. Harmon.
25              DEPUTY COMMISSIONER HARMON:  Well, let me explain
26      something.  That is not a little bit higher.  What I saw
27      there was that you were at the third grade level and in
```

28

1   three months you scored a 12.9; that's as high as you can

2   go.  Now, you heard me say the doctor's comments; that the

3   letter appeared that it had been written by a third

4   grader, which is consistent with the scoring.  And then I

5   get into the reading, math, language, mechanics,

6   expression, computation, concepts, vocabulary,

7   comprehension; 12.9 in every category.  Did you cheat?

8        INMATE HOLDER:  No.  Mr. Harmon, I took my time

9   with the test.  They gave me enough time to take my time

10  with the test, and I believe that's why I scored high.

11       DEPUTY COMMISSIONER HARMON:  And what about your

12  writing ability in that three month period?  Do you have

13  anything from June of '95 that we could read?

14       INMATE HOLDER:  I have a few things that I think

15  I've wrote but it's been -- oh, you can look at some of my

16  602s that I've wrote.

17       DEPUTY COMMISSIONER HARMON:  Okay, the reason I'm

18  asking you all these questions is because as you know, you

19  don't have any 115s and that's commendable.  But you've

20  got sixteen 128s.  Those are behavior issues.  And you --

21  I think you're pretty familiar with those.  And I just

22  hope that what I'm looking at, and what I'm contemplating

23  in my mind is that these are aberrations in your behavior,

24  and not a pattern of behavior that's gone back to the life

25  crime.

26       INMATE HOLDER:  Well, absolutely not, Mr. Harmon.

27  I'm a very different man today.

29

1          **DEPUTY COMMISSIONER HARMON:**  Let me tell you

2     something Mr. Holder, I've been doing this in one form or

3     another for 38 years.  I have a pretty good judge of

4     character, and I'm just wondering how that all came about.

5     That's a good question.

6          **ATTORNEY PITMAN:**  How what came about?

7          **DEPUTY COMMISSIONER HARMON:**  The scoring.  That's

8     why I'm asking him that question.

9          **ATTORNEY PITMAN:**  Could I just say one thing

10    before he answers that?

11         **DEPUTY COMMISSIONER HARMON:**  Well, he can stop

12    answering if you'd like.

13         **ATTORNEY PITMAN:**  No, I'm happy to have him

14    answer, but I just wanted to add one thing.  I had a -- in

15    the legal document section of the materials that I

16    received, I had filed a sentencing memorandum at the time

17    that he was sentenced, and in there I indicated that he

18    was ten years old when he arrived in Providence, Rhode

19    Island.  And he began attending school but had experienced

20    great difficulty with schoolwork there.  And then after

21    extensive testing, it came to light that he suffered from

22    dyslexia, a learning disability, which caused him to see

23    letters and numbers backwards.  And once his learning

24    disability was discovered, he was placed in special

25    education classes in the school system.  And I wrote where

26    he worked extremely hard to overcome his difficulties.

27    And then there was -- I said see attached letter from

30

1    Kenneth Dion (phonetic) who was Keith's teacher for three

2    years at Central High School in Providence.  And then,

3    although still suffering from dyslexia for which there

4    apparently is no cure, he stood out for his determination

5    to succeed in school.  The copy that I have here doesn't

6    have the exhibits attached.  I don't know if that letter

7    would be in the file.

8         **DEPUTY COMMISSIONER HARMON:**  I don't think that's

9    the issue counselor.

10        **ATTORNEY PITMAN:**  Okay.

11        **DEPUTY COMMISSIONER HARMON:**  I believe that he may

12   have dyslexia.  That's not the issue.

13        **ATTORNEY PITMAN:**  Okay.

14        **DEPUTY COMMISSIONER HARMON:**  The issue is how did

15   he recover from dyslexia in three months and score 12.9s

16   in every category.

17        **ATTORNEY PITMAN:**  I think what he's saying and he

18   can explain it further, but is that he took this phonics

19   program, and then when he took the second test, they gave

20   him more time to complete it and part of it was oral.  At

21   least that's what I understood the case to be, but.

22        **DEPUTY COMMISSIONER HARMON:**  Do you want to

23   comment (inaudible)?

24        **INMATE HOLDER:**  That's exactly what I said,

25   they -- by having more time, and I think I was able to me

26   more comfortable, take my time with the test, I believe

27   that's why I scored high.

31

1          **DEPUTY COMMISSIONER HARMON:**  You can't go any

2     higher.  That's the mark of a genius, almost.  It is, in

3     terms of a high school scoring.  But, okay, that's your

4     explanation.  I just wanted to know.  It's not something I

5     want to overlook.  So, anyway we -- and I don't to take

6     away from the fact that you've had zero 115s and that's

7     excellent.

8          **ATTORNEY PITMAN:**  Could I say one other thing too?

9     There haven't been any 128s since 1999.

10          **DEPUTY COMMISSIONER HARMON:**  I understand.  It's a

11     cumulative effect with me.

12          **ATTORNEY PITMAN:**  Yeah, but he had -- since '99,

13     he's been 128-free as well, so.

14          **DEPUTY COMMISSIONER HARMON:**  Okay, thank you.

15     Now, what I came up with in the file is that you've been

16     through the various STDs; hepatitis, TB, HIV programs.

17     You've been involved in the Impact Program in '99, Life

18     Skills in '99, Americane in '94, Cage Your Rage in '06,

19     that's the new one.  You did some self-help with Dr.

20     Carswell in '02.  Did you bring a copy of the documents

21     you wrote to Dr. Carswell with you today?  On the self-

22     help books?  So I could look at those?

23          **INMATE HOLDER:**  What I wrote to him?  No, I

24     didn't.  I sent it to her and then she sent me the chronos

25     and stuff.  I didn't bring (Inaudible).

26          **DEPUTY COMMISSIONER HARMON:**  Okay, you didn't keep

27     yourself a copy of any of that?

32

1      **INMATE HOLDER:**  I don't remember if I did or not.

2      **DEPUTY COMMISSIONER HARMON:**  Okay.  Then you did

3    the Self Determination Program in '94.  You did the Anger

4    Management in April '05 that we discussed that.  And

5    you've been in AA and NA now going back -- how long have

6    you been in that continuous this time?

7      **INMATE HOLDER:**  I've been going to NA and AA since

8    1995 from Delano to Folsom, and Soledad.

9      **DEPUTY COMMISSIONER HARMON:**  Okay, and you got all

10   12 steps memorized for me?

11     **INMATE HOLDER:**  I have one to eight memorized, but

12   I going to be truthful, I really gave more attention to

13   step eight; make a list of all (inaudible) to make amends

14   to them all.  I thought that was very important.  And on

15   step five is that I admit to God and to ourselves, and to

16   other human beings the exact nature of my wrong.  And

17   four -- step four was -- I don't know this right now, but

18   I can cite the steps from one through eight.

19     **DEPUTY COMMISSIONER HARMON:**  Do you remember the

20   tenth step?

21     **INMATE HOLDER:** No, I don't.  I don't (inaudible)

22   the tenth step is on.

23     **DEPUTY COMMISSIONER HARMON:**  Okay, and why don't

24   you know all 12 steps?  Your reading comprehension levels

25   are as high as they can go.

26     **INMATE HOLDER:**  Well, the reason why I don't study

27   the steps, Mr. Harmon is because the two I just mentioned

33

1    to you was -- it's spiritual and I made amends to all, you

2    know, I made a list of all these people that I've harmed

3    and can willing to make amends to them all, which was step

4    eight, because I feel that those steps are very important

5    for my life; of what I've done.  And the program that I go

6    to, NA and AA, it's a program that I go and I listen to

7    other people's you know, testimonies and things, and maybe

8    I'll get something out of it, but I'm not a drug user.

9    I've never been in alcohol problems, and I've never been

10   involved in anything illegal when it's coming to any kind

11   of illegal substance.  So, if I go to AA, it helps me out

12   spiritually.  It helps me out with the things that I, you

13   know, that I've done.  Like I mentioned those steps to

14   you.  It helps me over that because I know that I've done

15   some wrong things and I want to recognize those things.

16   And I've recognized those things.  But, I'm not -- AA and

17   NA is really set up for you know, the drug rehabilitation

18   situation, the alcoholic rehabilitation situation, and I

19   notice that every Board that I come to, I really get you

20   know, beat up about it (inaudible).

21           **DEPUTY COMMISSIONER HARMON:**  Well, I disagree with

22   you also, Mr. Holder.  That's why they're beating you up.

23   Because you can learn a lot from the 12 steps that don't

24   even apply to drugs or alcohol, like the fourth step that

25   you don't remember real well.  It's dealing with a moral

26   inventory, isn't it?

27           **INMATE HOLDER:**  Make a searching moral inventory

34

1    of yourself.

2        DEPUTY COMMISSIONER HARMON:  Right, so there's a

3    lot.  And when you read the tenth, it's basically a review

4    of four.  That's what it tells you.  That's why I asked

5    you that.  That's how important ten is.  But, yeah, I'm

6    real familiar with all the programs.  You also, I found in

7    there apparently you're involved in basketball.  Is that

8    right?  -You've had a lot of recognition to that?

9        INMATE HOLDER:  Yes.

10       DEPUTY COMMISSIONER HARMON:  Basketball player?

11   Okay.  Is there any other accomplishments?  I know you

12   gave us a big list here of things that you've done and

13   that always helps us a lot.  That's wonderful.  It saves

14   us a lot of time.  Is there anything else of your

15   accomplishments that I missed?

16       INMATE HOLDER:  Well, if you want to look at some

17   of the old stuff that I've been involved in before I got

18   involved in, in this case.  You know, things that I've

19   done in my past, you know.

20       DEPUTY COMMISSIONER HARMON:  Well, I'm stating --

21   remember now, right now, I'm only in post-conviction

22   factors.  That's what the Chair has told me to cover with

23   you, so, and it's really important from the day that you

24   were received into the Department of Corrections until

25   today; is there any other accomplishments you want me to

26   point out?

27       INMATE HOLDER:  I think you covered it all, Mr.

35

1    Harmon.

2        **DEPUTY COMMISSIONER HARMON:**  Okay, we're going to

3    go onto your doctor's reports, and before we do, I want to

4    ask you a couple of very important questions.  And the

5    first question I want to ask you is do you believe you

6    pose a risk to the safety of the people outside of the

7    prison walls today?

8        **INMATE HOLDER:**  No, Mr. Harmon.

9        **DEPUTY COMMISSIONER HARMON:**  Okay, what do you

10   believe makes you a different man today than the man that

11   came into prison for the life crime?

12       **INMATE HOLDER:**  Because I know the difference

13   between wrong and right.  I have not lived all my life

14   being involved in crime.  I have been -- I've worked

15   before.  I'm from a very solid family.  I understand the

16   gravication of what I have done.  I know that I can be

17   much better person, and I don't want to live the life of

18   just living in prison or hurting other people.  You know,

19   I would like to do unto others that I would like others to

20   do unto me.  That's the way I'm going to live my life from

21   the day that you have decided to give me a second chance.

22   I'm not going to be in trouble any more.  I know that. I'm

23   almost 50 years old, I'm for 50 you know, and this not the

24   way I want to live my life.  So, I know that when I leave

25   here, the day I leave here, I'm going to live my life as a

26   productive member of society wherever I go.  I'm never

27   going to be in trouble again, because I don't want to be

36

1    locked up and be away from my family.  My mom is old.  My

2    dad is old.  I don't want to be in prison when I lose

3    them, you know?  And I just know that I'm never going to

4    be in trouble again.  There's no doubt in my mind.  I'm

5    not from that kind of a background.  I got myself involved

6    in a crime.  I got caught, I did my time, and while I was

7    here, I wanted to show people that I can be here without

8    getting involved in the things that you know, plague most

9    of the prison, you know?  So, I believe that when I get

10    out, I won't have a problem.

11              **DEPUTY COMMISSIONER HARMON:**  Okay.

12              **INMATE HOLDER:**  I always live my life pretty good.

13              **DEPUTY COMMISSIONER HARMON:**  Okay, doctor's

14    reports.  In August '06, you have a new report and it's

15    from Dr. Marek, M-A-R-E-K, a psychologist.  And he writes

16    a brief report.  I'm going to just take parts of it.

17    Listen carefully.  This one and the one most recent to

18    that I'll cover also briefly.  I'll give you an

19    opportunity to respond.  The doctor starts out with your

20    history which has been gone over at length with the

21    Commissioner.  I'll go directly to the area of current

22    mental status and treatment needs.  And it says in part,

23    that on the day the interviewed with you, it says,

24    "He was calm and cooperative.  His behavior was

25    appropriate. He exhibited a good insight remorse

26    especially as it relates to his crime."  Under diagnostic

27    Impressions; under Axis I and II, None; Axis V, a GAF of

37

1    85.   "The prognosis is positive for him to be able to

2    maintain his current mental state in the community upon

3    parole."  In the area of the review of the life crime, it

4    says,

5            "Holder took full responsibility for his

6            role in the kidnapping.  He exhibited

7            remorse and has -- and had good insight into

8            the harm that was caused.  His remorse for

9            his crime appears genuine and appropriate."

10   In the area of Assessment of Dangerousness,

11           "His violence potential is obviously lower

12           than the average inmate based on his good,

13           recent institutional adjustment.  If

14           released to the community, his violence

15           potential is estimated to be no higher than

16           the average citizen in the community.  It

17           appears his involvement in the incident

18           offense was essentially an aberration for

19           him.  There are no obvious or significant

20           violence precursors for him."

21   In the heading of Clinical Observations, Comments, or

22   Recommendations, in part,

23           "He is competent and responsible for his

24           behavior.  He does not have a mental health

25           disorder which would necessitate treatment

26           either during his incarceration or on

27           parole.  And parole decision should be based

38

1             on custody factors."

2    The one just prior to that was from '02.  It was from

3    December.  Dr. Martha Carswell, C-A-R-S-W-E-L-L, the staff

4    psychologist.  In that particular report, the doctor once

5    again starts out with your history.  It is repetitive.  I

6    will go directly to the area of -- excuse me a second.

7    Let's see, Dr. Carswell's report.  I'll go to the area of

8    Plans if Granted Release.  I guess it's Article XI or

9    whatever.  Roman numeral XI.  In part it says, "His

10   prognosis for community living is very positive,

11   especially with his family's support."  In the area of

12   Clinical Assessment under Current Mental Status and

13   Treatment Needs, in part is says,

14           "Inmate Holder was cooperative and alert.

15            His mood and affect were within normal

16            limits.  There was no evidence of a mood or

17            a thought disorder.  His judgment appeared

18            to be sound.  There was no evidence of a

19            mood or a thought disorder.  Current

20            Diagnostic Impressions:  Axis I, No

21            Contributory Clinical Disorder; Axis II, No

22            Contributory Personality Disorder; and Axis

23            V, A Global Assessment of Functioning, a GAF

24            of 85.  His prognosis is positive for being

25            able to maintain his current mental state in

26            the community upon parole."

27   In the heading of Review of the Life Crime, in part,

39

1      "He took full responsibility for his part in

2      the kidnapping.  He also demonstrated

3      adequate empathy and awareness for the harm

4      that he caused the victims and those to his

5      life.  Irregardless of the inmate's current

6      explanation of the crime versus the omission

7      of this version in the court record, Inmate

8      Holder still appears to have adequate

9      understanding and empathy for the

10      circumstances leading up to the crime and

11      the damage done to the victims.  His remorse

12      for his crime appears to be appropriate and

13      genuine."

14   In the heading of Assessment of Dangerousness, in part,

15      "This inmate's violence potential within a

16      controlled setting is estimated to be

17      significantly below average relative to the

18      Level II inmate population, and if released

19      to the community, his violence potential is

20      estimated to be no higher than the average

21      citizen in the community.  There are no

22      significant risk factors for this inmate

23      that could be precursors to violence."

24   Under Clinical Observations, Comments, and

25   Recommendations, in part, "This inmate does not have a

26   mental health disorder which would necessitate treatment

27   either during his incarceration period or following

40

1    parole." And that's part of Dr. Carswell's report. So,

2    what I've done there Mr. Holder, is I've taken parts of

3    the two most recent doctor's reports, I've taken parts of

4    the counselor's reports and parts of your entire

5    institutional adjustment. I may have inadvertently left

6    out areas that are important to you and your attorney.

7    I'm going to go back to the Chair here in just a second.

8    But before I do, is there anything that you wish to add to

9    the area that I covered today?

10        INMATE HOLDER: No, Mr. Harmon.

11        DEPUTY COMMISSIONER HARMON: Did we cover things

12    okay?

13        INMATE HOLDER: Yes, Mr. Harmon.

14        DEPUTY COMMISSIONER HARMON: Counselor, are you

15    satisfied?

16        ATTORNEY PITMAN: Yes.

17        DEPUTY COMMISSIONER HARMON: Thank you. I'll

18    return to the Chair.

19        PRESIDING COMMISSIONER HARRIS-RITTER: Thank you.

20    Mr. Holder, let's talk about your parole plans now. I

21    have do have a number of letters; copies and the

22    originals, provided by your attorney. And I don't have

23    any already in there. Let's go through those. I have the

24    first letter, is from your stepsister, Ann Holder. Is

25    that correct? She lives in Trinidad?

26        INMATE HOLDER: Yes.

27        PRESIDING COMMISSIONER HARRIS-RITTER: And she's

41

1    offering you in a letter dated June 1st, 2006, employment

2    in her catering business.  Is that correct?

3         INMATE HOLDER:  Yes.

4         PRESIDING COMMISSIONER HARRIS-RITTER:  And also

5    there's a letter from your brother Gerard offering

6    financial assistance.  That letter is dated January 27th,

7    2006.  And --

8         ATTORNEY PITMAN:  May I just say some -- with

9    respect to Gerard, I would just indicate he's been very

10   supportive of Keith.  He is an attorney and has worked

11   really hard, has this consulting business, which goes --

12   they are hired by different companies, large businesses to

13   set up their diversity training-type programs.  And he's

14   been extremely supportive, and in the letter it indicates

15   that.  And he's also indicated to me that if in the event

16   tat Keith is released, you know, he will provide financial

17   assistance to him.

18        PRESIDING COMMISSIONER HARRIS-RITTER:  Right and

19   also a potential job offer.

20        ATTORNEY PITMAN:  And potential job offer in Rhode

21   Island.  I mean, he would do anything.

22        PRESIDING COMMISSIONER HARRIS-RITTER:  Well, he

23   even indicates that Keith could assist with developing

24   business presence for GH Consulting in Trinidad.

25        ATTORNEY PITMAN:  Right.

26        PRESIDING COMMISSIONER HARRIS-RITTER:  So, either

27   place.

42

1        **ATTORNEY PITMAN:**  That's correct.

2        **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

3    and then the next letter is from you, Mr. Pitman, offering

4    employment in Los Angeles.

5        **ATTORNEY PITMAN:**  That's correct.

6        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is that

7    correct?  So, that's another job offer.  And then the next

8    letter is from Joe Brooks.  It's dated, oh and I didn't

9    say your letter is October 19th, 2006.  Then January 25th,

10   2006 a letter from Essex, Newbury by Joe Brooks from

11   Haverhill, Massachusetts support for you.  It's basically

12   a letter of support and a job offer in his construction

13   company if you were to be in the Massachusetts area.  And

14   February 21st, 2006, a letter from Marcellus Sharp, the

15   President of Customized Cleaning Services, which is a

16   letter of support, and then March 11th, 2006 from Brian

17   Tunstall, T-U-N-S-T-A-L-L, who lives in Lake Balboa,

18   California, which I believe, is in the Los Angeles area.

19       **ATTORNEY PITMAN:**  That's correct.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Then that's

21   an offer of financial support.  And then a letter from

22   Leonard Lopes, L-O-P-E-S, dated February 23rd, 2006, also

23   a letter of support.  And then the next letter is dated

24   January 18th, 2006 from Lorraine Ramos and that's also a

25   letter of support.  Then the next letter is from Joseph C-

26   R-A-V-E-I-R-O, Craveiro indicating support, dated February

27   4th, 2006.  Another letter of support dated February 9th,

43

1    2006 from your friend Butch Correia, C-O-R-R-E-I-A, in

2    Rhode Island.  And the next letter from your fiancé,

3    Hiroko Takagi?  Is that -- how do you say her last name?

4         INMATE HOLDER:  Takagi.

5         PRESIDING COMMISSIONER HARRIS-RITTER:  Takagi.

6    Thank you.  And where -- there's no address on this.

7    Where does she live?  What city?

8         INMATE HOLDER:  She lives in Japan.

9         PRESIDING COMMISSIONER HARRIS-RITTER:  In Japan.

10        INMATE HOLDER:  She's in Japan.  You know, I'm

11   sorry.  Osaka.

12        PRESIDING COMMISSIONER HARRIS-RITTER:  Osaka?  And

13   how long have you known her?

14        INMATE HOLDER:  Since 1997, I believe, '97.

15        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

16        INMATE HOLDER:  '97, (inaudible).

17        PRESIDING COMMISSIONER HARRIS-RITTER:  The reason

18   I'm asking is because there's someone referred to in the

19   probation officer's report whose name is similar to this.

20   It's spelled differently than she spells it, but it could

21   be pronounced Hiroko also, who was a friend of yours who

22   had an interest in the case, and I'm wondering if it's the

23   same person, that's all.

24        ATTORNEY PITMAN:  It is.  He's known her since

25   before the commitment offense.

26        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

27        ATTORNEY PITMAN:  Before he was convicted.

44

1          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, so

2    longer ago than 1997.  All right, then there's a letter

3    from your mother, Sheila Holder, and it's dated March

4    21st, 2001, but there's a note at the bottom from your

5    brother that indicates your mother has dementia and so

6    she's unable to write a new letter.  Is that your

7    understanding as well?

8          **INMATE HOLDER:**  Yes, (inaudible) and she also

9    unfortunately suffered a stroke in September of this year.

10         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, so

11    she's not able to write a new letter.

12         **INMATE HOLDER:**  That's correct.

13         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All right,

14    and then there's a letter from your father, Elias Holder,

15    dated January 19th, 2006.  There's also one from him in

16    '03, both offering support.  And then there's a letter

17    dated February 14th, 2006 from Linell Baptiste (phonetic)?

18         **INMATE HOLDER:**  Yes.

19         **PRESIDING COMMISSIONER HARRIS-RITTER:**  And who is

20    Linell?

21         **INMATE HOLDER:**  She's my sister.

22         **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay.

23    That's what I thought, I just wanted to make sure.  That's

24    a letter of support.  And then there's a letter from

25    Diego, is it Jones?

26         **INMATE HOLDER:**  Yes.

27         **PRESIDING COMMISSIONER HARRIS-RITTER:**  It's hard

45

1    to read his handwriting, who lives in Providence, Rhode

2    Island and is also offering support.  So, it appears to me

3    that you have job offers in three states and one other

4    country.  Is that correct?

5            INMATE HOLDER:  Yes.

6            ATTORNEY PITMAN:  And may I just add one thing?

7            PRESIDING COMMISSIONER HARRIS-RITTER:  Certainly.

8            ATTORNEY PITMAN:  The letter from Marcellus Sharp,

9    who's that president of Customized Cleaning Services.

10           PRESIDING COMMISSIONER HARRIS-RITTER:  Yes.

11           ATTORNEY PITMAN:  He had written an earlier letter

12   also offering support.  I believe I have a copy of that.

13           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, this

14   is fine.

15           ATTORNEY PITMAN:  And then the Board wanted an

16   updated letter.

17           PRESIDING COMMISSIONER HARRIS-RITTER:  Right.

18           ATTORNEY PITMAN:  So he wrote an updated letter,

19   and said he continues to offer that support.

20           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, thank

21   you.  Now, I didn't see, and I want you to point out to me

22   if it's someplace that I just happened to miss it, I

23   thought these job offers -- I didn't see an offer of a

24   residence.  Is that in there and I missed it?

25           INMATE HOLDER:  For which places?

26           PRESIDING COMMISSIONER HARRIS-RITTER:  Any places.

27           ATTORNEY PITMAN:  I know --

46

1          INMATE HOLDER:  All of them.

2          PRESIDING COMMISSIONER HARRIS-RITTER:  All of

3    them?

4          INMATE HOLDER:  All of them.

5          ATTORNEY PITMAN:  I know Brian Tunstall, in his

6    letter, I believe --

7          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Are these

8    questions directed to counsel or to the inmate?

9          ATTORNEY PITMAN:  Oh.

10          PRESIDING COMMISSIONER HARRIS-RITTER:  They're

11    directed to the inmate, but counsel can help.  If it's a

12    problem, I'll take care of it.

13          ATTORNEY PITMAN:  In the Tunstall letter, he

14    indicates, "I'm willing to provide him with a place to

15    stay and assist him in finding gainful employment."

16          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

17          ATTORNEY PITMAN:  That's a person in Los Angeles.

18          PRESIDING COMMISSIONER HARRIS-RITTER:  All right,

19    and Mr. Holder, what is your understanding regarding a

20    place to stay in Trinidad?

21          INMATE HOLDER:  I'll be staying with my sister.

22          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  All

23    right, is there anything else that you want to add related

24    to your parole plans that we haven't gone over?

25          INMATE HOLDER:  Well, I want to make sure that

26    it's clear that I also will be -- you know, we do have a

27    home in Rhode Island.

47

1            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

2            INMATE HOLDER:  So, you know, of course I can -- I

3      have a place to stay in Rhode Island.

4            PRESIDING COMMISSIONER HARRIS-RITTER:  Is that

5      with your father?

6            INMATE HOLDER:  No, that's my mom.

7            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

8            INMATE HOLDER:  My mom owns a place, my dad owns a

9      place, my brother owns a place, so.

10            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  All

11      right, then we'll move on.  I want to note at this time we

12      sent out Penal Code section 3042 notices.  They go out to

13      agencies that have a direct interest in your case.  As a

14      result of that, we do have a representative from the

15      District Attorney's Office from Los Angeles County.  And I

16      have a question, and in fact, maybe Mr. Pitman or Mr.

17      Sequeira will have to answer this for me, but I note in

18      looking through these copies of the notices that went out,

19      one went to the presiding judge, one to the District

20      Attorney's Office, one to the Assistant Attorney General,

21      one to the public defender, and one to the Beverly Hills

22      Police Department.  And in looking at the probation

23      officer's report, it looked to me like it was prepared by

24      somebody in the sheriff's office.  So, do either of you

25      recall or have a record that would show that the

26      investigating agency on this was the Beverly Hills Police

27      Department?

48

1          ATTORNEY PITMAN:  Yes.

2          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  It's reflected

3     in the probation report.

4          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay, thank

5     you.

6          ATTORNEY PITMAN:  Yeah, the Beverly Hills Police

7     Department in --

8          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  First of

9     Detective Decure (phonetic) from the Beverly Hills Police

10    Department.

11         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

12         ATTORNEY PITMAN:  The IOs were Detective Decure

13    and (inaudible).

14         PRESIDING COMMISSIONER HARRIS-RITTER:  That's

15    fine.  I just wanted to make sure on the record that we

16    were okay with that.  All right.  Then at this time, Mr.

17    Holder, we move to the part of the hearing where we can

18    ask you questions.  I don't have any additional questions

19    for you right now, so I'm going to ask Commissioner Harmon

20    if he has any, but I also just want to let you know before

21    we go to Commissioner Harmon, that after that, then the

22    representative from the District Attorney's office will be

23    able to ask you questions, and he will do this by asking

24    the question -- directing it to the panel.  Then you'll

25    hear the question and then you may answer to the Panel,

26    unless there's some clarification needed.  If there is,

27    please tell me, and then I will have him clarify.  After

49

1    that, then your attorney will be able to ask you

2    questions.  Following that, then we move to the final

3    statements, okay?

4            INMATE HOLDER:  Yes.

5            PRESIDING COMMISSIONER HARRIS-RITTER:  All right,

6    Commissioner Harmon?

7            DEPUTY COMMISSIONER HARMON:  Yeah, this will be a

8    little bit out of sequence here, but I want to ask you the

9    question, why did you do this kidnapping?  What were the

10   reasons you (inaudible)?

11           INMATE HOLDER:  Well, as I stated before, Mr.

12   Harmon, it was about trying to gain some money to advance

13   my business.

14           DEPUTY COMMISSIONER HARMON:  Okay.  And I went all

15   the way back to your initial hearing.  You said you've

16   been hounded about this 12 Step thing for years, and I

17   went back to the initial hearing in 1997.  And what I

18   found in here; Deputy Commissioner Douglas asked you on

19   page 19, because you were in a 12-step program at the

20   time, and he says to you, I'll just take parts of it here.

21   It says,

22           "Well, let me ask you something, how many of

23            the steps do you and how many have you

24            applied to your actual lifestyle?  And you'

25            said, I know eight of the steps.  And

26            Douglas says, you know eight of the steps?

27            Eight of them?  Okay, so the fourth one is

50

1              to make a fearless and searching inventory,

2              right?  It is."

3    And then it goes on.  And then of course, you know,

4    there's question as to the 12 steps.  And then you and I

5    met back in '03 and we discussed it again.  And it's been

6    discussed in the meantime.  I'm just going back to me

7    since it was me.  And it says here -- I'm trying to cut it

8    down so we don't go into a lot of detail here.  I asked

9    you about the steps and at the time, I'm just going to

10   paraphrase here.  You said to me -- I said to you, did you

11   ever learn the steps?  And you said, some of the steps.

12   And I said to you, you don't know them all?  All the years

13   you've been in it and you don't know the steps?  I'm on

14   page 35 and 36 and it goes on.  And then you go to explain

15   the steps and all, but it was obviously a concern and all

16   that.  And we discussed the same things.  So, it's not

17   that we're picking on you, it's just that we just can't

18   get an understanding of why you're in the program and yet,

19   you still can't --

20            INMATE HOLDER:  Look, Mr. Harmon, I told you that

21   I enjoy going to the program.  I listen to a lot of the

22   testimonies that the guys gave and I feel that it will

23   help me in a way that, if I met someone someday that is

24   involved in drugs or alcohol, and et cetera, I can share

25   verbally the experiences that I have heard through

26   testimonies from other guys what drugs and alcohol do to

27   them.

51

1    **DEPUTY COMMISSIONER HARMON:**  Okay, that's

2    wonderful.  That's wonderful.  I guess what I'm worried

3    about is another kidnapping.

4        **INMATE HOLDER:**  Oh, Mr. Harmon.  (Inaudible).

5        **DEPUTY COMMISSIONER HARMON:**  No, I'm telling you

6    right up front.  What you did was one of the most

7    conniving serious crimes that could happen to innocent

8    people in their own home; a place of shelter, a place that

9    should never ever be attacked.  And if I have a person

10   that's sitting before me and I believe I'm being -- that

11   person's being deceptive, that's a real concern of mine.

12   And so that's why I'm asking you these questions.  Because

13   what I look at when I look through these transcripts, is

14   I'm being snowed.  That's what I look at is that there's a

15   lot of verbiage going on, but nothing's happening.  I mean

16   everybody knows the words remorse and insight, and all

17   that kind of stuff, but I want to get down to the nitty

18   gritty because the crime that you committed is one of the

19   worst crimes that can happen in my mind to an innocent

20   child and people.  So that's why I'm asking you these

21   things.  So, I want to ask you; I know you did it for

22   greed.  I've read all about the businesses and you and I

23   have met before.  What -- are you the -- I know you had a

24   crime partner.  Are you the planner of this whole crime?

25       **INMATE HOLDER:**  Yes, Mr. Harmon.

26       **DEPUTY COMMISSIONER HARMON:**  By yourself?

27       **INMATE HOLDER:**  No, Mr. Harmon, not by myself.

52

1    But I'm the person that was 100 percent responsible for

2    this crime.

3         DEPUTY COMMISSIONER HARMON:  I know you're

4    responsible for the crime.  Who thought up the crime?  Who

5    was the planner?  Who's the one that the idea was

6    triggered from?

7         INMATE HOLDER:  Myself.  I was the one that the

8    idea was triggered from, Mr. Harmon.  And then my other

9    crime partners got involved and we discussed the crime.

10        DEPUTY COMMISSIONER HARMON:  So the whole thing

11   was your idea, and you approached them.  Is that right?

12        INMATE HOLDER:  Yes, Mr. Harmon.

13        DEPUTY COMMISSIONER HARMON:  And did you,

14   yourself, ever threaten to kill anybody in that home?

15        INMATE HOLDER:  No, Mr. Harmon, I didn't threaten

16   to kill anybody in that home.

17        DEPUTY COMMISSIONER HARMON:  Did anybody threaten

18   the victim's with being killed.

19        INMATE HOLDER:  Yes.

20        DEPUTY COMMISSIONER HARMON:  And who was that?

21        INMATE HOLDER:  My crime partner.  Is it okay to

22   say his name?

23        DEPUTY COMMISSIONER HARMON:  I know your crime

24   partner's name, but you can say it.

25        INMATE HOLDER:  I'll answer the question, Steve

26   Rose.  But that was just a, you know, scare tactic.  I

27   think, Mr. Harmon you know the last time I met you, you

53

1    dealt with me and it was on different level.    It wasn't

2    this hard, but I respect that.    And I just want you to

3    know, in my heart that the day that you decide to give a

4    second chance in my life, you will never have to worry

5    about me again.

6        **DEPUTY COMMISSIONER HARMON:**    Okay.    Well, Mr.

7    Holder, I'm going to tell you right up front.    I'm

8    disappointed in you.    You know, I usually don't like to

9    come back a second time with anybody I meet, and they

10   haven't done what I've asked.

11       **INMATE HOLDER:**    What was it that you asked Mr.

12   Harmon, the last time that we met?

13       **DEPUTY COMMISSIONER HARMON:**    I don't think I have

14   to go over that again.    This is a serious crime.    This is

15   a very serious crime, and I'm looking to see whether or

16   not, you know I'm ready to give you the keys to the door,

17   you know?    And it's just my impressions that you leave me

18   with, that's all.    I don't have any magic that tells me

19   that your -- are reformed or you're not.    I have to go on

20   instinct on a lot of it.    A lot of it is subjective, you

21   know?    But, I'm disappointed.    On the other hand, you're

22   doing a lot of good things too.

23       **INMATE HOLDER:**    I'm sorry that you're disappointed

24   in me this time, Mr. Harmon.    You didn't sound this way

25   last time I met you.    But, you know, I'm trying my best.

26   I'm doing my best, and I think that in 16 years that I've

27   been down in prison, I think I have proven that I can stay

54

1    out of trouble.  I mean, you know, I just want to get

2    another chance to just have a life, have a family.  I

3    don't even have a family, you know.  So, you know,

4    whenever you decide, you know, I just hope that I'm here

5    to sit in front of you.  But I just want you to know that

6    I'm going to do unto others that I'd like others to do

7    unto me.  And I understand that this is a serious crime.

8    And I've always come here, and the times that I've sit in

9    front of you, I've always been straightforward with you.

10   But, there's nothing I can do to change what I've done 16

11   years ago, Mr. Harmon.  There's nothing I can do.  But I

12   can tell you I'm a better person today.  I'm a better

13   person today.  And I just want to be able to get out and

14   take care of my mom, you know, just whatever I have left.

15   That's all I want to do.  I'm not going to be in handcuffs

16   again.  I know that for a fact.  I know you don't know

17   that because I'm sitting here, because I did something

18   terrible, you know, to my friend.  She's no longer here.

19   But I'm telling you, I know I'm not going to be in trouble

20   again, so whenever you're ready to give me that chance, I

21   hope I'll be able to sit here in front of you and you say,

22   Keith, it's your time, you know.  There's nothing I can

23   do.  I can't change it.  I can't change it.  I'm very

24   sorry for what I've done, and I think by just showing that

25   I can be a better person because I'm from that

26   environment.  I'm not from the environment of drugs,

27   alcohol, guns, killing people, you know, I've done

55

1  something wrong.  I -- you know it was a bad idea.  I take

2  full responsibility for what I've done.  Full

3  responsibility.  I'm not shifting blame on anybody.  I

4  know I've done that.  You know, but there's no loss of

5  life to my crime.  I understand that.  I know I did a

6  terrible crime.  It's the same as if I took a life or

7  something, you know, but, you know, 16 years in prison.

8  You know, it's not easy, Mr. Harmon.  You know, walking

9  that line is not easy.  It's not an easy way to live.  And

10  I just want you to know that.  In my heart, that I know

11  I'm going to be a better person and I know I will be when

12  I leave this place.  You'll never have to worry about

13  (inaudible).  You never pick up the newspaper and see my

14  name in it again.

15       **DEPUTY COMMISSIONER HARMON:**  Okay.  Okay.  I will

16  return to the Chair.

17       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

18  Mr. Sequeira, do you have any questions that you'd like to

19  pose to the inmate through the Board?

20       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Yeah, I would

21  like to know why the inmate thinks that sixteen 128s

22  during his last 16 years in prison means he's been

23  performing well.

24       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Answer to

25  the Panel.

26       **INMATE HOLDER:**  I would like you to know that a

27  lot of the 128s that I have for not -- for instance, not

56

```
 1    showing skin.  I was sleeping.  I'm not showing skin.  Or
 2    out of bounds.  It doesn't show that I'm a threat to
 3    society because I was sleeping and not showing skin.
 4    They're warning 128s, you know?  I haven't been in any
 5    violent things, no drugs, no assault on staff, no
 6    threatening staff, no -- I mean, you know in a lot of the
 7    128s, when we come to the Board, it's one side.  It's you
 8    know, the inmate never gets a chance you know, to really
 9    say hey, you know, it's one-sided.  You know, the officer
10    has the power to do anything when the -- it's coming to a
11    128.  Just write it, send it to his file.  It doesn't have
12    to go to like a 115 has to be looked at the sergeant,
13    looks at the lieutenants, before they say it's worthy, you
14    know?  So, I mean, you know, the 128s I have, you can see
15    all of them; what they're about.  None of them is saying
16    that I've done anything that would make me a bad person in
17    society because he wasn't showing skin or he was out of
18    bounds, walking on the line or something like that, going
19    into the program office when you're not supposed to go
20    into the program office.  I was mowing the yard, you know.
21    You know, so, I mean, you know, just having you know, the
22    sixteen 128s that I have on my file; none of them have
23    shown that I'm a threat to society or I'm a threat to
24    myself or to others.  You know, I mean, you know, they're
25    128s for warning (inaudible) Mr. Holder.  Some officers
26    will pull you over and talk to you, some officers just
27    want to write it because they know, that you know, how it
```

57

1    affects us at the Board.

2           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  Any

3    further questions?

4           DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Yeah, just a

5    minute.

6           DEPUTY COMMISSIONER HARMON:  While he's looking,

7    but just so you know Counsel, the letter is in the file.

8    I knew it was there earlier.

9           ATTORNEY PITMAN:  Which letter?

10          DEPUTY COMMISSIONER HARMON:  From the lady that

11   passed away.

12          ATTORNEY PITMAN:  Oh, okay.

13          DEPUTY COMMISSIONER HARMON:  Okay.

14          ATTORNEY PITMAN:  Good.  I don't know if the one

15   from Mr. Dion is in the file either, but that was the

16   special ed teacher at his school.  If not, I have a copy

17   in my file, my original file that a --

18          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  I have no

19   further questions.

20          PRESIDING COMMISSIONER HARRIS-RITTER:  Thank you.

21   Mr. Pitman, do have any questions you'd like to pose to

22   your client?

23          ATTORNEY PITMAN:  I don't have any questions that

24   I need to pose to him.

25          PRESIDING COMMISSIONER HARRIS-RITTER:  All right,

26   then we'll move to final statements.  We'll start with the

27   representative from the Los Angeles County District

58

1    Attorney's office.

2          **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** Thank you.

3    I'd ask the panel to find the inmate unsuitable for parole

4    at this time for the following reasons. First of all, the

5    commitment itself -- offense itself involved an extreme

6    amount of planning and premeditation. It was a crime that

7    involved multiple victims. The poor housekeeper was

8    absolutely terrified, the victim's mother, what is -- in

9    panic over the disappearance of her baby, and of course

10   the father of the baby was also understandably shook up by

11   this whole incident. The inmate planned this crime out of

12   greed. He needed the money. He also claims that there's

13   this romantic relationship with the victim's mother, and

14   frankly in everything that I've seen with respect to the

15   inmate's various statements about the deceased victim in

16   this case, it seems to me today that he's finally

17   admitting that she was, in fact, a victim, where in the

18   past, he's tried to indicate that she was a co-

19   conspirator, that she was involved in the kidnapping of

20   her own baby. Now, that's the kind of pattern with this

21   inmate before I (inaudible) times, kind of shift the blame

22   on her and I can tell you through the original police

23   reports how he manipulated her; how, when his story

24   started going south, when the baby was turned in by one of

25   his crime partner's friends in Compton, how he accompanied

26   her down to the police station, got her to try and change

27   her story around to help his means, you know, he was

59

1   clearly manipulating her.  And the reason I say he was
2   manipulating her and continue to manipulate is you look at
3   the probation report and you look at this contact person
4   who was arrested, and that's this woman named Hiroko
5   Hitachi who's now his fiancé, or has been his fiancé for
6   the 17 or 18 years.  So, he has this great relationship
7   with the victim's mother or the victim in the case since
8   she'd also be considered the victim.  What's the
9   relationship with this other woman?  Well, obviously if we
10  would believe that he's manipulating the victim's mother
11  during this whole crime to begin with, which makes it even
12  more serious.  Not only does he victimize this poor woman
13  and (inaudible) and the child, and the husband and the
14  father of the child, but he continues to torment her and
15  that's even evidenced in the letters that she's writing to
16  try to help him later on, because she feels sorry for him,
17  because she feels bad that he got involved in it.  It's
18  probably hard for her to believe that he would try to
19  extort money from her husband in the amount of $400,000.
20  This manipulative nature also shows itself once he comes
21  to prison.  What does he say about his 128s?  At the last
22  hearing he says, well, the officers just write you up for
23  anything.  He doesn't seem to be willing to follow the
24  rules in prison.  I mean there are specific rules, and
25  maybe he could argue that maybe one of these 128s is a
26  little unfair, but there are 16 of them.  And he doesn't
27  seem to think that he's guilty of any of those 16.  If he

60

1  can't follow the rules within the institution, how can he

2  he expected to follow the rules outside in society?  And

3  you know he's been to Panels numerous times before.  They

4  discussed issues about the 128s with him at the last

5  Panel.  He was also asked why he didn't have a work

6  assignment at the last Panel and part of it was attributed

7  to the transfer of prisons, but again, he's not working

8  here.  He seems to program only if he thinks it will help

9  him in some way.  It's just like the whole 12 steps.  He

10  doesn't really know the steps, he's just going through the

11  motions because he feels he has to.  And he doesn't -- and

12  I don't see any true understanding of the steps.  I mean,

13  he talks about the steps as if it's something he has to

14  learn to help somebody else, not as if the steps were

15  designed in some way to help him in terms of his own self-

16  awareness and self-help.  Because I don't think that he,

17  still to this day, thinks he's really done much wrong.  I

18  mean, it's all in the name of love according to him or

19  then, or for his failing business.  You know, I think he's

20  a master manipulator.  I think that this is a pattern with

21  him, and I think he poses an unreasonable risk to society

22  due to his 128s and the seriousness of the offense, his

23  lack of adequate self-help programming, and he certainly

24  could do much more in those areas.  And for those reasons,

25  I'd ask the Panel find him unsuitable for parole and to

26  make it a two-year denial.  Thank you.

27          PRESIDING COMMISSIONER HARRIS-RITTER:  Thank you.

61

1    Mr. Pitman?

2         ATTORNEY PITMAN:  Thank you.  May I just -- there

3    is a question I'd like to ask.

4         PRESIDING COMMISSIONER HARRIS-RITTER:  Certainly,

5    go right ahead.

6         ATTORNEY PITMAN:  That I neglected to.  Mr.

7    Holder, with respect to the self-help programs that are

8    available here, can you tell us what they are?

9         INMATE HOLDER:  The self-help programs?

10        ATTORNEY PITMAN:  That are available to you.

11        INMATE HOLDER:  Yes.  NA, AA, the Life Skills, the

12   One-on-One Groups that you know, I have some chronos in

13   when I see Dr. (inaudible).  You know the ones that I have

14   done, the Cage Your Rage, all of -- these are all the

15   self-helps that they had.

16        ATTORNEY PITMAN:  Okay.

17        INMATE HOLDER:  And I have done all the self-helps

18   that you know, was available to me.

19        ATTORNEY PITMAN:  Okay.  And I'm ready to make my

20   closing.

21        PRESIDING COMMISSIONER HARRIS-RITTER:  Go right

22   ahead.

23        ATTORNEY PITMAN:  First of all, I would indicate

24   that my position is that Mr. Holder is a suitable

25   candidate for parole at this time.  We believe, based on

26   his background, based on his institutional adjustment, and

27   based on all the facts and circumstances surrounding both

62

1   the incident and his incarceration, that he would not pose
2   an unreasonable risk of danger to society or be a threat
3   to the public safety.  I would begin by indicating he's a
4   high school graduate from Central High School in
5   Providence, Rhode Island.  He has no juvenile record or
6   history of criminal behavior of any kind.  He -- other
7   than the commitment offense, he has a minimal adult record
8   consisting of one misdemeanor to which he pled no contest
9   to in Glendale.  Apart from the incident case and I think
10  this is somewhat debatable, but apart from that, he has no
11  record whatsoever of any kind of violent behavior, no
12  record of assaultive behavior of any kind.  He's been in a
13  pretty tough environment for the last 16 years in the
14  California Department of Corrections.  He's been through
15  some pretty hard prisons; has no 115s, no record of any
16  kind involving dangerous, violent, assaultive behavior,
17  with respect to other inmates or staff.  He has a stable
18  social history with respect to his relationships both in
19  the institution and outside.  He has maintained extensive
20  relationships, both with family and with friends, and
21  people he's known since he was in Rhode Island.  He also
22  has a stable work history while he's been in the
23  Department of Corrections.  I would take offense also to
24  Mr. Sequeira's comments about Mr. Holder's work situation.
25  He's on a list and would like nothing more than to be able
26  to have a job here and to work, but unfortunately, he's on
27  a waiting list.  He was moved from the north facility here

63

1   to the -- he was downgraded, I suppose, to the Level II

2   yards and there just are no job assignments for him.

3   Throughout his time in prison he has really attempted to

4   involve himself in vocational skills including Janitorial,

5   for which he received several commendations and you know,

6   has really worked hard.  He also did the Mill and Cabinet

7   Program.  He worked as a Porter, and whenever there's been

8   work for him to do, he's done it.  He volunteers here.  He

9   has a section of the yard that he keeps clean.  Everyday

10  he dumps the trash, he cleans it, picks up papers, but

11  unfortunately there's no official job assignment for him.

12  But while in prison, he is certainly, I believe, enhanced

13  his ability to function as a law abiding citizen in

14  society.  Number one, he has participated extensively

15  throughout his 16 years in self-help programs, educational

16  programs, therapy, and vocational.  And I left out that he

17  also was certified as a Propane Technician.  I think he's

18  shown real maturation and growth while inside, and I

19  believe that has reduced his likelihood of recidivism.

20  You know, he came out to Los Angeles; it was the first

21  time he was away from his family.  He was running around,

22  he was on the streets, he was you know, hanging around

23  with all you know, different kinds of people at that time.

24  And I think he's really learned you know, I think he's

25  matured and grown and realizes what's important in life

26  and what's important to him, and I think he's expressed

27  very clearly that he you know, would not be back in this

64

1  situation, and frankly, I believe him.  I think he's
2  speaking from his heart and I think he's telling the
3  truth.  I think his remorse is truly genuine.  I think he
4  is not only remorseful that you know, he did this crime
5  and got in this situation and destroyed a large portion of
6  his own life and his family's life, but I think he really
7  feels true remorse for the victims of this offense and the
8  people that he has hurt, and did hurt, through this
9  offense.  And I'll just talk a little bit here about the
10  12-step programs.  Keith has never drank really in his
11  life, never took any kind of illegal drugs of any kind.
12  And with respect to his abilities, I don't know about the
13  testing, I wasn't there when he took these tests.  I don't
14  know who administered the tests at these different times,
15  so I can't really speak to the difference in the scores,
16  but I know you know, he has wanted and tried to avail
17  himself of every possible self-help program, and
18  unfortunately there aren't a whole lot of them.  There are
19  AA and NA, and I recognize that those are wonderful
20  programs and really help a lot of people.  I think Keith
21  goes to those programs and takes from it what he can.  I
22  don't think he's got the kind of mind that can memorize
23  steps and is analytical in a certain sense.  I think he's
24  articulate, I think he's bright, but I think it's
25  difficult for him to just sit there and memorize all the
26  steps, and I mean, if that I think would make the
27  difference that he could come in and memorize all those

65

1    steps, and I don't mean to be facetious in any way, you

2    know, I think he'd start working on it today because, you

3    know, I think he is sincere, and I don't think he's trying

4    to be deceptive at all.  I think what he takes out of the

5    NA and AA programs is that he's learned that it's

6    important for him to make amends to the people that he has

7    hurt.  And he's tried to do that.  He writes letters

8    constantly to his family, to other people, and I think

9    that he sees that as what's important to make amends, to

10   take a moral inventory of himself.  I don't know all the

11   steps quite frankly, but I think that he takes what he can

12   and I think he was trying to express that you know, he

13   listens to the stories, and I'm sure the inmates in here

14   have you know just, you know, incredible stories of their

15   problems and how drugs and alcohol destroyed many lives

16   and their lives and their family's lives, and I think that

17   he feels that that's something that he can take with him

18   and maybe pass it on to others; at least that aspect of

19   it.  But I think he has grown through his participation in

20   those programs.  And I think also, with respect to the

21   anger management, with respect to the therapy that he has

22   had while in here, I think that he's really grown

23   enormously in that respect as well.  With respect to his

24   disciplinary situation while in prison; I would again

25   reiterate that he has had no 115s, which, of course, are

26   serous disciplinary violations.  So in the entire time

27   he's been here, he has had no 115s.  With respect to the

66

1    128s, I know that those are not adjudicated types of
2    write-ups or anything.  There's no hearing, you're not
3    entitled to be heard, you're not entitled to have a
4    hearing where someone here, an impartial officer or
5    somebody or adjudicator hears evidence and makes some kind
6    of decision as to whether the 128 is well-founded or not,
7    or whether it's true.  But he has had these 128s and they
8    are considered to be minor write-ups.  I would -- and he's
9    not proud of them, and he shouldn't have them, and you
10   know they are for things; for not showing skin while
11   you're sleeping or you know, he's in a new place and he
12   walks into an office or something, and not to minimize it,
13   but I think the important point that I want to make is,
14   since 1999, he has not had a 128 or negative chrono of any
15   kind and that's going on -- that's over seven years that
16   he, not only has never had a 115, but has not had any
17   128s.  And I think that's significant, and I think it
18   shows growth and an ability to figure out you know, what
19   he needs to do to really adjust and to not upset anybody
20   within the system, and I think he's done that.  With
21   respect to his parole plans, I think his plans are
22   realistic.  I think there is a real chance that he will be
23   deported.  If that's the case, he would be sent back to
24   Trinidad.  He has his sister there.  There's also another
25   letter from a person in Trinidad who would assist him.
26   His sister owns a business.  I have spoken to his sister.
27   She is ready to put him to work and to give him a place to

67

1   live and she, along with the rest of the family, is

2   hopeful that someday he can be out and with his family.

3   His plans in Los Angeles; he has employment prospects as

4   well as in Rhode Island, and those are real and viable,

5   and I think that his plans are realistic, and he does have

6   a family support and other support.  With respect to --

7   I've already talked about his institutional behavior.  I

8   would just indicate the psychiatric reports and the

9   reports by the psychologists have all been consistent.

10  They've all been very favorable.  There was a report from

11  1999 where the doctor indicated that in his position or in

12  his opinion, (cough) excuse me, if Mr., Holder were to be

13  paroled, he would "be likely to succeed in excellent

14  style".  He has a very low potential for violence, both in

15  the institution as well as in society.  And I think that's

16  something that's extremely important that the Board should

17  consider.  He's now served 185 months in prison for this

18  crime, which is an extremely long period of time.  And I

19  would just indicate with respect to the commitment

20  offense, there were no physical injuries of any kind

21  contrary to what Sequeira said.  The father of this child

22  never was even aware of the kidnapping, was never in

23  court, never had anything really to do with it on any

24  level.  The plan was not to injure anybody or hurt

25  anybody, and nobody again, was physically injured.  Not to

26  say that there wasn't psychic damage and not to say that

27  it wasn't an extremely serious offense, and we don't want

68

1    to downplay it.  I would further indicate that the

2    counselors and the staff in the Department of Corrections

3    have indicated that they view him favorably, both through

4    the chronos that we've presented as well as different

5    letters that have been written.  I believe he's a low

6    risk.  I think that's consistent with the staff here who

7    are you know, have expertise in that as well as the

8    forensic psychologists and psychiatrists.  He has a

9    laudatory chrono in his file for saving someone's life

10   here.  And I would just close by saying you know, that I

11   think Mr. Holder had worked you know, really hard.  He's

12   cleared up the problem of the 128s and hasn't had any in

13   over seven years.  At the last Board Hearing, he was asked

14   to continue with self-help, which he has done with these

15   two programs that we've submitted; the Life Skills and the

16   Cage Your Rage and the Family Effectiveness Training

17   programs.  And he was also asked to submit updated

18   letters, which he has done.  Those were the two basic

19   suggestions that were made to him at the last hearing.

20   And just on a personal note, I've known Mr. Holder since

21   1990 and it's painful for me to come in here and see him

22   because I think he's a good person and I think he made a

23   terrible mistake.  I think he did something incredibly

24   stupid, and I think he knows that, and I think he hurt

25   people.  And I've seen him many times over the last 16

26   years, and you know, I'm watching him grow old in here as

27   we're all you know, getting older from the time that I

69

1  first met him. But I truly believe in my heart that he is

2  someone who, if released, would be an excellent candidate

3  and would not be back. And I would just really implore

4  the Board members to you know, to give him a chance and to

5  find him suitable. And I would submit the matter.

6  　　　　PRESIDING COMMISSIONER HARRIS-RITTER:  Thank you.

7  Mr. Holder, would you like to make a final statement?

8  　　　　INMATE HOLDER:  Yes.

9  　　　　DEPUTY COMMISSIONER HARMON:  Excuse me. Let's take

10  a break here a second and change tapes. You guys don't

11  know if there are any sealed tapes do you?

12  　　　　Male:  Not unsealed. I can get (inaudible).

13  　　　　DEPUTY COMMISSIONER HARMON:  I have a tape here, I

14  just don't know if --

15  　　　　PRESIDING COMMISSIONER HARRIS-RITTER:  I have

16  some.

17  　　　　DEPUTY COMMISSIONER HARMON:  I don't know where it

18  came from. It sounds like it'll be okay. I think it

19  will be okay. There's nothing on the recording. I can

20  just switch the tape.

21  　　　　　　[Thereupon a new tape was inserted]

22  　　　　DEPUTY COMMISSIONER HARMON:  Go ahead, sir.

23  　　　　PRESIDING COMMISSIONER HARRIS-RITTER:  Go ahead.

24  　　　　INMATE HOLDER:  Thank you. I would just like to

25  say that I'm very sorry for my actions and what I have

26  done. I understand the gravication of what I've done,

27  and I'm very sorry for what I've done. I'm very sorry to

70

1    my friend Kiomi who's no longer here, her father, her
2    brother, her mom, little Tony; I don't know how old he
3    now, but I'm very sorry for little Tony and his dad as
4    well, and anybody else who's been affected by this case;
5    taxpayers of California, and especially my parents and my
6    family and my supporters. And I'd just like to say that
7    on the day that you feel that I'm going to be ready to be
8    released, I would just like you to know that I hope I'll
9    be here so I can come in and you'll find me suitable
10   someday. I'd just like you to know that I'm going to be
11   a productive member of society the day that you grant me
12   my second chance in life; that I'm never going to be in
13   trouble again. I know I'm not going to be in trouble
14   again, and I understand it may be a little bit difficult
15   for you to believe me because I'm here and you know, and
16   I did a bad crime. And Mr. Harmon, I'm very sorry that
17   you're disappointed in me, that I you know, you're not
18   pleased with me today, and I'm very sorry. I hope that
19   you know, maybe the next time I come, you'll be pleased,
20   but I'm sure it's not going to be anything different.
21   I'm going to be you know, God's (inaudible) I'm going to
22   be the same person, and hopefully, I'll have the same
23   support if everyone stays with me and you know, and I
24   just want you to know that when you feel that you know,
25   that you're ready to give me a second chance, I hope I
26   won't you know, disappoint you on that day, you know,
27   that I'm very sorry for having you feel that you're

71

1  disappointed in me today, and DA, thank you for coming

2  up.  And I have to say one thing in closing, that about

3  my 128s, and I want you to know that I took

4  responsibility for my 128s.  I didn't take -- if I felt

5  that I didn't take responsibility, I would have probably

6  tried to fight my 128s.  I took responsibility for what

7  I've done.  It was a mistake, it was warnings, and I just

8  want you to know that I took responsibility for

9  everything that I have done in my life.  And I just hope

10  someday, I'll be able to have another chance at freedom,

11  to be with my family and to at least have a family,

12  because I don't even have a family.  Thank you.

13          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

14  We'll now recess for deliberations.  It's 4:25 p.m.

15                  **A D J O U R N M E N T**

16                      --o0o--

17

18

19

20

21

22

23

24

25

26

27

72

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3        **DEPUTY COMMISSIONER HARMON:**  You're on record.

4        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

5    We are back on the record, and all parties previously

6    noted as present are still present and the time is 5:00

7    p.m.  In the matter of Inmate Keith Holder, the Panel has

8    reached the following decision.  Mr. Holder, the Panel

9    reviewed all information received from the public and

10   relied on the following circumstances in concluding that

11   the prisoner is not suitable for parole and would pose an

12   unreasonable risk of danger to society or a threat to

13   public safety if released from prison at this time.  This

14   is a one-year denial.  And I'll go through that with you

15   now.  This was a cruel offense.  Multiple victims were

16   involved in the same incident.  It was carried out in a

17   pretty calculated manner.  The offense was carried out in

18   a manner, which demonstrated a callous disregard for

19   human suffering, particularly related to the maid, Ms.

20   Estelilla.  The conclusions are drawn from the statement

21   of facts, which was taken from the probation officer's

22   report, pages two to three which I'm incorporating by

23   reference and will just summarize.  But basically you

24   contrived a very complicated scheme to use an innocent

25   baby as a pawn to get money from the father of the baby

26   so you could financially support the mother of the child

27   **KEITH  HOLDER    E-87291    DECISION PAGE 1    10/26/06**

73

1    unbeknownst to her.  It was just greed as you said

2    yourself.  As far as institutional behavior goes, the

3    Panel believes that you have not yet sufficiently

4    participated in beneficial self-help or therapy programs.

5    And we do note the misconduct while incarcerated was

6    sixteen 128A counseling chronos, the last of which was

7    August 25th, 1999 for manipulating staff, which was more

8    than seven years ago.  The Hearing Panel notes that

9    responses to Penal Code Section 3042 notices indicate

10   opposition to a finding of parole suitability

11   specifically the District Attorney of Los Angeles County.

12   Other information bearing unsuitability includes other

13   factors of past mental state, past and present attitude

14   towards the crime, signs of remorse, involvement in any

15   other criminal misconduct, which is reliably documented

16   and any other relevant reliable information or

17   circumstances, which taken alone, may not firmly

18   establish unsuitability, but which when taken together

19   contribute to a pattern which results in unsuitability at

20   this time.  We really believe you're on the right track,

21   and I really want to emphasize that with you.  We really

22   feel that you've made excellent progress, and the Panel

23   believes that you just need to develop some further

24   insight into your behavior related to the life crime and

25   remorse for all the victims including Ms. Estelilla who

26   was terrorized more than anybody else in the whole crime.

27   **KEITH  HOLDER   E-87291   DECISION PAGE 2   10/26/06**

74

1    She's the one who was bound in the living room and the

2    baby was taken from her protective custody.  The Panel

3    makes the following findings.  The prisoner needs further

4    therapy in order to face, discuss, understand and cope

5    with stress in a non-destructive manner.  Until

6    additional progress is made, the prisoner continues to be

7    unpredictable and a threat to others.  Nevertheless, the

8    prisoner should be commended for his recent completion of

9    Cage Your Rage and particularly for having no serious

10   disciplinaries the entire time you've been in prison,

11   however, these positive aspects of your behavior don't

12   outweigh the factors of unsuitability at this time.  The

13   Panel recommends that you remain disciplinary-free.  As

14   indicated above, you -- we really do commend you for

15   that.  That's very difficult to do, we understand that.

16   And if available, participate further in self-help and

17   therapy programming.  One of the things that you can do

18   if there are not programs that are available to you is

19   you can read books on self-help topics such as looking at

20   insight into what it was that caused you to get involved

21   in this in the first place or dealing with who else were

22   victims related to this crime, that kind of thing.  You

23   can read those books and you can do book reports, and you

24   can bring them to the next Board Hearing.  That shows the

25   Panel that even if there were not programs available to

26   you, you basically created your own program to show that

27   **KEITH  HOLDER   E-87291   DECISION PAGE 3   10/26/06**

75

1    you really are working on this and how much you've worked

2    on it.  At this time that would conclude the reading of

3    the decision.  Commissioner Harmon, do you have anything

4    you'd like to add.

5         DEPUTY COMMISSIONER HARMON:  I think I've been very

6    clear to Mr. Holder what you know, what my expectations

7    of him would be.  He can't put that many years into that

8    particular program and not really gather from it what I

9    think he should be able to.  You know, I think you should

10   -- if you're going to come back to the Board, and I'm

11   going to be on that Panel, I'm sure going to expect you

12   to be able to at least tell me those steps that don't

13   apply to drinking and alcohol as you see them, but how

14   the other ones may benefit you.  Other than that, I'm

15   wondering if the other programs you've been going

16   through, you have not picked up on what those programs

17   represent either.  So, you know, if you're going to come

18   in and represent something, I sure want to know what

19   you've learned from those programs.  But other than that,

20   I mean you know, in the big scheme of things, I do

21   believe you're on the right track as the Commissioner

22   said.  You've got work to do.  I can envision you at some

23   point being released from prison and I encourage you to

24   listen to what I say, you know, in terms of what my

25   expectations are you know, if you were going to come back

26   before me.  I was disappointed today.  You know, you

27   KEITH  HOLDER   E-87291   DECISION PAGE 4   10/26/06

76

1    gave me the same song and dance you gave me a few years

2    ago, and then I pull up the initial hearing and I see you

3    did the same thing then.  And I can pull out the other

4    ones too, and I'm sure they're also talking about the

5    same areas, so you know, one thing I don't want to do is

6    mislead you.  You're serving a life term and I'm not

7    trying to play God, but I sure want to make sure that

8    when you walk out the door that you're a different person

9    than the person who came in.  If that makes any sense to

10   you.  My first obligation is to public safety.  So

11   therefore, I wish you luck, sir, and that's all I have

12   Commissioner.

13             PRESIDING COMMISSIONER HARRIS-RITTER:  Thank

14   you.  That concludes the hearing.  It's 5:05 p.m.  Good

15   luck, Mr. Holder.

16             INMATE HOLDER:  Thank you.

17                  A D J O U R N M E N T

18                       --oOo--

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON:_____FEB 2 3 2007_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE

26   DECISION IS MODIFIED.

27   KEITH  HOLDER    E-87291    DECISION PAGE 5    10/26/06

77

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Janet C. Warnock, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 76, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KEITH HOLDER, CDC No. E-87291, on OCTOBER 26, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 13, 2007, at Sacramento County, California.

_Janet C. Warnock_

---

Janet C. Warnock
Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**

# EXHIBIT "B"

INMATE COPY

## PSYCHOLOGICAL EVALUATION
### FOR THE BOARD OF PAROLE HEARINGS
### REVISED AUGUST 2006
### PAROLE CONSIDERATION HEARING
### SEPTEMBER 2006 LIFE TERM INMATE CALENDAR

### CORRECTIONAL TRAINING FACILITY-SOLEDAD
### August 4, 2006

This is the sixth psychological evaluation for the Board of Parole Hearings on inmate Keith Holder, CDC# E-87291. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I.  IDENTIFYING INFORMATION:

Holder is a 45-year-old, divorced, black male. His stated religious affiliation is Catholic. His date of birth is February 20, 1960. He had no unusual physical characteristics and had a reported alias of Desmond Bolden.

## II.  DEVELOPMENTAL HISTORY:

Holder denied any history of birth defects or delays of developmental milestones. He denied a history of cruelty to animals or arson. He suffered rheumatic fever as a child, which resulted in damaged heart valves. He currently suffers from cardiac problems as a result. He denied a childhood history of physical or sexual abuse as either a perpetrator or a victim.

## III.  EDUCATION:

At age ten, Holder moved with his family from Trinidad to Rhode Island. Although he suffered from dyslexic problems, he still graduated from high school. In 1995, he obtained a TABE score of 12.9. His current involvement and interests include writing music and singing. He maintains a strong interest in the business world.

## IV.  FAMILY HISTORY:

Holder's parents are still living. He has three brothers and sisters. He described his relationship with his family as warm and supportive. He writes home regularly and his parents visit him twice a year. His brothers and sisters visit him approximately eight times a year. He reported no significant criminal or substance abuse history by his other family members.

## V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He said he is a heterosexual male.  He denied any history of high-risk sexual behavior or sexual aggression.

## VI.  MARITAL HISTORY:

Holder got divorced in 1992.  His ex-wife now lives in Japan.  He has a good relationship with his ex-wife.  He has no children.  He has a fiancée with whom he has had a relationship for 17 years.  They met before his incarceration.

## VII.  MILITARY HISTORY:

Holder never served in the military.

## VIII.  EMPLOYMENT/INCOME HISTORY:

Holder has operated several businesses, including conducting fashion shows and music productions.  From the early 1980s to 1989, he owned a sight seeing business for foreign students.  This business also provided a home stay service for these students.

## IX.  SUBSTANCE AND ABUSE HISTORY:

Due in part to his heart condition, Holder has never abused alcohol or illegal drugs. However, to his credit, he attends AA, to reap whatever benefits he may accrue.

## X.  PSYCHIATRIC AND MEDICAL HISTORY:

Holder denied any history of psychiatric hospitalizations, suicidal behavior or ideation, serious accidents, head injuries, seizure or other neurological conditions.  He has had rheumatic fever and has continued heart problems.  He does not take any medication.

## XI.  PLANS IF GRANTED RELEASE:

If deported, he will live with his sister.  If paroled to California, he will get a job as a janitor.  His plan is as viable as any other inmate who must get a job after release.

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Holder was oriented to time, place and person, evincing no psychotic symptomatology. He was not depressed and exhibited congruent affect.  He was calm and cooperative.  His behavior was appropriate.  He is estimated to be in the average range of intellectual functioning.  He exhibited good insight and remorse, especially as it relates to his crime.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:       None
AXIS II:      None
AXIS III:     Heart problems
AXIS IV:      Incarceration
AXIS V:       GAF=85

The prognosis is positive for him to be able to maintain his current mental state in the community upon parole.

## XIII.  REVIEW OF LIFE CRIME:

Holder took full responsibility for his role in the kidnapping.  He exhibited remorse and had good insight into the harm that was caused.  His remorse for his crime appears genuine and appropriate.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

His violence potential is obviously lower than the average inmate, based on his good recent institutional adjustment.  If released to the community, his violence potential is estimated to be no higher than the average citizen in the community.  It appears his involvement in the instant offense was essentially an aberration for him.  There are no obvious or significant violence precursors for him.

## XV.  CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

He is competent and responsible for his behavior.  He has the capacity to abide by institutional standards and has done so for the last several years.  He does not have a mental health disorder which would necessitate treatment either during his incarceration or on parole.  He is to be commended for his continued participation in AA.  Since his last hearing, he says he has completed another self-help group, Anger Management.  No treatment recommendations are being made because he does not have a mental health disorder.  Parole decisions should be based on custody factors.

W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
MAY 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 3, 2002

This is the fifth psychological evaluation for the Board of Prison Terms on inmate Keith Holder, CDC# E-87291, who has been incarcerated for approximately 12 years. This report is the product of a personal interview, conducted on 12/03/02, as well as a review of his Central file and unit health record. This interview was a single contact with this individual for the sole purpose of preparing this report.

**NOTE:** This report contains information that has not changed since the last Board of Prison Term's report. All information was reviewed, and any necessary updates were made on 12/03/02, the date of this report.

### PSYCHOSOCIAL ASSESSMENT

I.    **IDENTIFYING INFORMATION:**

Inmate Holder is a 42-year-old, married, African-American male. His stated religious affiliation is Catholic. His date of birth is 02/20/60. There were no unusual physical characteristics noted. He did have a reported alias of Desmond Bolden.

II.   **DEVELOPMENTAL HISTORY:**

Inmate Holder denied any history of birth defects or delays of developmental milestones. He denied a history of cruelty to animals or arson. The inmate did describe a significant childhood illness, having suffered rheumatic fever as a child, which resulted in damaged heart valves. He currently suffers from cardiac problems as a result of the rheumatic fever. He denied a childhood history of physical or sexual abuse as either a perpetrator or a victim.

HOLDER, KEITH
CDC NUMBER:  E-87291
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO


III.  **EDUCATIONAL HISTORY:**

Having immigrated from Trinidad at the age of ten with
his family, inmate Holder stated that he completed high
school in Providence, Rhode Island, achieving his high
school diploma.  While he reported having never
attended special education, he did report a dyslexic
problem.  However, this learning disability did not
prevent him from obtaining average grades in public
school.  His latest measured TABE score revealed a
grade point level of 12.9, which was done at Folsom
State Prison in 1995.  His current involvement and
interests include writing music, and singing, and he
mains a strong interest in business.

IV.  **FAMILY HISTORY:**

Both of inmate Holder's parents are currently living.
His mother is 67 years old, and has developed diabetes,
but is still in fair health.  His father is 70 years
old, and is in good health.  Having immigrated from
Trinidad, they took up permanent residence in Rhode
Island, where they are currently living.

Inmate Holder has three brothers and sisters, all of
whom are living.  He described his relationship with
all of his family as very close, warm and supportive.
He said that he writes daily, phones daily, and that
his mother and father visit him approximately two times
a year.  His various brothers and sisters visit
approximately eight times a year.  He reported no
significant criminal or substance abuse history by his
other family members.

V.  **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Inmate Holder stated that he is a heterosexual male.
He denied any history of high-risk sexual behavior or
sexual aggression.

VI.  **MARITAL HISTORY:**

Inmate Holder said that he is currently married, but
has been separated from his Japanese wife for 13 years.
His wife now lives in Japan.  He said that he has
maintained a good friendship with his wife, and that

HOLDER, KEITH
CDC NUMBER:  E-87291
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

they phone or write each other 12 times a year.  The
inmate stated that he has no children.  He further
described his eight-year relationship with his fiancée,
which he described currently as being close and
supportive.  He stated that they met before his
incarceration in CDC.

VII.  <u>MILITARY HISTORY</u>:

The inmate denied any history of military service.

VIII. <u>EMPLOYMENT/INCOME HISTORY</u>:

Prior to his commitment offense, inmate Holder had a
significant work history.  He has operated several
businesses, conducting fashion shows and music
productions.  From 1986 to 1989, he maintained a
business involving sightseeing tours in Los Angeles
with his wife.  He also provided a board and care
business for foreign students during this time.

IX.  <u>SUBSTANCE ABUSE HISTORY</u>:

Due in part to his heart condition, inmate Holder
stated that he has never abused alcohol or other
illegal drugs.  Moreover, he attended Alcoholics
Anonymous from 1995 to 1997, and he has attended
Narcotics Anonymous from 1995 to the present.  He
further stated that he has attended the classes
because they are the only offered self-help programs
at CTF, although he did state that he attended the
Self-Determination Program in 1994.

X.  <u>PSYCHIATRIC AND MEDICAL HISTORY</u>:

Inmate Holder denied any history of medical or
psychiatric hospitalizations, or any history of
suicidal behavior or attempts.  He denied a history of
serious accidents or head injuries, or a history of
seizures or other neurological conditions.  However, he
did state that he had rheumatic fever, which resulted
in a significant medical condition, mainly his cardiac
problem.  He does not currently take any medication.

HOLDER, KEITH
CDC NUMBER:  E-87291
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

XI.  **PLANS IF GRANTED RELEASE:**

If granted parole, inmate Holder would live with his
friend, Brian Tunstall (who has been approved).
Vocationally, inmate Holder plans to begin a sight-
seeing tour business in Los Angeles, and also do more
music and fashion production.  His prognosis for
community living is very positive, especially with his
family support.

## CLINICAL ASSESSMENT

XII.  **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Holder was cooperative and alert.  He was
appropriately dressed and groomed.  His speech was
normally articulate and contextually meaningful.  His
mood and affect were within normal limits.  His
behavior was appropriate to content.  His intellectual
functioning was clinically estimated to be within the
average to above average range.  There was no evidence
of a mood or thought disorder.  His judgment appeared
to be sound.  There was no evidence of a mood or
thought disorder.

**CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):**

**AXIS I:**     No Contributory Clinical Disorder.
**AXIS II:**    No Contributory Personality Disorder.
**AXIS III:**   Deferred.
**AXIS IV:**    Incarceration.
**AXIS V:**     Global Assessment of Functioning (GAF) = 85.

His prognosis is positive for being able to maintain
his current mental state in the community upon parole.

XIII.  **REVIEW OF LIFE CRIME:**

Inmate Holder described the circumstances surrounding
his commitment offense.  He took full responsibility
for his part in the kidnapping.  He also demonstrated
adequate empathy and awareness for the harm that he
caused the victims and those close to his life.  He
went on, however, to describe potentially mitigating

HOLDER, KEITH
CDC NUMBER:  E-87291
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

circumstances not included in the record of his trial.
That is, he stated that the victim's mother was
actually his girlfriend, with whom he plotted to extort
money from the kidnapped child's father in Japan.
Irregardless of the inmate's current explanation of the
crime versus the omission of this version in the court
record, inmate Holder still appears to have adequate
understanding and empathy for the circumstances leading
up to the crime and damage done to the victims.  His
remorse for his crime appears to be appropriate and
genuine.

XIV.  <u>ASSESSMENT OF DANGEROUSNESS</u>:

A.  In consideration of several factors, including his
lack of a violent criminal history, his relative
lack of any criminal history, his lack of violent
CDC-115 violations, or any CDC-115 violations, and
his greater maturity, this inmate's violence
potential within a controlled setting is estimated
to be significantly below average relative to this
Level II inmate population.

B.  If released to the community, his violence
potential is estimated to be no higher than the
average citizen in the community.

C.  There are no significant risk factors for this
inmate which could be precursors to violence.

XV.  <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

A.  This inmate is competent and responsible for his
behavior.  He has the capacity to abide by
institutional standards and has done so during his
incarceration period.

B.  This inmate does not have a mental health disorder
which would necessitate treatment either during
his incarceration period or following parole.

C.  This inmate does not appear to have a drug or
alcohol problem, and there are no recommendations
in this area.

HOLDER        E-87291        CTF-NORTH        12/05/02        gmj

HOLDER, KEITH
CDC NUMBER:  E-87291
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

M. E. Carswell PhD

M. E. CARSWELL, Ph.D., FSICPP
Staff Psychologist
Diplomate, Forensic Psychology
CORRECTIONAL TRAINING FACILITY, SOLEDAD

B. Zika, Ph.D.

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

MEC/gmj

D:  12/03/02
T:  12/05/02

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## APRIL 1996 CALENDAR
## LIFER HEARING
## FOLSOM STATE PRISON

**HOLDER, Keith    E-87291**

INMATE COPY

INMATE COPY

This is the 2nd psychological evaluation for the Board of Prison Terms regarding this 36-year old West Indies male now beginning the 6th year of a 7 Years to Life Sentence for the crime of Kidnap For Ransom. This evaluation consisted of a 45-minute clinical interview, administration and interpretation of the MMPI-2 and a review of the Medical File and C-File.

**BACKGROUND:** Born in Trinidad, Mr. Holder immigrated to the United States when he was ten years old. He attended and graduated high school in Providence, Rhode Island. Although dyslexic and a slow reader he managed to obtain average grades. A victim of Rheumatic Fever, he was under a physician's care until early adulthood. Due to this disease he does not smoke, drink alcohol or caffeine, or use drugs. Nor, he states, has he ever. He married a Japanese National during 1988 and reports he is still married. Regarding the Instant Offense, he appears to be genuinely remorseful and regrets his behavior.

On Mental Status Examination he presents as neatly groomed and oriented to time, place, person, and situation. There are no unusual psychomotor movements. Mood and affect are of appropriate and variable range. There is a pleasant cast to his face--almost a smile--which could be mis-interpreted by others to imply he was not serious when interacting around a topic. There is no evidence of mood disorder, thought disorder, or psychoses. There is no suicidality nor homicidality. Intellectual functioning appears to be at least average. Both judgment and insight are adequate.

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## APRIL 1996 CALENDAR
## LIFER HEARING
## FOLSOM STATE PRISON

**HOLDER, Keith    E-87291**

DIAGNOSTIC IMPRESSION:

|       |      |        |                                                   |
|-------|------|--------|---------------------------------------------------|
| Axis  | I:   | V71.09 | No diagnosis or condition.                        |
| Axis  | II:  | V71.09 | No diagnosis or condition.                        |
| Axis  | III: |        | Valvular Heart Disease due to Rheumatic Fever, by history. |
| Axis  | IV:  |        | Psychosocial Stressor is Incarceration.           |
| Axis  | V:   | GAF = 88. |                                                |

CONCLUSIONS: Mr. Holder has acquired a much more positive attitude over the past two-three years. There are no CDC 115's. There is no diagnosable psychopathology. Violence potential within the institutional setting has been much less than average and in a less controlled setting, such as return to the community, violence potential would continue to be much less than average.

RECOMMENDATIONS: There are no psychological recommendations.

*Jerre L. Lender, Ph.D.*

Jerre L. Lender, Ph.D.
Supervising Senior Psychologist

**HOLDER, Keith    E-87291**          **FOLSOM STATE PRISON**          **3/27/96    JLL:ml**
2

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## MARCH 1997 CALENDAR
## LIFER HEARING
## FOLSOM STATE PRISON

**HOLDER, Keith    E-87291**

This is an update to the Psychological Evaluation, for the Board of Prison Terms, of March 27, 1996. This thirty-seven year old West Indies male is now beginning the seventh year of a Seven Years to Life Sentence for the Crime of Kidnap For Ransom. Mr. Holder was interviewed for forty minutes for today's update and his Unit Health Record and Central File were reviewed.

BACKGROUND: Mr. Holder is the fourth of five children born in Trinidad. He was born with a heart condition and received penicillin medication until twenty years of age. Shortly after birth he spent two years in a convalescent hospital before moving into the family's home. Mother moved to Rhode Island during 1967 and the rest of the family, including Grandmother, followed in 1970. During high school he had begun involvement in fashion productions for department stores and continued this endeavor after high school graduation (1979) until he moved to California in 1983. From 1983 until the time of the Instant Offense he did auto detailing and developed a sight-seeing tour business. Presently he continues to express remorse over the Instant Offense and it appears he has been utilizing his incarceration in a most productive way.

Upon Mental Status Examination I find him to be pleasant and cooperative--well-groomed. He seems calm yet appropriately concerned about the interview. Speech is of normal rate and volume. Mood is normal and affect is appropriate. Thoughts are logical, rational, and coherent with no loosening of associations. There are no auditory or visual hallucinations nor suicidal or homicidal ideation. Fund of knowledge is quite adequate. Judgment is good. Insight is good.

DIAGNOSTIC IMPRESSIONS:

Axis I:   V71.09      No diagnosis or condition.

Axis II:              No diagnosis or condition.

Axis III:             Medical Condition:   Valvular Heart Disease due to Rheumatic Fever, by History.

Axis IV:              Psychosocial Stressor:  Incarceration.

Axis V:   Global Assessment of Functioning = 92.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
FEBRUARY 2006 CALENDAR

HOLDER, KEITH                                              E87291

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Count 2: Kidnap for Ransom, PC 209(A), Los Angeles County Case Number SA003399. Term: 7 years to Life with MEPD of 5/13/97. Received in CDC on 3/1/91. Victim: Katsutoshi Takazato, age: 11 months.

1.    **Summary of Crime:** Kyomi Takazato, a 26 year old Japanese citizen, lived in Beverly Hills with her 11 month old son, Katsutoshi (Tony) Takazato. The father and intended victim in the instant offense was Fuminari Hayashida, a wealthy Japanese business man. He lived in Japan and was Takazato's lover and Tony's father. Hayashida traveled to the United States every two or three months and stayed with them. Holder and his crime partner Rose, conspired to extort $400,000.00 from Mr. Hayashida. A friend of the co-conspirators, Ronald Coleman, who feared getting involved in the offense informed police.

On May 17, 1990, Kyomi Takazato spent the day with her friend, Keith Holder who she had known for two years. Kiyomi had left her baby in her home with her live in housekeeper and baby-sitter, Marikit Estalilla. When she returned home with Holder at 12:30 a.m. she found the housekeeper bound and gagged. She had been handcuffed to a pole in the living room.

Estalilla told Kiyomi that a man came into her room about 11:00 p.m., grabbed her by the hand and led her into the living room where he handcuffed, gagged and blindfolded her. She was instructed not to call police, or he would kill everyone in the house. He then took the baby. Holder found a ransom note which read, "I want $400,000.00. 24 hours. I will call. No cops or you will never see the baby." They decided at that time not to call police. They decided that after the baby was safely returned, they would tell the police the truth.

When Holder and Kiyomi arrived at the Compton Police Department, the police separated them. While questioning both of them, Holder was arrested. At 11:35 p.m. on May 17, 1990, witness Ronald Coleman called the police regarding the kidnapping. He told the police that the kidnapper

Inmate Copy

COPY TO INMATE ON:
Nov. 21, 2005

was Steve Rose and with the help of the witness, the police stopped Steve Rose at 11:45 p.m. while he was driving a blue BMW. The victim's baby was found in the vehicle.

Source documents considered, Los Angeles County Probation Officer's Report, pages two through fourteen and U.S. Court of Appeal for the Second Appellate District Division Five, pages three through ten.

2.   **Prisoner's Version:**  At an interview on 10/7/05, Holder stated that the previous version is accurate: Holder contends that the kidnapping was a scheme derived by himself, crime partner, Steve Ross and Kiyomi Takazato to extort $400,000.00 from the baby's father. Holder states that they had been involved romantically for two to three years. She was well taken care of by the baby's father and this was an attempt to extort a large amount of cash at one time. Holder states that he understands that regardless of Kiyomi's involvement he was guilty of the commitment offense. Holder expressed remorse for all victims involved.

3.   **Aggravating/Mitigating Circumstances:**

   a.   **Aggravating Factors:**

   - Victim was particularly vulnerable.
   - Prisoner had opportunity to cease but continued with crime.
   - Multiple victims.
   - Nature of crime exhibited viciousness, cruelty or callousness.
   - Prisoner had a special relationship of confidence and trust with the victim.

   b.   **Mitigating Factors:**

   - Prisoner has minimal history of criminal behavior.

B.   **Multiple Crime(s):**  N/A.

   1.   **Summary of Crime:**  N/A.

   2.   **Prisoner's Version:**  N/A.

II.   **PRECONVICTION FACTORS:**

A.   **Juvenile Record:**  The prisoner has no arrests or convictions as a juvenile.

LIFE PRISONER EVALUA    REPORT                                                    3
PAROLE CONSIDERATION HEARING
FEBRUARY 2006 CALENDAR

B.    **Adult Convictions and Arrests:**  Holder's arrest history is limited to an August
      13, 1984, Glendale P.D. arrest and conviction for 487.1 PC Grand Theft Property.
      In Glendale Municipal Court, case number M840725A on December 12, 1984,
      convicted of 484F(2) PC Forgery of Name on Credit Card, misdemeanor in which
      he received two years summary probation.

C.    **Personal Factors:**  Holder was born February 20, 1960 to Sheila and Ellis
      Holder.  He came to the United States from Trinidad in 1970 to the state of Rhode
      Island where his parents continue to reside.  Holder indicated that he graduated
      from Central High School in Providence, Rhode Island, in 1979.  He has had
      Vocational Training as a Jewelry Designer and Fashion Promoter.  Holder married
      Koari Chiba, a Japanese Citizen in 1989.  Holder states that she has consequently
      returned to Japan and has remarried.  At the time of the commitment offense,
      Holder was working as a Tour Bus Owner/Operator taking mainly Japanese
      Tourists on various tours in the Southern California area.  Holder states he has
      basic understanding of the spoken/Japanese language.  Also noted are letters
      contained in the Miscellaneous Section of the Central File from Kiyomi Takazato
      indicating her support for the prisoner, it appears that Holder was a productive
      member of society prior to the commitment offense.

III.   **POSTCONVICTION FACTORS:**

A.    **Special Programming/Accommodations:**  N/A.

B.    **Custody History:**  All documents from the previous hearing remain the same.
      Since Holder's last Board Report he has been unassigned and is currently on the
      Support Services Waiting List.  Holder was received at CTF on 8/6/97 and has
      remained at CTF in the general population with Medium A custody.  (See Post
      Conviction Progress Report).

C.    **Therapy and Self-Help Activities:**  Since Holder's last BPT Hearing he has
      participated in Alcoholics and Narcotics Anonymous and Anger Management
      Groups.  (See Post Conviction Progress Report).

D.    **Disciplinary History:**  Since Holder's last BPT Hearing he has remained
      disciplinary free.

E.    **Other:**  Holder attended his Subsequent #3 Parole Consideration Hearing on
      2/3/05.  Parole was denied for 1 year.  The Board recommended that Holder
      remain disciplinary free; and participate in self-help programs.

IV.   **FUTURE PLANS:**

HOLDER, KEITH              E87291                CTF-SOLEDAD              FEB/2006

LIFE PRISONER EVALU.    ↓ REPORT
PAROLE CONSIDERATION HEARING                                          4
FEBRUARY 2006 CALENDAR

    A.   **Residence:**  Holder states, if deported to Trinidad he can live with his sister Ann Holder.

       If paroled in California, Holder states he can live with his friend, Brian Tunstall. His address is P.O. Box 2553, North Hills, California 91393.  His telephone number is (213) 760-1980.  Holder states he will provide support letters at the time of his hearing.

    B.   **Employment:**  Holder states, if deported he will be able to obtain employment in the fashion area through his sister in Trinidad.

       If paroled to California, Holder states he will be able to obtain employment in the Janitorial field.

       Holder states he will provide support letters at the time of his hearing.

    C.   **Assessment:**  In review of Holder's parole plans, this counselor does not foresee any problems, however, it is recommended that Holder updates his support letters prior to his hearing.

**V.**   **USINS STATUS:**  Wanted by USINS #A30582446.

**VI.**   **SUMMARY:**

    A.   Prior to release the prisoner could benefit from:
       1.   Continuing to be disciplinary free.
       2.   Participation in self-help and therapy program.

    B.   This report is based upon an interview with the prisoner on 10/7/05 lasting approximately 1 hour and a complete review of the Central File lasting 2 hours.

    C.   Per the Olson Decision, Holder was afforded an opportunity to review his Central File.  Holder did not examine his Central File.  (Refer to CDC 128B dated 10/7/05 in the General Chrono Section of the Central File).

    D.   No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUA    REPORT
PAROLE CONSIDERATION HEARING
FEBRUARY 2006 CALENDAR

5

K. Heinly                          11-17-05
Correctional Counselor I           Date

D. Carnazzo    CCII    11-17-05
Correctional Counselor II          Date

I. Guerra    FC (A)    11-17-05
Facility Captain                   Date

D. S. Levorse    CPR    11-18-05
Classification and Parole Representative    Date

HOLDER, KEITH          E87291          CTF-SOLEDAD          FEB/2006

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐    DOCUMENTATION HEARING

☒    PAROLE CONSIDERATION HEARING

☐    PROGRESS HEARING

INSTRUCTIONS
  TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
  TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
      ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/3/04 to 10/15/05 | | | **PLACEMENT:**  Remained at CTF in the general population. **CUSTODY:**  Medium A. **VOC. TRAINING:**  None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:**  None noted this period.  Holder is currently on the Support Services Waiting List. **GROUP ACTIVITIES:**  Holder participated in Alcoholics and Narcotics Anonymous as verified by CDC 128B's dated 6/23/04, 6/30/04, 9/30/04, 12/31/04, 3/31/05 and 6/30/05. **PSYCH. TREATMENT:**  None noted during this period. **PRISON BEHAVIOR:**  Holder remained disciplinary free during this period. **OTHER:**  Holder participated in the "Cage your Rage" Anger Management Group verified by CDC 128-C dated 2/11/05. Holder has completed Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home Self Help Anger Management Program verified by CDC 128B dated 4/14/05. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE | |
|---|---|---|---|
| *[signature]* | | 11-17-05 | |
| HOLDER | E87291 | CTF-SOLEDAD | FEB/2006 |

BPT 1004 (REV 7/86)                          Page _1_

# EXHIBIT "C"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: November 8, 2007 | | | |
|---|---|---|---|
| Honorable: STEVEN R. VAN SICKLEN | Judge | B. Perez | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004875
In re,
KEITH HOLDER,
     Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on September 4, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; In re Rosenkrantz (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on March 1, 1991 after a conviction for kidnap for ransom. He was sentenced to seven years to life. His minimum parole eligibility date was May 13, 1997.

The record reflects that on May 17, 1990, the Petitioner's accomplice, Steve Rose, entered the home of Kiomi Takazato, bound and gagged her nanny, Mariquette Estelilla, and kidnapped her baby. Mr. Rose threatened to kill Ms. Estelilla if she called police and left a ransom note demanding $400,000 for the baby's return. The Petitioner was with Ms. Takazato during the kidnapping, but it was later discovered that he planned the offense and enlisted Mr. Rose's help. The baby was discovered, unharmed, in Mr. Rose's car after he was pulled over by police acting on an anonymous tip. The Petitioner stated that he planned the kidnapping to get Ms. Takazato's husband to pay him the money, in order to invest it in his business and become wealthy enough to support Ms. Takazato in a relationship.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on October 26, 2006. The Petitioner was denied parole for one year. The Board concluded that the Petitioner was

1

Minutes Entered
11-8-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | November 8, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | B. Perez | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004875
In re,
KEITH HOLDER,
                Petitioner,
        On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily upon his commitment offense.

The Court finds that there is some evidence to support the Board's findings that multiple victims were attacked during the commitment offense and that the offense was carried out in a dispassionate and calculated manner. Cal. Code Regs., tit. 15, §2402, subds. (c)(1)(A) and (c)(1)(B). Ms. Estelilla was bound and gagged and made to fear for her life during the kidnapping. Additionally, Ms. Takazato's baby was kidnapped from his home. Although no one was harmed during the offense, these victims were certainly traumatized by the kidnapping. The Petitioner admits that he planned the kidnapping for a couple of weeks. He and his accomplice plotted together and committed the offense in a dispassionate and calculated manner.

The Court finds that there is no evidence to support the Board's finding that that commitment offense demonstrated an exceptionally callous disregard for human suffering. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D). Although the kidnapping was certainly a very serious offense, it was not more aggravated or more violent than an ordinary kidnapping for ransom. Therefore, it did not demonstrate an exceptionally callous disregard for human suffering. See *In re Scott* (2004) 119 Cal.App.4th 871, 891.

The Board also considered the Petitioner's prior grand theft conviction and the Board's perception that he needs more therapy and self-help in order to gain insight about his offense. While these factors may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole. Cal. Code Regs., tit. 15, §2402(b).

The Board also considered the Petitioner's post-conviction gains, including his participation in several anger management and other self-help programs; his two completed vocations; his multitude of job offers in the

2

| Minutes Entered |
|---|
| 11-8-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| | |
|---|---|
| Date:    November 8, 2007 | |
| Honorable:  STEVEN R. VAN SICKLEN | Judge |
| NONE | Bailiff |

B. Perez        Deputy Clerk

NONE        Reporter

(Parties and Counsel checked if present)

BH 004875
In re,
KEITH HOLDER,
        Petitioner,
        On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

United States and Trinidad; as well as his commendable ability to remain free of any serious discipline throughout his incarceration. However, they still concluded that the Petitioner would pose an unreasonable threat to public safety. Penal Code §3041(b). As indicated in *Rosenkrantz, supra*, 29 Cal.4th at 677, it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence that demonstrates unsuitability for parole, as long as there is some evidence to support the finding of unsuitability. See, *In re Jacobson* (2007) 154 Cal.App.4th 849, 860; and *In re Hyde,* (2007)154 Cal.App.4th 1200, 1213. The nature of the Petitioner's commitment offense constitutes the modicum of evidence required to support the Board's finding of unsuitability. See *Rosenkrantz, supra*, 29 Cal.4th at 677.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Keith Holder
E-87291
California State Prison - Soledad
P.O. Box 689 F-223L
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

3

| Minutes Entered |
|---|
| 11-8-07 |
| County Clerk |

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br><br>DEC 1 1 2007<br><br>LOS ANGELES<br>SUPERIOR COURT |
| PLAINTIFF/PETITIONER:<br><br>KEITH HOLDER | |

| CLERK'S CERTIFICATE OF MAILING<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004875 |
|---|---|

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time       ☒ Order re: Petition for Writ of Habeas Corpus
☐ Order to Show Cause       ☐ Order
☐ Order for Informal Response       ☐ Order re:
☐ Order for Supplemental Pleading       ☐ Copy of

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

December 11, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
       B. Perez

Keith Holder
E-87291
California State Prison - Soledad
P.O. Box 689 F-223L
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, California 90013

Keith Holder
CDC:E-87291
Correctional Training Facility
P.O. Box 689  / F-233L
Soledad, CA 93960-0689


Case Number B204941
Division  5

In re KEITH HOLDER on Habeas Corpus.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

F I L E D

FEB 1 1 2008

JOSEPH A. LANE

| In re | B204941 |
|---|---|
| KEITH HOLDER | (Super. Ct. No. BH004875) |
| on | (Steven R. Van Sicklen, Judge) |
| Habeas Corpus. | **O R D E R** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed January 15, 2008. The petition is denied. The record submitted reflects some evidence to support the challenged decision. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071, 1080; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664-665.)

_____      _____      _____
TURNER, P.J.                              ARMSTRONG, J.                         KRIEGLER, J.

Court of Appeal, Second Appellate District, Div. 2 - No. B192978
**S161962**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

DEJUAN HINES, Defendant and Appellant.

The petition for review is denied.

SUPREME COURT
FILED

APR 3 0 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
**GEORGE**
Chief Justice

Dear Court Clerk,                    5/19/08

My filing Fee was Sent to the Correctional trust account office on this date. This notification is to inform You I have signed a trust Withdrawal Order form For $5.00 For my filing fee. The Court Should receive my payment Within five to ten working days. Thank You!

Yours truly

Keith Holder

# E-filing   PROOF OF SERVICE BY MAIL
## (C.C.P. § 1013A, 2015.5)

I, the undersigned, certify and declare that I am over 18 years of age and I am party to this action,

incarcerated at the Correctional Training Facility, Soledad, California and a party to the below entitled

case.

On, _May. 18_____, 2008, I served a true copy of:

### PETITIONER FOR WRIT OF HABEAS CORPUS

by:

☐    Depositing same in the prison mailbox in a sealed envelope, with first class postage attached.

☒    Handing same to institutional staff, for processing as Legal Mail per institutional procedures, in a sealed envelope, with an attached Inmate Trust Account Withdrawal form, requesting appropriate postage be attached by the institution's mailroom.

☐    Handing same to institution staff, with First Class postage attached, for processing as Legal Mail per institutional procedures. To be deposited in the United States Mail, pursuant to the California Code of Regulations, Title 15, §§ 3142 and 3165.

### To be delivered to:

**Office of the Attorney General**
**455 Golden Gate Ave. Suite 11000**
**San Francisco, CA 94202**

I declare under he penalty of perjury under the laws of the State of California that the foregoing is true

and correct.

_____
K. Holder, Declarant



KEITH HOLDER, E-87291
Correctional Training Facility
P.O. Box 689, Cell #: EW-233
SOLEDAD, CA 93960-0689

LEGAL AID
Confidential

RECEIVED
MAY 2 0 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE
San Francisco, CA 94102