1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   KEITH HOLDER,                        No. C 08-2572 CW (PR)

12           Petitioner,

13        v.                              ORDER GRANTING PETITION FOR
                                          WRIT OF HABEAS CORPUS
14   BEN CURRY, Warden,

15           Respondent.

16   _____/

17

18                              INTRODUCTION

19        Pro se Petitioner Keith Holder, a state prisoner incarcerated

20   at the Correctional Training Facility in Soledad, California, seeks

21   a writ of habeas corpus under 28 U.S.C. § 2254, challenging the

22   October 26, 2006 decision of the California Board of Parole Hearings

23   (BPH) denying him parole at his fifth parole suitability hearing.

24   Doc. No. 1 at 3 & 24.  At the time he was denied parole in 2006,

25   Petitioner had served approximately sixteen years on his seven to

26   life sentence, over nine years past his minimum eligible parole date

27   of May 13, 1997.  Doc. No. 1-1 at 103.

28        On September 10, 2008, the Court issued an Order to Show Cause

United States District Court
For the Northern District of California

1  why the writ should not be granted.  Doc. No. 3.  On January 8,

2  2009, Respondent filed an Answer.  Doc. No. 4.  On February 11,

3  2009, Petitioner filed a Traverse.  Doc. No. 5.

4  After the matter was submitted, on April 22, 2010, the Ninth

5  Circuit issued its decision in Hayward v. Marshall, 603 F.3d 546

6  (9th Cir. 2010) (en banc), which addressed important issues relating

7  to federal habeas review of BPH decisions denying parole to

8  California state prisoners.  On May 6, 2010, the Court ordered the

9  parties to file supplemental briefing explaining their views of how

10  the Hayward en banc decision applies to the facts presented in

11  Petitioner's challenge to the BPH's decision denying him parole.

12  Doc. No. 6.  Respondent filed supplemental briefing on May 28, 2010;

13  Petitioner filed his on June 17, 2010.  Doc. Nos. 7 & 8.

14  Having considered the entire record before the Court and all of

15  the papers filed by the parties, the Court GRANTS the Petition and

16  remands the matter to the BPH.  Within thirty (30) days from the

17  date of this Order, the BPH must set a parole date for Petitioner

18  unless it finds new evidence, arising after the 2006 hearing, of

19  current dangerousness.  See Pirtle v. California Board of Prison

20  Terms, No. 07-16097, 2010 WL 2732888 at *8 (9th Cir. July 12, 2010).

21  BACKGROUND

22  I.   The Commitment Offense and Petitioner's State Court Challenges
     to His October 26, 2006 Denial of Parole
23
24  The BPH summarized the facts of Petitioner's commitment

     offense, as derived from pages two and three of the initial
25
     probation report, as follows:
26
27  On May 17th, 1990, Kiomi Takazato . . . spent

28  2

the day with her friend [Petitioner] Keith
Holder whom she ha[d] known for two years and
who ha[d] many lady friends in the Japanese
community.  She left her baby in her home with
her live-in housekeeper and babysitter,
Mariquette Estelilla . . . .  When [Takazato]
returned home with [Petitioner] at 12 or 12:30
a.m., she found the housekeeper, Estelilla bound
and gagged.  She was handcuffed to a pole in the
living room.  Estelilla told [Takazato] that a
man came into her room about 11 p.m., grabbed
her by the hand and led her into the living room
where he handcuffed, gagged her, and blindfolded
her.  He told her not to call the police or he
would kill everyone in the house.  He then took
the baby.  [Petitioner] found a ransom note,
which read, ["]I want $400,000, 24 hours.  I
will call.  No cops or you never see baby.["]
They decided not to call the police.  Later in
the morning, [Petitioner] told Kiomi that he had
received a call from a man who said the baby was
at the Compton Police Department and was all
right; however, because the kidnapper threatened
to return and kill everyone, they decided to
tell the police that the baby had been taken by
a friend, and that everything was okay.  After
they got the baby, they would then tell the
police the truth.  When they arrived at the
Compton Police Department, the police separated
[Petitioner and Takazato], and after questioning
both of them, arrested [Petitioner].  At 11:35
p.m. on May 17th 1990, witness Ronald Coleman
called the police regarding a kidnapping.  He
told the police that the kidnapping was over a
mafia-type drug deal and that the baby was from
wealthy Chinese parents.  He indicated that the
kidnapper was Steve Rose.  With the help of the
witness, the police stopped Steve Rose at 11:45
p.m. while he was driving a blue BMW and the
victim's baby was found in the vehicle.

Doc. No. 1-1 at 13-14.

Following a jury trial, Petitioner was convicted of kidnap for
ransom and sentenced to seven years to life in state prison.  Doc.
No. 1 at 2-3; Doc. No. 1-1 at 103.  He was received by the
California Department of Corrections and Rehabilitation on March 1,
1991.  Doc. No. 1-1 at 103.  Prior to appearing before the BPH on

3

October 26, 2006, Petitioner had been denied parole four times.  Id. at 24.

Petitioner unsuccessfully challenged the BPH's decision denying him parole for the fifth time in the state superior and appellate courts.  Doc. No. 1-1 at 103-08.  On April 30, 2008, the California Supreme Court summarily denied Petitioner's petition for review.  Doc. No. 4-12 at 2.  This federal Petition for a Writ of Habeas Corpus followed.  Doc. No. 1.

II.   The October 26, 2006 Parole Suitability Hearing

At Petitioner's October 26, 2006 parole suitability hearing, the BPH recited the facts of Petitioner's commitment offense and asked him to explain his involvement.  Petitioner thanked the BPH for this opportunity and stated:

> I'm totally responsible for everything that happened with this crime.  And what caused me to . . . take part in this crime was that at the time, . . . I was in love with Kiomi and . . . I was running a small sight seeing tour business.  And I knew at the time that I didn't . . . have the financial ability to afford the kind of lifestyle that she was used to.  And the idea was my idea, and it was all about just trying to scare Mr. Takazato into thinking that the baby was going to be harmed and the baby was not going to be returned, and we was [sic] just actually trying to embezzle money from him, so I [could] invest the money into my business and try to afford a lifestyle that I know she was used to.  So, I'm not going to shift blame to anyone.  I'm fully responsible for what I've done, and I'm very sorry for what I've done.  I think the record will reflect from the very first Board Hearing, I've always been straightforward and honest about my part in this crime.  And I know I've done some things wrong.  And of course if I can make it right, if I can change it, I would.  I did that crime.  It was something that I know that I should not have done and I was wrong for doing what I've done.

4

Doc. No. 1-1 at 15–16.    Later in the hearing, Petitioner returned to

the subject of his remorse for the crime and gave the BPH some

insight into how his imprisonment had changed him, stating:

> I know the difference between right and wrong.
> I have not lived all my life being involved in
> crime. . . . I've worked before.  I'm from a
> very solid family.  I understand the [gravity]
> of what I have done.  I know that I can be [a]
> much better person, and I don't want to live the
> life of just living in prison or hurting other
> people.  . . . I would like to do unto others
> that I would like others to do unto me.  That's
> the way I'm going to live my life from the day
> [you decide] to give me a second chance.  I'm
> not going to be in trouble anymore.  I know
> that.  I'm almost 50 years old . . . and this
> [is] not the way I want to live my life.  So, I
> know that when I leave here, the day I leave
> here, I'm going to live my life as a productive
> member of society wherever I go.  I'm never
> going to be in trouble again, because I don't
> want to be locked up and be away from my family.
> My mom is old.  My dad is old.  I don't want to
> be in prison when I lose them, you know?  And I
> just know that I'm never going to be in trouble
> again.  There's no doubt in my mind.  I'm not
> from that kind of background.  I got myself
> involved in a crime.  I got caught, I did my
> time, and while I was here, I wanted to show
> people that I can be here without getting
> involved in the things that you know, plague
> most of the prison . . . .  So, I believe that
> when I get out, I won't have a problem.

Id. at 39–40.  Still later in the hearing, Petitioner added:

> I'm trying my best.  I'm doing my best, and I
> think that in [sixteen] years that I've been
> down in prison, I think I have proven that I can
> stay out of trouble. . . .  I just want you to
> know that I'm going to do unto others that I'd
> like others to do unto me.  And I understand
> that this is a serious crime.  And I've always
> come here, and the times that I've [sat] in
> front of you, I've always been straightforward
> with you.  But, there's nothing I can do to
> change what I've done [sixteen] years ago
> . . . .  There's nothing I can do.  But I can
> tell you I'm a better person today.  And I just

5

> want to be able to get out and take care of my
> mom . . . just whatever I have left.  That's all
> I want to do.  I'm not going to be in handcuffs
> again.  I know that for a fact.  I know you
> don't know that because I'm sitting here,
> because I did something terrible . . . to my
> friend. . . .  But I'm telling you, I know I'm
> not going to be in trouble again, so whenever
> you're ready to give me that chance, I hope I'll
> be able to sit here in front of you and you say,
> Keith, it's your time, you know.  There's
> nothing I can do.  I can't change it.  I can't
> change it.  I'm very sorry for what I've done,
> and I think by just showing that I can be a
> better person because I'm from that environment.
> I'm not from the environment of drugs, alcohol,
> guns, killing people, you know, I've done
> something wrong. . . . it was a bad idea.  I
> take full responsibility for what I've done.
> Full responsibility.  I'm not shifting blame on
> anybody. . . . . I know I did a terrible crime.
> . . . In my heart, . . . I know I'm going to be
> a better person . . . when I leave this
> place. . . . You [will] never pick up the
> newspaper and see my name in it again.

Id. at 58-59.

The August 2, 2006 psychological evaluation conducted in anticipation of Petitioner's October 26, 2006 parole suitability hearing by psychologist W.K. Marek, upon which the BPH relied in rendering its decision to deny Petitioner parole, substantiated his feelings of remorse, noting:  "[Petitioner] took full responsibility for his role in the kidnapping.  He exhibited remorse and had good insight into the harm that was caused.  His remorse for his crime appears to be genuine and appropriate."  Doc. No. 1-1 at 85; see id. at 41.  The BPH also noted that Dr. Marek found Petitioner's potential for violence to be no higher than the average citizen in the community.  Doc. No. 1-1 at 41; see id. at 85.  Further, the BPH noted Dr. Marek's observation that Petitioner's involvement in the

commitment offense was "essentially an aberration" and that "there [were] no obvious or significant violence precursors for him." Id. The BPH also observed that Dr. Marek commended Petitioner for his "continued participation in Alcoholics Anonymous" and recent completion of an Anger Management course, and noted that he did not have a mental health disorder that required treatment either during his incarceration or on parole. Doc. No. 1-1. at 85; see id. at 41-42.

The BPH went on to discuss Petitioner's parole plans, citing at least fifteen recent letters of support he received from family members and friends, which included several firm offers of employment, and financial support, as well as a place to live should Petitioner be granted parole. See Doc. No. 1-1 at 44-51.

The BPH also noted that Petitioner's only prior contact with the criminal justice system was in 1984 when he received two years of summary probation for misdemeanor fraudulent use of a credit card. Doc. No. 1-1 at 19. The evidence at the hearing also reflected that Petitioner had not received any serious rules violation reports throughout the entire period of his incarceration, and that the last infraction he received was in 1999, some seven years earlier. Id. at 69-70. Finally, the BPH noted Petitioner's recent programming in prison, which included completion of the "Cage Your Rage" anger management program and Dr. Thomas Gordon's Family Effectiveness Training, Harmony in the Home self-help anger management program. Doc. No. 1-1 at 25-26. The BPH also recognized that Petitioner held several jobs while in prison, including Porter,

Adult Basic Education, Culinary and Janitorial, and that he "maintained good work reports" while employed.[1]  Id. at 27. Petitioner's attorney added that Petitioner does volunteer work in the prison.  Id. at 27.        The BPH also acknowledged Petitioner's longstanding participation in the Alcoholics Anonymous and Narcotics Anonymous Twelve-Step programs since 1995.  Doc. No. 1-1 at 36. Petitioner explained that he has never had an addiction to drugs or alcohol, but described his participation in these programs as:

> spiritual . . . I ma[k]e amends to all. . . . I made a list of all these people that I've harmed and [am] willing to make amends to them all, which is step eight, because I feel that [step eight is] very important for my life; [for] what I've done.  And the program that I go to, NA and AA, it's a program that I go to and I listen to other people's . . . testimonies and things, and maybe I'll get something out of it, but I'm not a drug user.  I've never been in alcohol problems, and I've never been involved in anything illegal when it[] [comes] to any kind of illegal substance.  So if I go to AA, it helps me out spiritually.  It helps me out with things . . . that I've done. . . . It helps . . . because I know that I've done some wrong things and I want to recognize those things. And I've recognized those things.

Id. at 37.

     Regarding his participation in the twelve-step programs, the BPH's Deputy Commissioner Harmon asked Petitioner if he had memorized all twelve steps.  Petitioner explained, "I have one to eight memorized, but I['m] going to be truthful, I really gave more

_____

[1]    When asked if he had a current prison job assignment, Petitioner explained that he has not held a job since 2004 when he was transferred from North Facility and that he is on a waiting list for work because the institution has no available jobs.  Doc. No. 1-1 at 26–27.

8

attention to step eight; make a list of all . . . to make amends to
them all.  I thought that was very important.  And on step five is
that I admit to God and to ourselves, and to other human beings the
exact nature of my wrong."  Doc. No. 1-1 at 36.  Later in the
hearing, Commissioner Harmon returned to the subject of Petitioner's
participation in the twelve-step programs, which they apparently had
discussed at Petitioner's prior parole suitability hearing in 2003:

> I asked you about the steps and at the time [of
> your 2003 hearing], . . . I said to you, did you
> ever learn the steps?  And you said, some of the
> steps.  And I said to you, you don't know them
> all?  All the years you've been in it and you
> don't know the steps? . . .  And then you go to
> explain all the steps and all, but it was
> obviously a concern and all that.  And we
> discussed the same things.  So it's not that
> we're picking on you, it's just that we just
> can't get an understanding of why you're in the
> program, and yet, you still can't –

Id. at 54.  At this point, Petitioner interrupted Commissioner
Harmon, and said:

> Look, Mr. Harmon, I told you that I enjoy
> going to the program.  I listen to a lot of the
> testimonies that the guys [give] and I feel that
> it will help me in a way that, if I met someone
> someday that is involved in drugs or alcohol,
> and et cetera, I can share verbally the
> experiences that I have heard through
> testimonies from the other guys what drugs and
> alcohol do to them.

Id.  Commissioner Harmon responded, "Okay, that's wonderful.  That's
wonderful.  I guess what I'm worried about is another kidnapping."
Id. at 55.  Commissioner Harmon continued:

> No, I'm telling you right up front.  What
> you did was one of the most conniving serious
> crimes that could happen to innocent people in
> their own home; a place of shelter, a place that
> should never ever be attacked.  And if I have a

> person that's sitting before me and I believe
> . . . that person's being deceptive, that's a
> real concern of mine.  And so that's why I'm
> asking you these questions.  Because . . . when
> I look through these [prior parole suitability
> hearing] transcripts, [I feel] I'm being snowed.
> That's what I look at is that there's a lot of
> verbiage going on, but nothing's happening.  I
> mean everybody knows the words remorse and
> insight, and all that kind of stuff, but I want
> to get down to the nitty gritty because the
> crime that you committed is one of the worst
> crimes that can happen in my mind to an innocent
> child and people.  So that's why I'm asking you
> these things.

Id.

At the conclusion of the evidentiary portion of the hearing,

the BPH rendered its decision, and found that Petitioner was "not

suitable for parole and would pose and unreasonable risk of danger

to society or a threat to public safety is released from prison at

this time."  Doc. No. 1-1 at 76.  The BPH explained the reasons for

the one-year denial:

> This was a cruel offense.  Multiple victims were
> involved in the same incident.  It was carried
> out in a pretty calculated manner . . . which
> demonstrated a callous disregard for human
> suffering, particularly related to the maid, Ms.
> Estelilla.  The conclusions are drawn from the
> statement of facts, which was taken from the
> probation officer's report, pages two to three
> which I'm incorporating by reference. . . .  As
> far as institutional behavior goes, the Panel
> believes that you have not yet sufficiently
> participated in beneficial self-help or therapy
> programs.  And we do note the misconduct while
> incarcerated was sixteen 128A counseling
> chronos, the last of which was August 25th ,
> 1999 for manipulating staff, which was more than
> seven years ago.
>
> . . . .
>
> Other information bearing unsuitability includes
> other factors of past mental state, past and

10

> present attitude towards the crime, signs of
> remorse, involvement in any other criminal
> misconduct, which is reliably documented and any
> other relevant reliable information or
> circumstances, which taken alone, may not firmly
> establish unsuitability, but which when taken
> together contribute to a pattern which results
> in unsuitability at this time.
>
> . . . .
>
> We really believe you're on the right track and
> [we] really want to emphasize that with you.  We
> really feel that you've made excellent progress,
> and the Panel believes you just need to develop
> some further insight into your behavior related
> to the life crime and remorse for all the
> victims including Ms. Estelilla who was
> terrorized more than anybody else in the whole
> crime.

Id. at 77.

The BPH then made the following findings:

> The prisoner needs further therapy in order to
> face, discuss, understand and cope with stress
> in a non-destructive manner.  Until additional
> progress is made, the prisoner continues to be
> unpredictable and a threat to others.
> Nevertheless, the prisoner should be commended
> for his recent completion of Cage Your Rage and
> particularly for having no serious
> disciplinaries the entire time [he's] been in
> prison, however, these positive aspects of [his]
> behavior don't outweigh the factors of
> unsuitability at this time.

Id. at 78.

Commissioner Harmon concluded the hearing by stating the

following:

> I think I've been very clear to
> [Petitioner] what . . . my expectations of him
> would be.  He can't put that many years into
> that particular program and not really gather
> from it what I think he should be able to.  You
> know, . . . if you're going to come back to the
> Board, and I'm going to be on that Panel, I'm
> sure going to expect you to be able to at least

11

tell me those steps that don't apply to drinking
and alcohol as you see them, but how the other
ones may benefit you.  Other than that, I'm
wondering if the other programs you've been
going through, you have not picked up on what
those programs represent either.  So you know,
if you're going to come in and represent
something, I sure want to know what you've
learned from those programs.  But other than
that, I mean you know, in the big scheme of
things, I do believe you're on the right track
as the Commissioner said.  You've got work to
do.  I can envision you at some point being
released from prison and I encourage you to
listen to what I say . . . in terms of what my
expectations are . . . if you were going to come
back before me.  I was disappointed today.  You
know, you gave me the same song and dance you
gave me a few years ago, and then I pull up the
initial hearing and I see you did the same thing
then.  And I can pull out the other ones too,
and I'm sure they're also talking about the same
areas, so you know, one thing I don't want to do
is mislead you.  You're serving a life term and
I'm not trying to play God, but I sure want to
make sure that when you walk out that door that
you're a different person than the person who
came in.  If that makes any sense to you.  My
first obligation is to public safety.

Id. at 79-80.

III. The State Court Decisions Regarding Petitioner's Challenges to
the BPH's October 26, 2006 Denial of Parole

The state superior court affirmed the decision of the BPH to

deny Petitioner parole.  Doc. No. 1-1 at 103.  The court noted:

The Board found the Petitioner unsuitable
for parole after a parole consideration hearing
held on October 26, 2006.  The Petitioner was
denied parole for one year.  The Board concluded
that the Petitioner was unsuitable for parole
and would pose an unreasonable risk of danger to
society and a threat to public safety.  The
board based its decision primarily upon his
commitment offense.

The Court finds that there is some evidence
to support the Board's findings that multiple
victims were attacked during the commitment

12

offense and that the offense was carried out in
a dispassionate and calculated manner.
[Citations.]  Ms. Estelilla was bound and gagged
and made to fear for her life during the
kidnapping.  Additionally, Ms. Takazato's baby
was kidnapped from his home.  Although no one
was harmed during the offense, these victims
were certainly traumatized by the kidnapping.
The Petitioner admits that he planned the
kidnapping for a couple of weeks.  He and his
accomplice plotted together and committed the
offense in a dispassionate and calculated
manner.

Id. at 103-04 (emphasis added).

The court further found, however, that there was

no evidence to support the Board's finding that
the commitment offense demonstrated an
exceptionally callous disregard for human
suffering.  [Citations.]  Although the
kidnapping was certainly a very serious offense,
it was not more aggravated or more violent than
an ordinary kidnapping for ransom.  Therefore,
it did not demonstrate an exceptionally callous
disregard for human suffering.  [Citation.]

Id. at 104 (emphasis added).

The court further observed:

The Board also considered the Petitioner's
prior grand theft conviction and the Board's
perception that he needs more therapy and self-
help in order to gain insight about his offense.
While these factors may not justify a finding of
unsuitability, the Board may properly consider
them as relevant to a determination of whether
the Petitioner is suitable for parole.

The Board also considered the Petitioner's
post-conviction gains, including his
participation in several anger management and
other self-help programs; his two completed
vocations; his multitude of job offers in the
United States and Trinidad; as well as his
commendable ability to remain free of any
serious discipline throughout his incarceration.
However, [the Board] still concluded that the
Petitioner would pose an unreasonable threat to
public safety.  [Citation.] . . . The nature of

13

1      <u>Petitioner's offense constitutes the modicum of</u>
       <u>evidence required to support the Board's finding</u>
2      <u>of unsuitability</u>.   [Citation.]

3           Accordingly, the petition is denied.

4   <u>Id.</u> at 104-05 (emphasis added).

5      The state appellate court also affirmed the BPH's decision to

6   deny Petitioner parole.  Doc. No. 1-1 at 108.  The state supreme

7   court summarily denied Petitioner's petition for review.  Doc. No.

8   4-12 at 2.  This federal Petition for a Writ of Habeas Corpus

9   followed.  Doc. No. 1.

10                          LEGAL STANDARD

11     In <u>Hayward</u>, the Ninth Circuit explained the law in California

12  as it relates to parole suitability determinations:

13          The California parole statute provides that
        the Board of Prison Terms "shall set a release
14      date unless it determines that the gravity of
        the current convicted offense or offenses, or
15      the timing and gravity of current or past
        convicted offense or offenses, is such that
16      consideration of the public safety requires a
        more lengthy period of incarceration for this
17      individual."   The crucial determinant of
        whether the prisoner gets parole in California
18      is "consideration of the public safety."

19          In California, when a prisoner receives an
        indeterminate sentence of fifteen years to life,
20      the "indeterminate sentence is in legal effect a
        sentence for the maximum term, subject only to
21      the ameliorative power of the [parole authority]
        to set a lesser term."  Under the California
22      parole scheme, the prisoner has a right to a
        parole hearing and various procedural guarantees
23      and rights before, at, and after the hearing; a
        right to subsequent hearings at set intervals if
24      the Board of Prison Terms turns him down for
        parole; and a right to a written explanation if
25      the Governor exercises his authority to overturn
        the Board of Prison Terms' recommendation for
26      parole.  Under California law, denial of parole
        must be supported by "some evidence," but review
27

28                              14

of the [decision to deny parole] is "extremely deferential."

Hayward, 603 F.3d at 561-62 (footnotes and citations omitted). The court further explained,

Subsequent to Hayward's denial of parole, and subsequent to our oral argument in this case, the California Supreme Court established in two decisions, In re Lawrence . . . and In re Shaputis, . . . that as a matter of state law, "some evidence" of future dangerousness is indeed a state sine qua non for denial of parole in California.  We delayed our decision in this case so that we could study those decisions and the supplemental briefs by counsel addressing them.  As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." . . .  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  . . .  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. . . .  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes and citations omitted).

After providing this background on California law as it applies to parole suitability determinations, the court then explained the role of a federal district court charged with reviewing the decision of either the BPH or the governor denying a prisoner parole. According to the Ninth Circuit, this Court must decide whether a decision "rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an

15

unreasonable determination of the facts in light of the evidence.'"
Hayward, 603 F.3d at 562–63 (citations omitted); see also Cooke v.
Solis, 606 F.3d 1206, 1208, n. 2 & 1213 (9th Cir. 2010) (applying
Hayward and explicitly rejecting the state's argument that "the
constraints imposed by AEDPA preclude federal habeas relief" on
petitioner's claim; noting that in Hayward, the court "held that due
process challenges to California courts' application of the 'some
evidence' requirement are cognizable on federal habeas review under
AEDPA").

DISCUSSION

I.   California Law Regarding Parole Suitability Determinations

When assessing whether California's parole board's suitability
determination was supported by "some evidence," the court's analysis
is framed by the "regulatory, statutory and constitutional
provisions that govern parole decisions in California." Cooke, 606
F.3d at 1213 (citing In re Rosenkrantz, 29 Cal. 4th 616 (2002)); see
Hayward, 603 F.3d at 561–62. Under California law, prisoners
serving indeterminate life sentences, like Petitioner, become
eligible for parole after serving minimum terms of confinement
required by statute. In re Dannenberg, 34 Cal. 4th 1061, 1069–70
(2005). Regardless of the length of the time served, "a life
prisoner shall be found unsuitable for and denied parole if in the
judgment of the panel the prisoner will pose an unreasonable risk of
danger to society if released from prison." Cal. Code Regs. tit.
15, § 2402(a). In making this determination, the BPH must consider
various factors, including the prisoner's social history, past and

present mental state, past criminal history, the base and other
commitment offenses, including behavior before, during and after the
crime, past and present attitude toward the crime and any other
information that bears on the prisoner's suitability for release.
See Cal. Code Regs. tit. 15, § 2402(b)-(d).

In considering the commitment offense, the BPH must determine
whether "the prisoner committed the offense in an especially
heinous, atrocious or cruel manner."  Cal. Code Regs. tit. 15,
§ 2402(c)(1).  The factors to be considered in making that
determination include:  "(A) Multiple victims were attacked, injured
or killed in the same or separate incidents; (B) The offense was
carried out in a dispassionate and calculated manner, such as an
execution-style murder; (C) The victim was abused, defiled or
mutilated during or after the offense; (D) The offense was carried
out in a manner which demonstrates an exceptionally callous
disregard for human suffering; (E) The motive for the crime is
inexplicable or very trivial in relation to the offense."  Id.

As the Ninth Circuit observed in Hayward, the California
Supreme Court has held that, "the core statutory determination
entrusted to the Board and the Governor [in determining a prisoner's
parole suitability] is whether the inmate poses a current threat to
public safety . . . ."  In re Lawrence, 44 Cal. 4th 1181, 1191
(2008).  And, "the core determination of 'public safety' under the
statute and corresponding regulations involves an assessment of an
inmate's current dangerousness."  Id. at 1205 (emphasis in original)
(citing Rosenkrantz, 29 Cal. 4th 616 and Dannenberg, 34 Cal. 4th

17

1061).   The court further explained that:

> a parole release decision authorizes the Board
> (and the Governor) to identify and weigh only
> the factors relevant to predicting "whether the
> inmate will be able to live in society without
> committing additional antisocial acts." . . .
> These factors are designed to guide an
> assessment of the inmate's threat to society, if
> released, and hence could not logically relate
> to anything but the threat <u>currently</u> posed by
> the inmate.

<u>Lawrence</u>, 44 Cal. 4th at 1205-06 (citations omitted).   The relevant

inquiry, therefore, is:

> whether the circumstances of the commitment
> offense, when considered in light of other facts
> in the record, are such that they continue to be
> predictive of current dangerousness many years
> after commission of the offense.   This inquiry
> is, by necessity and by statutory mandate, an
> individualized one, and cannot be undertaken
> simply by examining the circumstances of the
> crime in isolation, without consideration of the
> passage of time or the attendant changes in the
> inmate's psychological or mental attitude.

<u>In re Shaputis</u>, 44 Cal. 4th 1241, 1254-55 (2008).

The evidence of current dangerousness "must have some indicia

of reliability."   <u>In re Scott</u>, 119 Cal. App. 4th 871, 899 (2004)

(<u>Scott I</u>).   Indeed, "the 'some evidence' test may be understood as

meaning that suitability determinations must have some rational

basis in fact."   <u>In re Scott</u>, 133 Cal. App. 4th 573, 590, n. 6

(2005) (<u>Scott II</u>).

Subsequent to <u>Hayward</u>, the Ninth Circuit issued decisions in

<u>Cooke</u>, 606 F.3d 1206, and <u>Pirtle</u>, 2010 WL 2732888, both of which

focused on the notion that the "some evidence" of current dangerous

must be reliable.   In <u>Cooke</u>, the court ultimately reversed the

district court's denial of Cooke's challenge to the BPH's decision

18

denying him parole, finding that the BPH's stated reasons for denying parole did not support the conclusion that Cooke posed a current threat to public safety. <u>Cooke</u>, 606 F.3d at 1216. Specifically, the court stated:

> [E]ach of the Board's findings . . . lacked any evidentiary basis. Nothing in the record supports the state court's finding that there was "some evidence" in addition to the circumstances of the commitment offense to support the Board's denial of Petitioner's parole. The Parole Board's findings were individually and <u>in toto</u> unreasonable because they were without evidentiary support. When habeas courts review the "some evidence" requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings. Here, there was no evidence that reasonably supports either the necessary subsidiary findings or the ultimate "some evidence" finding. Accordingly, we hold that the state court decision was "'based on an unreasonable determination of the facts in light of the evidence.'" <u>Hayward</u>, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2). Cooke is entitled to a writ of habeas corpus.

<u>Id.</u>; <u>see also</u> <u>Pirtle</u>, 2010 WL 2732888 at *8 (affirming the district court's decision to grant habeas relief, concluding, "In sum, there is no evidence in the record to support the Board's finding that Pirtle poses a current threat to public safety. The Board's stated reasons for the denial of parole either lacked evidentiary support, had no rational relationship to Pirtle's current dangerousness, or both.")

II.  Analysis of Petitioner's Claim

Petitioner seeks federal habeas corpus relief from the BPH's October 26, 2006 decision finding him unsuitable for parole on the ground that the decision did not comport with due process. Doc. No.

19

1.

Respondent argues that Petitioner is not entitled to relief because he has not demonstrated that the state court decision was contrary to, or an unreasonable application of, the California "some evidence" standard, or that it was based on an unreasonable determination of the facts in light of the evidence.  Doc. Nos. 4 & 7.  In its supplemental post-Hayward briefing, Respondent notes that the state appellate court was the highest state court to address the merits of Petitioner's claim in a reasoned decision.  That decision read, in its entirety, "The court has read and considered the petition for writ of habeas corpus filed January 15, 2008.  The petition is denied.  The record submitted reflects some evidence to support the challenged decision.  In re Dannenberg (2005) 34 Cal. 4th 1061, 1071, 1080; In re Rosenkrantz (2002) 29 Cal. 4th 616, 664-665."

Because in its decision denying Petitioner relief, the state superior court provided not just a legal conclusion and unexplained case citations, but analysis as well, it is that decision that the Court analyzes under AEDPA.  See LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000); Williams v. Rhoades, 354 F.3d 1101, 1106 (federal court may look to any lower state court decision that was examined, and whose reasoning was adopted, by the highest state court to address the merits of a petitioner's claim).

As the superior court noted in upholding the BPH's finding that Petitioner was unsuitable for parole, the BPH "based its decision primarily upon his commitment offense."  The superior court

concluded that "[t]he nature of Petitioner's offense constitutes the modicum of evidence required to support the Board's finding of unsuitability."  Doc. No. 1-1 at 103 & 105.  As explained below, after careful review of the record, the Court finds that the state courts' approvals of the BPH's decision to deny Petitioner parole were an unreasonable application of the California "some evidence" standard, and were based on an unreasonable determination of the facts in light of the evidence presented in the state courts.  See Hayward, 603 F.3d at 562-63.

Although the BPH relied almost solely on the commitment offense, it noted other reasons for a finding of unsuitability, which included "past mental state, past and present attitude towards the crime, signs of remorse and involvement in any other criminal misconduct."  Doc. No. 1-1 at 77.  But an examination of the record shows these findings are not only unsupported by any evidence in the record, but are, in fact, contradicted by it.  See Cooke, 606 F.3d at 1216 (when habeas courts review the "some evidence" requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence must have reasonable factual support); Pirtle, 2010 WL 2732888 at *8.

In his August 4, 2006 psychological evaluation prepared for and submitted as evidence at Petitioner's October 26, 2006 parole suitability hearing, under the heading "Current Mental Status/Treatment Needs," Dr. Marek observed:

> [Petitioner] was oriented to time, place
> and person, evincing no symptomatology.  He was
> not depressed and exhibited congruent affect.
> He was calm and cooperative.  His behavior was

1
           appropriate.  His is estimated to be in the
           average range of intellectual functioning.  He
2
           exhibited good insight and remorse, especially
           as it relates to his crime.
3

4
Doc. No. 1-1 at 84.  Under the heading "Clinical Observations/

Comments/Recommendations," the psychologist observed:
5

6
           [Petitioner] is competent and responsible
           for his behavior.  He has the capacity to abide
           by institutional standards and has done so for
7
           the last several years.  He does not have a
           mental health disorder which would necessitate
8
           treatment either during his incarceration or on
           parole.  He is to be commended for his continued
9
           participation in [Alcoholics Anonymous].  Since
           his last hearing, he says he has completed
10
           another self-help group, Anger Management.  No
           treatment recommendations are being made because
11
           he does not have a mental health disorder.
           Parole decisions should be based on custody
12
           factors.

13
Id. at 85; see id. at 41-42.  The psychologist further noted that

14
the "prognosis is positive for [Petitioner] to be able to maintain

15
his current mental state in the community upon parole."  Id. at 85.

16
And, as noted above, Dr. Marek's evaluation indicated Petitioner did

17
not require mental health treatment, either while in prison or on

18
parole, a statement that lies in direct contrast to the BPH's

19
factually unsupported conclusion that Petitioner "needs further

20
therapy in order to face, discuss, understand and cope with stress

21
in a non-destructive manner."  Doc. No. 1-1 at 78.

22
    In the area of Assessment of Dangerousness, the psychologist

23
found that

24
           [Petitioner's] violence potential is obviously
           lower than the average inmate based on his good,
25
           recent institutional adjustment.  If released to
           the community, his violence potential is
26
           estimated to be no higher than the average
           citizen in the community.  It appears his
27

28

involvement in the incident offense was
essentially an aberration for him.  There are no
obvious or significant violence precursors for
him.

Id. at 41; see id. at 85.

Petitioner's two prior psychological evaluations provided

similar conclusions regarding his mental state and lack of need for

treatment.  In an evaluation dated December 5, 2002, under the

heading "Current Mental Status/Treatment Needs," a different

psychologist observed:

[Petitioner] was cooperative and alert.  He
was appropriately dressed and groomed.  His
speech was normally articulate and contextually
meaningful.  His mood and affect were within
normal limits.  His behavior was appropriate to
content.  His intellectual functioning was
clinically estimated to be within average to
above average range.  There was no evidence of a
mood or thought disorder.  His judgment appeared
to be sound.

Id. at 89.  This psychologist concluded:  "[Petitioner's] prognosis

is positive for being able to maintain his current mental state in

the community upon parole."  Id.  In yet another psychological

evaluation dated March 27, 1996, a third psychologist concluded:

[Petitioner] has acquired a much more
positive attitude over the past two-three years.
There are no [serious disciplinary violations].
There is no diagnosable psychopathology.
Violence potential within the institutional
setting has been much less than average and in a
less controlled setting, such as return to the
community, violence potential would continue to
be much less than average.

Id. at 93.

Regarding Petitioner's signs of remorse, Dr. Marek, who

conducted Petitioner's most recent psychological evaluation,

23

observed that he "took full responsibility for his role in the kidnapping. He exhibited remorse and had good insight into the harm that was caused. His remorse for his crime appears to be genuine and appropriate." Doc. No. 1-1 at 85; <u>see id.</u> at 41. And, as noted earlier, at the hearing, Petitioner spoke at length regarding the depths of his remorse over what he had done. <u>See</u> Doc. No. 1-1 at 15-16, 20, 39-40 & 57-59.

In light of this evidence regarding Petitioner's past and present mental state and signs of remorse, as well as the conclusions of three psychologists that Petitioner's violence potential was no higher than that of the average citizen in the community, the Court finds no evidence to support the BPH's conclusion that Petitioner exhibited lack of remorse and poor insight into his crime. <u>See</u> <u>Cooke</u>, 606 F.3d at 1216; <u>Pirtle</u>, 2010 WL 2732888 at *8 ("[t]he record contains no evidence that contradicts [the] professional assessment [of the psychologist who concluded the petitioner] was neither unstable [n]or potentially dangerous"). Similarly, here, there was no reliable evidence to suggest that if released on parole, Petitioner would pose an unreasonable risk of danger to society or a threat to public safety. <u>See</u> Cal. Code Regs. tit. 15, § 2402(a).

The Court therefore concludes that the state courts' determinations that the BPH's findings constituted "some evidence" of current dangerousness was an "'unreasonable application' of the California 'some evidence' requirement, and was 'based on an unreasonable determination of the facts in light of the evidence.'"

24

1    Hayward, 603 F.3d at 562–63 (citations omitted); see Cooke, 606 F.3d

2    at 1216; Pirtle, 2010 WL 2732888 at *8.  As a result, Petitioner is

3    entitled to federal habeas relief.

                              CONCLUSION

5        For the foregoing reasons, the Petition for a Writ of Habeas

6    Corpus is GRANTED.  Within thirty (30) days from the date of this

7    Order, the BPH must set a parole date for Petitioner unless it finds

8    new evidence, arising after the 2006 hearing, of current

9    dangerousness.  Within ten (10) days thereafter, Respondent must

10   file a notice with the Court confirming Petitioner's parole date.

11   Within seven (7) days after the parole date, Respondent must file a

12   notice informing the Court whether Petitioner was released on

13   parole.  The Court retains jurisdiction to enforce its Order.

14       The Clerk of the Court shall terminate all pending motions,

15   enter judgment and close the file.  Each party shall bear his own

16   costs.

18       IT IS SO ORDERED.

20   Dated: 8/6/2010

                                 CLAUDIA WILKEN
                                 United States District Judge

25

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

KEITH HOLDER,

          Plaintiff,

  v.

BEN CURRY et al,

          Defendant.

_____/

Case Number: CV08-02572 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 6, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Keith  Holder
E87291
P.O. Box 689 - FW233
Soledad,  CA 93960

Dated: August 6, 2010

          Richard W. Wieking, Clerk
          By: Nikki Riley, Deputy Clerk